Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

# UNITED STATES DISTRICT COURT

for the

Northern District of Mississippi

Oxford Division

**RECEIVED**

**AUG 25 2025**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

|  |  |
|---|---|
| Ehiremen Bennard Eriakha | Case No. 3:25-cv-250-DMB-RP |
| *Plaintiff(s)* | *(to be filled in by the Clerk's Office)* |
| –v– | |
| University of Mississippi; Dr. Yi Yang; Dr. Marie Barnard; Dr. Annette Kluck; Dr. Yinan Huang | |
| *Defendant(s)* | |

## COMPLAINT AND REQUEST FOR INJUNCTION
## JURY TRIAL DEMANDED

### I.   The Parties to This Complaint

**A.   The Plaintiff(s)**

| | |
|---|---|
| Name | Ehiremen Bennard Eriakha |
| Street Address | 1802 Jackson Avenue West, Apartment 83 |
| City and County | Lafayette County, Oxford |
| State and Zip Code | Mississippi, 38655 |
| Telephone Number | 662-274-0258 |
| E-mail Address | eriakhabernard@gmail.com |

**B.   The Defendant(s)**

Defendant No. 1

| | |
|---|---|
| Name | University of Mississippi |
| Job or Title *(if known)* | Public Institution |
| Street Address | |

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

|  |  |
|---|---|
| City and County | Oxford, Lafayette County |
| State and Zip Code | Mississippi 38677 |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 2

|  |  |
|---|---|
| Name | Dr. Yi Yang |
| Job or Title *(if known)* | Chair, Department of Pharmacy Administration |
| Street Address | 225 Faser Hall |
| City and County | Oxford, Lafayette County |
| State and Zip Code | Mississippi 38677 |
| Telephone Number | |
| E-mail Address *(if known)* | yiyang@olemiss.edu |

Defendant No. 3

|  |  |
|---|---|
| Name | Dr. Marie Barnard |
| Job or Title *(if known)* | Graduate Program Coordinator, Pharmacy Administration |
| Street Address | 234 Faser Hall |
| City and County | Oxford, Lafayette County |
| State and Zip Code | Mississippi 38677 |
| Telephone Number | |
| E-mail Address *(if known)* | mbarnard@olemiss.edu |

Defendant No. 4

|  |  |
|---|---|
| Name | Dr. Annette Kluck |
| Job or Title *(if known)* | Dean of the Graduate School |
| Street Address | Graduate School |
| City and County | Oxford, Lafayette County |
| State and Zip Code | Mississippi 38677 |
| Telephone Number | |
| E-mail Address *(if known)* | askluck@olemiss.edu |

Defendant No. 5

|  |  |
|---|---|
| Name | Dr. Yinan Huang |
| Job or Title *(if known)* | Faculty Member |
| Street Address | 235 Faser Hall |
| City and County | Oxford, Lafayette County |
| State and Zip Code | Mississippi 38677 |
| Telephone Number | |

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

E-mail Address *(if known)*    yhuang9@olemiss.edu

## II.    Basis for Jurisdiction

What is the basis for federal court jurisdiction? *(check all that apply)*

☒ Federal question          ☐ Diversity of citizenship

This case arises under the following federal statutes and constitutional provisions.

### Constitutional Provisions

1. First Amendment to the United States constitution — protecting Plaintiff's rights to free expression, petition, and association, including protection against retaliation for engaging in protected speech, filing rebuttals, and maintaining familial association.

2. Equal Protection Clause of the Fourteenth Amendment — prohibiting selective, arbitrary, or discriminatory treatment by public officials, and requiring that similarly situated individuals be treated equally under the law.

3. Due Process Clause of the Fourteenth Amendment — guaranteeing both procedural due process (notice, disclosure of standards, impartial adjudication, and a meaningful opportunity to be heard) and substantive due process protections against arbitrary, capricious, and retaliatory departures from accepted academic norms.

### Federal Statutes

4. 42 U.S.C. § 1983 — providing a federal cause of action for deprivations of constitutional and statutory rights committed under color of state law.

5. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d — prohibiting discrimination on the basis of race, color, or national origin in federally funded programs.

### State Law (Supplemental Jurisdiction)

6. Breach of Contract under Mississippi law — arising from the University of Mississippi's failure to adhere to its own published academic policies and its violation of the signed July 19, 2024 Mentor–Mentee Agreement.

*Note: Paragraph 6 raises a state-law claim for breach of contract. This Court has supplemental jurisdiction over that claim under 28 U.S.C. § 1367, as it arises from the same set of facts as Plaintiff's federal claims.*

### Color of State Law and Qualified Immunity

7. All Defendants acted under color of state law and within the scope of their official duties. By 2025, it was clearly established that retaliation, arbitrary status changes, and deprivation of tuition remission and assistantship funding without due process were unlawful. No reasonable official could have believed such conduct lawful, defeating any claim of qualified immunity.

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

### III. Statement of Claim

A. Where did the events giving rise to your claim(s) occur?

The events giving rise to these claims occurred primarily at the University of Mississippi's Oxford campus. Specific locations include the Department of Pharmacy Administration (Faser Hall), the Graduate School, and various university administrative offices involved in academic evaluation, assistantship administration, and disciplinary proceedings.

B. What date and approximate time did the events giving rise to your claim(s) occur?

The relevant events giving rise to Plaintiff's claims occurred between July 2024 and August 2025, as follows:

a. July 19, 2024 — Plaintiff executed a signed, Department-approved Mentor–Mentee Agreement with faculty member Dr. Yinan Huang, guaranteeing a one-on-one mentoring relationship as a central framework for his doctoral studies, research trajectory, and professional development.

b. June 13, 2025 — Department Chair Dr. Yi Yang unilaterally dismantled the Agreement, imposed coerced co-mentorship, and began attending Plaintiff's research meetings, converting them into forums of surveillance and intimidation.

c. June 30, 2025 — Graduate Program Coordinator Dr. Marie Barnard and Chair Dr. Yang issued a disciplinary memorandum alleging "non-submission" of an Abilities Transcript ("AT") and threatening probationary sanctions, despite Plaintiff's repeated good-faith communications documenting his willingness to complete the requirement under safe and transparent mentoring conditions.

d. July 9, 2025 — Plaintiff submitted a detailed written rebuttal contesting the allegations, formally objecting to the coercive and procedurally improper process, and requesting clarification, redress, and adherence to policy.

e. July 17, 2025 — Plaintiff's mentor, Dr. Yinan Huang, admitted in a virtual meeting that the restructuring of Plaintiff's mentoring arrangement was imposed by the Department to "protect her" and appease faculty interests, not grounded in mutual consent, policy, or academic judgment.

f. August 21, 2025 — Dr. Marie Barnard issued a memorandum recommending that Plaintiff be reduced to provisional status, adding new requirements never before cited, creating a "moving target" to justify sanctions.

g. August 22, 2025 — Dean Annette Kluck ratified the downgrade to provisional status, and Dr. Yang immediately denied Plaintiff's assistantship renewal on the basis of that downgrade — after having withheld his customary July renewal letter while internally assigning him teaching responsibilities.

Summary:
These coordinated actions dismantled Plaintiff's mentoring support, jeopardized his academic standing, stripped him of tuition remission, stipend, and health insurance, and placed his lawful F-1 visa status at immediate risk. Collectively, they amount to constructive expulsion and reflect a pattern of retaliatory, discriminatory, and bad-faith conduct.

C.  What are the facts underlying your claim(s)?

**COUNT I – RETALIATION**
*(First Amendment to the U.S. Constitution, via 42 U.S.C. § 1983)*

**Against:** The University of Mississippi; Dr. Yi Yang (individual and official capacities); Dr. Marie Barnard (individual and official capacities); Dr. Annette Kluck (individual and official capacities); and Dr. Yinan Huang (individual and official capacities).

**Legal Authorities**

(a) *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) — public institutions may not retaliate against individuals for protected expression.

(b) *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) — adverse actions are unlawful if they would dissuade a reasonable person from engaging in protected activity.

(c) *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) — shifting and inconsistent explanations constitute evidence of pretext.

(d) *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) — while limiting protection for speech made pursuant to official job duties, the Court reaffirmed that citizen speech on matters of public concern, including petitions and formal complaints to government entities, remains protected by the First Amendment.

(e) *Adler v. Pataki*, 185 F.3d 35 (2d Cir. 1999) — retaliation against an individual for the protected activity of a close family member violates the First Amendment.

(f) *Bd. of Curators v. Horowitz*, 435 U.S. 78, 91 (1978) — academic deference applies only to bona fide academic judgments, not disciplinary or retaliatory measures.

(g) *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) — courts defer to universities only when decisions are grounded in reasoned academic judgment, made in good faith.

**Allegations**

**Factual Background: Plaintiff's Academic Record Establishing Absence of Deficiency**

1. Plaintiff Ehiremen (Bennard) Eriakha is a doctoral student in the Department of Pharmacy Administration at the University of Mississippi. Since his enrollment in August 2023, he has remained continuously in good academic standing, fulfilling every academic and professional requirement of the program.

2. Over the course of four academic semesters, Plaintiff has never received less than an A+ in any course and has maintained a perfect grade point average of 4.0 on a 4.0 scale.

3. At no point did Plaintiff fail or withdraw from coursework, receive any evaluation of academic deficiency, or face criticism of his scholarship, research productivity, or professional competence.

4. To the contrary, Plaintiff consistently met or exceeded expectations, earning multiple honors for scholastic and professional excellence.

5. These honors included:

(a) Recognition as a Top 5% Finalist by the International Society for Pharmacoeconomics and Outcomes Research (ISPOR 2024) for research presented at its annual conference in Atlanta, Georgia;

(b) Induction into Phi Kappa Phi in August 2024, awarded only to the top 10% of graduate students achieving scholarly distinction;

(c) The Teaching Assistant of the Year Award from the School of Pharmacy in April 2024 for outstanding contributions to student learning;

(d) Induction into the Gamma Beta Phi National Honor Society in November 2024, recognizing academic excellence and service among students in U.S. colleges and universities; and

(e) Recognition by the Rho Chi Society in April 2025 for distinguished academic and professional achievement in pharmacy.

6. Plaintiff's record reflects continuous excellence, eliminating any legitimate academic or professional basis for the adverse actions imposed.

**Protected Activities**

7. The First Amendment safeguards Plaintiff's rights to free speech, petition, and association, including:

(a) The right to object to coercive, retaliatory, or improper academic procedures;

(b) The right to submit rebuttals and written objections contesting adverse departmental actions; and

(c) The right to associate with and support his twin brother, Omokhodion (Alfred) Eriakha, who himself engaged in protected activities by filing formal complaints alleging contract breaches, due process violations, retaliation, and denial of disability accommodations.

8. Plaintiff exercised these constitutional rights in multiple ways, including but not limited to:

(a) Submitting written objections (June 13–24, 2025) contesting the dismantling of his signed one-on-one mentoring agreement;

(b) Objecting to the Department Chair's coercive attendance at, and surveillance of, his research and mentoring meetings;

(c) Raising concerns about coercion, psychological safety, retaliation, and procedural fairness;

(d) Filing a formal written rebuttal on July 9, 2025 (Exhibit D) to a disciplinary memorandum issued on June 30, contesting its factual inaccuracies, procedural defects, and retaliatory purpose, and expressly requesting redress; and

(e) Maintaining familial association with his twin brother Alfred, whose protected activities — including filing complaints of retaliation, breach of contract, due process violations, and denial of disability accommodations — were known to the Department and University.

**Binding Mentor–Mentee Agreement Guaranteeing One-on-One Mentorship**

9. On July 19, 2024, Plaintiff executed a formal, signed Mentor–Mentee Agreement with faculty

member Dr. Yinan Huang.

10. The Agreement, which was expressly approved by the Department, established a one-on-one developmental mentoring relationship intended to ensure stability, academic guidance, and professional development.

11. The Agreement represented a core component of Plaintiff's doctoral program and formed part of the academic framework on which Plaintiff reasonably relied in structuring his research, coursework, and long-term professional trajectory.

12. By formally documenting the mentor-mentee expectations in a signed, Department-approved Agreement, the University created binding program obligations, constraining arbitrary alteration and negating any claim that subsequent departures were protected exercises of unfettered academic discretion.

13. For nearly one year, Plaintiff engaged in a stable and productive mentoring relationship with Dr. Huang, his formally assigned mentor under the Agreement.

14. This relationship consistently provided constructive feedback, research collaboration, and academic guidance, and it fostered the trust and stability essential to Plaintiff's progress and professional development.

## Coercive Restructuring and Surveillance in Violation of Mentoring Agreement

15. On June 13, 2025, Department Chair Dr. Yi Yang unilaterally dismantled Plaintiff's established mentoring arrangement with Dr. Huang.

16. Without Plaintiff's consent, notice, or reference to any written policy, Dr. Yi Yang inserted herself as a co-mentor, effectively converting the agreed-upon one-on-one mentoring relationship into a coerced and involuntary co-mentorship in direct violation of the signed Agreement.

17. Simultaneously, Dr. Yang began attending Plaintiff's weekly research meetings with Dr. Huang.

18. These meetings, previously conducted exclusively between Plaintiff and Dr. Huang, had provided a safe forum for constructive feedback, research development, and psychological support.

19. Dr. Yang's unexplained attendance fundamentally altered the character of these meetings, transforming them from collaborative mentoring sessions into exercises in surveillance, coercion, and intimidation.

20. These adverse actions occurred in close temporal proximity to the protected activity of Plaintiff's twin brother, Omokhodion (Alfred) Eriakha, who in Spring 2025 filed multiple formal complaints alleging breach of contract, retaliation, due process violations, and denial of disability accommodations, the most recent of which was filed on June 3, 2025.

21. The Department was fully aware of Alfred's protected activities, and the close temporal proximity between his complaints and Dr. Yang's intrusive interventions establishes a strong inference that Plaintiff was targeted not for any academic deficiency but in retaliation for his association with Alfred's protected advocacy — conduct squarely prohibited by the First Amendment's protections against retaliation by association (see Adler v. Pataki, 185 F.3d 35 (2d Cir. 1999)).

## Complaint Regarding Increased Surveillance, Coercion, Psychological Safety, and Breach of Signed Agreement

22. Between June 13 and June 24, 2025, Plaintiff submitted multiple written, good-faith objections to the dismantling of his signed one-on-one mentoring agreement and the imposition of coerced co-mentorship.

23. These objections were known to the following individuals:

(a) Dr. Yinan Huang, Plaintiff's assigned developmental mentor;

(b) Dr. Yi Yang, Chair of the Department of Pharmacy Administration;

(c) Dr. Marie Barnard, Graduate Program Coordinator; and

(d) Dr. Annette Kluck, Dean of the Graduate School.

24. In his objections, Plaintiff explained that the restructuring violated the signed Mentor–Mentee Agreement, lacked any written policy basis, and undermined the psychological safety that is essential to an effective mentoring relationship.

25. Plaintiff specifically requested that the Department honor the signed Mentor–Mentee Agreement and implement transparent, non-coercive, and psychologically safe mentoring practices. These written objections constituted protected speech and petitioning activity under the First Amendment and placed Defendants on clear notice that Plaintiff opposed mentoring practices that were coercive and departed from established professional norms.

**Shifting Rationales and Inconsistent Justifications as Evidence of Pretext**

26. Rather than respond directly to Plaintiff's written objections, Defendants offered shifting and contradictory rationales for dismantling the signed one-on-one mentoring arrangement:

(a) Dr. Yang initially asserted the restructuring was for *"Dr. Huang's professional development"* and had been *"approved by all tenured faculty."*

(b) In a July 17, 2025 virtual meeting, Dr. Huang admitted the changes were imposed to *"protect her"* as she prepared to depart the University and to *"keep the faculty happy"* in order to preserve access to research data.

(c) In the same meeting, Dr. Huang further stated: *"Dr. Yang was the one who recruited me. She sponsored you during the summer. She pays you."* This statement was intended to compel Plaintiff's compliance with actions that lacked any policy basis, violated the signed Mentor–Mentee Agreement, and departed from established mentoring practices that Plaintiff had already identified as coercive, psychologically unsafe, and harmful to his professional development.

27. These inconsistent and self-serving explanations confirm that the increased surveillance and restructuring were not the product of academic judgment but of administrative convenience and retaliation. Shifting rationales of this type are widely recognized as hallmarks of pretext and unlawful motive. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

**Misuse of Administrative Tools to Punish Protected Activity**

28. On June 30, 2025, just six days after Plaintiff lodged his written objections to the dismantling of his signed mentor-mentee agreement and the imposition of coercive surveillance, Defendants, Dr. Marie Barnard and Dr. Yi Yang issued a disciplinary memorandum falsely alleging that Plaintiff had "failed

to meet a non-coursework academic performance expectation" by "refusing" to submit his Abilities Transcript ("AT").

29. The memorandum further threatened to reclassify Plaintiff to provisional status for the alleged "non-submission" of the AT. This marked the first formal disciplinary sanction threatened against Plaintiff directly in response to his protected objections.

30. The June 30 memorandum was both factually inaccurate and procedurally defective.

31. First, Plaintiff had repeatedly documented his willingness to complete the AT under safe and transparent mentoring conditions and had actively sought to finalize the process. Defendants disregarded these communications and instead rebranded Plaintiff's protected objections to inappropriate and coercive mentoring practices as "noncompliance."

32. Second, the AT is not a graded course assignment, qualifying examination, or research deliverable. It is a developmental reflection tool intended to facilitate mentoring dialogue and student growth. By mislabeling the AT as an "academic performance expectation," Defendants distorted departmental policy and converted a formative, non-punitive instrument into a disciplinary tool.

33. This deliberate distortion and repurposing establishes Defendants' misuse of administrative tools to punish Plaintiff for exercising protected rights. It further demonstrates a substantial departure from accepted academic norms, thereby removing the presumption of academic deference. See Bd. of Curators v. Horowitz, 435 U.S. 78, 91 (1978); Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985).

**Rebuttal Letter as Protected Activity and Institutional Stonewalling**

34. On July 9, 2025, Plaintiff submitted a detailed written rebuttal letter (Exhibit D) contesting the June 30 memorandum as factually inaccurate, procedurally defective, and retaliatory.

35. This rebuttal letter was submitted to Dr. Marie Barnard, Graduate Program Coordinator, with the following individuals copied:

(a) Dr. Yinan Huang, Plaintiff's assigned developmental mentor;

(b) Dr. Yi Yang, Chair of the Department of Pharmacy Administration;

(c) Dr. Annette Kluck, Dean of the Graduate School;

(d) Dr. Jennifer Simons, Assistant Provost;

(e) Dr. Noel Wilkin, Provost; and

(f) The Office of the Provost.

36. This rebuttal letter constituted core petitioning activity protected by the First Amendment. See Garcetti v. Ceballos, 547 U.S. 410, 421 (2006) (distinguishing between official-duty speech and protected citizen petitioning). It directly invoked Plaintiff's right to due process by raising contractual, procedural, and constitutional objections, and formally requesting institutional redress.

37. Defendants never acknowledged or responded to the rebuttal letter, thereby depriving Plaintiff of a meaningful opportunity to be heard by those who initiated the sanction and violating his procedural due process rights. See Goss v. Lopez, 419 U.S. 565, 579 (1975).

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

38. Plaintiff had raised his concerns in good faith to every level of authority available — his mentor, Department Chair, Graduate Program Coordinator, Dean of the Graduate School, Assistant Provost, and Provost. His July 9 rebuttal thus exhausted all internal remedies available to him.

## Policy Violations, Circular Justifications, and Pretextual Denial of Funding

39. On August 21, 2025, Dr. Marie Barnard—without ever addressing Plaintiff's July 9 rebuttal letter—issued a disciplinary memorandum formally recommending to Dean Annette Kluck that Plaintiff be reduced to provisional status. This action escalated the disciplinary measures against Plaintiff and marked the second formal disciplinary sanction.

40. The August 21 memorandum introduced new and expanded requirements for which Plaintiff had never previously been identified as deficient, in a post hoc attempt to manufacture an "academic deficiency" and retroactively rationalize the disproportionate sanction of provisional status.

41. On August 22, 2025, Dean Annette Kluck ratified the downgrade of Plaintiff to provisional status. Her letter (Exhibit M) omitted mandatory safeguards expressly required by the University of Mississippi's Policies and Procedures (M Book) governing changes to graduate student status, including:

(a) the requirement that status changes be recommended by an appropriate faculty group (e.g., advisory or graduate education committee), not unilaterally by the Graduate Program Coordinator and Department Chair;

(b) the requirement that only documented academic performance deficiencies may justify such sanctions, serving as a safeguard against the misuse of developmental tools such as the Abilities Transcript; and

(c) the requirement that dismissal or status changes "ordinarily … take effect between semesters or enrollment periods," to protect students from sudden disruptions that jeopardize enrollment, financial aid, and immigration status.

42. By intentionally omitting these safeguards, Dean Annette Kluck both misrepresented and misapplied University policy.

43. That same day, August 22, 2025, Chair Dr. Yi Yang replied to Plaintiff's August 19 inquiry regarding his missing graduate research assistantship renewal letter, informing Plaintiff that he was "not eligible" for an assistantship due to his provisional status, which had been imposed earlier that same day.

44. This reasoning was circular and pretextual: Defendants first violated University policy by imposing provisional status without cany documented academic performance deficiency, without faculty-group recommendation, and at the start of a semester, then relied on that improper downgrade as the sole basis for denying Plaintiff's graduate research assistantship—demonstrating pretext and retaliatory motive.

## Premeditated and Pretextual Retaliatory Actions

43. The retaliatory and pre-meditated nature of Defendants' actions were most clearly revealed in the assistantship non-renewal sequence. In prior academic years, renewal letters for the fall semester were consistently issued in July, prior to the start of the semester, thereby creating a settled expectation of reappointment before any teaching or proctoring duties were assigned.

44. In 2025, however, Defendants deliberately deviated from this established practice: they withheld Plaintiff's renewal letter, concealed their predetermined non-renewal decision, and then, only after manufacturing a "provisional status" downgrade, invoked that status as a post hoc justification for terminating his assistantship.

45. This dual-track scheme outwardly treated Plaintiff as an active Teaching Assistant while secretly preparing to terminate his funding, thereby demonstrating premeditation and retaliatory intent. The sequence unfolded as follows:

(a) On August 6, 2025, Dr. Alicia Bouldin informed Plaintiff that his name had been supplied by Department Chair Dr. Yi Yang as a Teaching Assistant for the Fall 2025 semester.

(b) On August 8, 2025, Dr. Alicia Bouldin (Associate Dean and faculty member) formally assigned Plaintiff to serve as a Teaching Assistant for PHCY 502 (Cardiovascular Module) and PHCY 581 (Pharmacy Practice Applications/Skills Lab 3) (Exhibit G), despite no signed renewal letter — a departure from prior practice, in which renewal letters were always issued before any assignments.

(c) On August 18, 2025, Dr. James Pitcock, Team Leader for PHCY 502, onboarded Plaintiff by granting Blackboard access, assigning exam proctoring duties, and confirming his active instructional role on the course team (Exhibits H & I).

(d) On August 19, 2025, Plaintiff inquired with Chair Dr. Yi Yang about the missing assistantship renewal letter, which in prior years had been issued in July. Dr. Yi Yang provided no response.

(e) On August 21, 2025, Dr. Marie Barnard issued a disciplinary memorandum recommending Plaintiff's reclassification to provisional status.

(f) On the morning of August 22, 2025, Dean Annette Kluck ratified Dr. Marie Barnard's recommendation, formally reducing Plaintiff to provisional status.

(g) On the evening of August 22, 2025, Chair Dr. Yi Yang belatedly responded to Plaintiff's August 19 inquiry, citing the provisional status ratified earlier that same day as the reason Plaintiff was "not eligible" for assistantship renewal (Exhibit L).

46. The juxtaposition is stark: Plaintiff was integrated into instructional duties on August 8 and 18 — assigned TA responsibilities, granted Blackboard access, and scheduled to proctor exams — only to be summarily declared ineligible for assistantship renewal on August 22.

47. This sequence demonstrates that Defendants had predetermined the termination, deliberately withheld the customary July renewal letter, and then strategically invoked provisional status as a post hoc justification — a closed loop of retaliation wholly outside the bounds of any "bona fide academic judgment." See Bd. of Curators v. Horowitz, 435 U.S. 78, 91 (1978); Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985).

48. This contradiction between Defendants' own conduct (actively assigning TA duties and onboarding Plaintiff) and their later rationale (citing provisional status) is precisely the kind of inconsistent explanation the Supreme Court has recognized as "smoking gun" evidence of pretext, permitting a clear inference of retaliatory motive. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).

49. Upon information and belief, this dual-track conduct — presenting an outward appearance of continuity while internally preparing to terminate Plaintiff's funding — was deliberately executed to conceal retaliation and evade accountability.

50. This concealment confirms the administrative and punitive character of Defendants' actions, aimed not at advancing academic evaluation but at concealing retaliation from internal review or judicial scrutiny.

**Defendants as State Actors and Their Individual Roles in the Retaliatory Scheme**

51. All Defendants acted under color of state law and in deliberate disregard of Plaintiff's constitutional and contractual rights. Because these actions involved administrative sanctions, financial deprivation, immigration jeopardy, and retaliatory misuse of policy — not bona fide evaluations of coursework, research, or competence — they fall wholly outside the scope of judicial deference to academic judgment. Each Defendant played a distinct and intentional role in the retaliatory scheme:

(a) **Dr. Yi Yang (Chair)** unilaterally dismantled Plaintiff's signed one-on-one mentoring agreement, imposed a coerced co-mentorship, and inserted herself into Plaintiff's research and mentoring meetings to conduct surveillance. The U.S. Department of Education's January 2025 Retaliation Guidance identifies "increased monitoring or surveillance" as a recognized marker of retaliation. Dr. Yang also co-authored retaliatory disciplinary memoranda, withheld Plaintiff's customary July assistantship renewal letter, and then cited the contrived "provisional status" downgrade as grounds for ineligibility. This circular scheme of retaliation and pretext inflicted severe economic, educational, immigration, reputational, and psychological harm on Plaintiff — materially adverse consequences that, under Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006), would deter any reasonable student from exercising protected rights.

(b) **Dr. Marie Barnard (Graduate Program Coordinator)** authored the June 30 and August 21 disciplinary memoranda, escalating sanctions while failing to acknowledge or respond to Plaintiff's July 9 rebuttal and despite the absence of any documented academic deficiencies. She deliberately misused the Abilities Transcript — a developmental reflection tool — by reclassifying it as an "academic performance deficiency," thereby distorting departmental policy and transforming a formative requirement into a punitive device. She further introduced new and expanded requirements that had never previously been identified, in a post hoc attempt to manufacture an "academic deficiency" and retroactively justify the disproportionate sanction of provisional status. Such shifting and inconsistent justifications are precisely the type of evidence of pretext and retaliatory motive recognized in Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

(c) **Dr. Annette Kluck (Dean of the Graduate School)** ratified Plaintiff's downgrade to provisional status on August 22 — after the fall semester had already begun — with full knowledge that it violated multiple safeguards in the University of Mississippi's Policies and Procedures (M Book), which require that such changes (i) take effect "between semesters or enrollment periods"; (ii) be recommended by an appropriate faculty group; and (iii) be based on documented academic performance deficiencies. In her letter, she selectively omitted these safeguards, thereby institutionalizing the retaliatory pretext. Courts have consistently held that academic deference does not extend to decisions made "in bad faith or for arbitrary reasons." Bd. of Curators v. Horowitz, 435 U.S. 78, 91 (1978); Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985). By ratifying a downgrade that stripped Plaintiff of his assistantship, tuition remission, health insurance, and ultimately his visa eligibility, Dr. Kluck imposed materially adverse consequences that fall squarely within Burlington Northern's protection against retaliatory sanctions.

(d) **Dr. Yinan Huang (Faculty Member)** played a central role in justifying the dismantling of Plaintiff's mentoring agreement by offering contradictory and shifting rationales. She admitted that the restructuring was imposed to "protect her" and to "keep faculty happy" in order to preserve research access. She also failed to uphold her obligations under the signed Mentor–Mentee Agreement, which required her to safeguard the mentee's development and professional stability. Instead, she participated

in the retaliatory pretext by engaging in emotional manipulation and by attempting to justify Dr. Yi Yang's forced imposition and unconstitutional coercion. These admissions and failures reveal motivations grounded in faculty convenience and departmental politics rather than any bona fide evaluation of Plaintiff's performance. Such inconsistent explanations provide precisely the type of "smoking gun" evidence of pretext the Supreme Court has recognized as compelling evidence of unlawful intent. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).

**Clearly Established Law Foreclosing Qualified Immunity**

52. By 2025, it was firmly established that retaliation for protected complaints — including retaliation by association — violates the First Amendment. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977) (holding that retaliation for protected activity is unlawful); Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (materially adverse actions are unlawful if they would deter a reasonable person from exercising protected rights); Adler v. Pataki, 185 F.3d 35, 44 (2d Cir. 1999) (retaliation against an individual for the protected activity of a close family member violates the First Amendment).

53. Defendants' conduct — dismantling Plaintiff's signed Mentor–Mentee Agreement in violation of its express terms, imposing surveillance, deliberately misusing the Abilities Transcript, fabricating post hoc rationales to justify disproportionate sanctions, violating mandatory safeguards in the University of Mississippi's M Book, and exploiting assistantship, academic standing, and visa eligibility as tools of coercion — were not legitimate academic judgments but clearly retaliatory sanctions imposed to punish protected activity. No reasonable official could have believed such conduct was lawful under clearly established precedent. Accordingly, Defendants are not entitled to qualified immunity. See Hope v. Pelzer, 536 U.S. 730, 741 (2002) (qualified immunity does not protect officials where unlawfulness is apparent in light of pre-existing law).

54. Upon information and belief, discovery will confirm that Defendants deliberately and uniquely targeted Plaintiff for adverse treatment in retaliation for (a) his documented objections to coercive mentoring practices and procedural violations, and (b) his close familial association with his twin brother Alfred, whose own protected activities — including formal complaints of retaliation, contract breaches, due process violations, and denial of disability accommodations — were well known to the Department.

55. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered:

(a) Reputational harm — stigma within his department, impairing future academic and professional opportunities;

(b) Educational harm — disruption of his doctoral trajectory, loss of stable mentoring support, and jeopardy to timely degree progress;

(c) Economic harm — loss of tuition remission, stipend, and health insurance, undermining his ability to continue enrollment;

(d) Immigration harm — jeopardy to his lawful presence in the United States as a direct result of the loss of assistantship funding and full-time student status; and

(e) Emotional and psychological harm — sustained mental and emotional distress caused by the coercive and retaliatory environment.

**Prayer for Relief**

56. Plaintiff respectfully seeks the following relief:

(a) **Declaratory Judgment** — A declaration that Defendants violated Plaintiff's First Amendment rights by retaliating against him for engaging in protected speech, petitioning activity, and association, including retaliation-by-association with his twin brother.

(b) **Injunctive Relief** — Preliminary and permanent injunctions:

(i) Restoring Plaintiff's one-on-one mentoring agreement as memorialized in the signed Mentor–Mentee Agreement;

(ii) Vacating the August 21–22, 2025 provisional status downgrade and restoring Plaintiff to full academic standing;

(iii) Reinstating Plaintiff's eligibility for graduate assistantship funding, tuition remission, and associated benefits;

(iv) Expunging from Plaintiff's academic file all retaliatory memoranda, warnings, and status changes, including the June 30, 2025 memorandum and the August 21–22, 2025 provisional status recommendation and ratification; and

(v) Enjoining Defendants from retaliatory misuse of developmental tools such as the Abilities Transcript, or from imposing sanctions in violation of published policy safeguards.

(c) **Compensatory Damages** — For financial losses, disruption of Plaintiff's doctoral trajectory, reputational injury, and sustained emotional distress.

(d) **Punitive Damages** — Against the individual Defendants, in their personal capacities, for conduct undertaken with deliberate indifference or reckless disregard of Plaintiff's constitutional rights.

(e) **Attorneys' Fees and Costs** — Pursuant to 42 U.S.C. § 1988(b), to the extent Plaintiff retains counsel or otherwise qualifies for recovery of litigation expenses.

(f) **Prospective Monitoring and Compliance** — An order requiring the University of Mississippi to file periodic compliance reports with the Court, for a period to be determined, documenting:

(i) All changes in Plaintiff's academic status, funding eligibility, or mentoring arrangements;

(ii) All uses of the Abilities Transcript requirement or similar developmental tools in the Department of Pharmacy Administration; and

(iii) Steps taken to ensure adherence to University policy and to prevent further retaliation against Plaintiff or similarly situated students.

(g) **Additional Relief** — Such other and further relief as the Court deems just, proper, and necessary to redress the violations alleged herein and to restore Plaintiff to the position he would have occupied absent retaliation.

## COUNT II – DENIAL OF EQUAL PROTECTION
*(Fourteenth Amendment to the U.S. Constitution, via 42 U.S.C. § 1983)*

**Against**: The University of Mississippi; Dr. Yi Yang (individual and official capacities); Dr. Marie Barnard (individual and official capacities); Dr. Annette Kluck (individual and official capacities); and

Dr. Yinan Huang (individual and official capacities).

**Legal Authority**

(a) **U.S. Const. amend. XIV, § 1** — "No State shall … deny to any person within its jurisdiction the equal protection of the laws."

(b) **Village of Willowbrook v. Olech**, 528 U.S. 562 (2000) — class-of-one claims arise where an individual is intentionally treated differently from others similarly situated without rational basis.

(c) **Washington v. Davis**, 426 U.S. 229 (1976) — facially neutral practices violate Equal Protection where discriminatory purpose is shown.

(d) **Village of Arlington Heights v. Metro.** Housing Dev. Corp., 429 U.S. 252 (1977) — discriminatory intent may be inferred from factors such as historical background, procedural departures, substantive departures from norms, and contemporaneous statements by decisionmakers.

(e) **Reeves v. Sanderson Plumbing Prods., Inc.**, 530 U.S. 133, 147 (2000) — shifting explanations support inference of unlawful intent.

(f) **Regents of the Univ. of Mich. v. Ewing**, 474 U.S. 214, 225 (1985) — substantial departure from accepted academic norms evidences lack of professional judgment.

(g) **St. Mary's Honor Ctr. v. Hicks**, 509 U.S. 502, 511 (1993) — false explanations permit inference of intentional discrimination.

**Allegations**

**Climate of Racialized Labeling Infusing Administrative Actions**

57. The Equal Protection Clause requires state actors to treat similarly situated individuals alike. It prohibits selective or discriminatory treatment that is arbitrary, irrational, or motivated by impermissible considerations such as race, national origin, or pretextual retaliation cloaked as academic discretion.

58. Plaintiff and his twin brother are Black international students from Africa.

59. Faculty and peers repeatedly characterized Plaintiff and his twin brother with stigmatizing labels such as "bullies," "dominants," and "disruptive." These descriptors arose not from any misconduct, but from their willingness to ask questions, contribute ideas, and engage actively in academic discourse.

60. Such descriptors were racially coded stereotypes, drawing on long-recognized cultural tropes that recast the intellectual engagement of Black men as aggressive, domineering, or threatening. By mischaracterizing ordinary academic participation in this way, Defendants imported racial bias into faculty perceptions and departmental decision-making.

61. On one occasion, Dr. Yi Yang, Chair of the Department, told Plaintiff that "other faculty members are concerned that you and your brother dominate conversations." This contemporaneous statement by the Department's chief decisionmaker confirmed that racially coded stereotypes influenced faculty perceptions, providing direct evidence of discriminatory intent under Village of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252 (1977).

62. Under Washington v. Davis, 426 U.S. 229 (1976), facially neutral practices that are infected with

discriminatory purpose violate Equal Protection. Here, reliance on racially coded stereotypes — confirmed through contemporaneous statements, procedural departures, and faculty ratification — tainted subsequent disciplinary and administrative actions with discriminatory intent.

**Dismantling of Signed Mentoring Agreement Through Discriminatory and Pretextual Rationale**

63. Against this backdrop of racial stereotyping and stigmatizing labels, on June 13, 2025, Dr. Yi Yang, Chair of the Department, unilaterally dismantled Plaintiff's signed one-on-one mentoring agreement with Dr. Yinan Huang. This action did not arise in a vacuum but occurred within — and was informed by — the discriminatory climate that had already recast Plaintiff's academic engagement through racialized stereotypes.

64. The stated rationale — that the restructuring was necessary to "protect" Dr. Huang in light of her anticipated departure from the University — lacked any legitimate academic basis. Ordinarily, when a mentor departs the University, the student is reassigned to another faculty mentor to preserve continuity, not subjected to surveillance or coercive restructuring of an existing relationship.

65. Viewed in context, the invocation of "protection" echoed earlier racialized stereotyping of Plaintiff as threatening, recasting his mentoring relationship as a situation from which faculty supposedly needed to be protected. This rationale illustrates how discriminatory bias, rather than academic judgment, drove the dismantling of Plaintiff's mentoring agreement, in violation of the Equal Protection Clause's guarantee that all students, regardless of race, are entitled to equal treatment under the law.

66. This rationale is further revealing because Dr. Yi Yang, the Department Chair who imposed the restructuring, and Dr. Yinan Huang, the faculty member purportedly being "protected," share the same racial and ethnic background. Plaintiff, by contrast, is a Black international student from Africa. The selective invocation of "protection" in this context underscores how faculty solidarity and racial affinity were leveraged to dismantle Plaintiff's contractual mentoring arrangement, while simultaneously recasting Plaintiff as a source of danger rather than a student entitled to good-faith mentoring support.

67. Such disparate treatment illustrates how discriminatory stereotypes became embedded into departmental decision-making, with "protection" selectively framed along racial lines. This rationale not only lacked any policy or academic foundation but also reflected impermissible bias, tainting subsequent administrative actions and underscoring the discriminatory purpose proscribed by the Equal Protection Clause.

68. The invocation of "protection" in this manner operated as a racially selective rationale, privileging faculty solidarity and convenience over Plaintiff's contractual rights as a Black international student. The Equal Protection Clause requires that all racial groups be treated alike; it does not permit safeguarding one group at the expense of another, or elevating faculty interests above the rights of students. By dismantling Plaintiff's mentoring arrangement under the guise of "protecting" a faculty member of the same racial background, Dr. Yi Yang embedded racial bias into departmental decision-making and violated Plaintiff's constitutional entitlement to equal protection of the laws.

69. Defendants' explanations for unilaterally dismantling Plaintiff's established one-on-one mentoring agreement — without his knowledge or consent and over his repeated objections — shifted repeatedly, from "faculty protection," to "faculty rights," to "faculty development." None were grounded in University policy, departmental custom, or genuine academic necessity. Such inconsistent and self-serving rationales are hallmarks of pretext and discriminatory intent. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

70. In particular, the racially selective invocation of "protection," when combined with these shifting

justifications and the departure from ordinary practice, exemplifies the type of historical background, sequence of events, and procedural deviations that the Supreme Court in Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267 (1977), recognized as compelling evidence of discriminatory purpose.

**From Stereotypes to Sanctions: Escalation Through Racialized Labeling**

71. The discriminatory climate intensified after Plaintiff's twin brother, Omokhodion (Alfred) Eriakha, filed formal complaints alleging retaliation, contract breaches, procedural due process violations, and denial of disability accommodations.

72. On June 30, 2025, Defendants Dr. Yi Yang and Dr. Marie Barnard issued a disciplinary memorandum to Plaintiff, threatening to reclassify him to provisional status on the false pretext of "failing" to submit the Abilities Transcript.

73. That same day, Plaintiff's twin brother, Alfred, was labeled "disruptive" by four faculty members — Drs. Erin Holmes, Marie Barnard, Meagen Rosenthal, and Yi Yang — without any factual description of conduct or compliance with established University procedural safeguards. The close temporal proximity between Alfred's protected complaints and the imposition of this stigmatizing label underscores both the retaliatory escalation and the discriminatory stereotyping at play, providing further evidence of discriminatory purpose under Village of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 267 (1977).

74. The "disruptive" designation was wholly unfounded and consistent with earlier racially coded descriptors such as "bullies" and "dominants," which had been used to stigmatize Plaintiff and his brother for nothing more than active classroom participation and intellectual engagement. By converting ordinary academic engagement into racialized misconduct, Defendants perpetuated cultural stereotypes that recast Black men's scholarly contributions as threatening rather than substantive.

75. What began as informal stereotyping and racially coded labeling in academic settings and discourse was escalated and formalized into official memoranda: Alfred was placed on indefinite probation and downgraded to provisional status, while Plaintiff was likewise reclassified to provisional status and stripped of his assistantship.

76. By converting racially coded stereotypes into written disciplinary sanctions, Defendants embedded prejudice into University policy and practice, transforming bias from mere perception into punitive institutional action. This departure from neutral disciplinary standards, coupled with the reliance on racialized descriptors, exemplifies the type of historical background, sequence of events, and substantive deviations that the Supreme Court in Village of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 267 (1977), recognized as powerful evidence of discriminatory intent.

**Comparator Evidence Demonstrating Arbitrary and Discriminatory Treatment**

77. Upon information and belief, no similarly situated white or U.S.-born student has ever been subjected to any of the following:

(a) The forced dismantling of a signed one-on-one mentoring agreement;

(b) Compulsion into coerced co-mentorship with the Department Chair;

(c) The imposition of stigmatizing labels such as "disruptive" or "dominant" for ordinary classroom participation and intellectual engagement; or

(d) Reclassification to provisional status after a semester had already begun — in direct violation of the M Book safeguard requiring such changes to take effect "between semesters or enrollment periods" — and the subsequent stripping of assistantship eligibility.

78. Upon information and belief, discovery will confirm the stark absence of comparable treatment among similarly situated peers, establishing that Defendants' actions were not the product of neutral academic judgment. Rather, the targeting of Plaintiff reflected both discriminatory animus on the basis of race and national origin, and arbitrary, irrational treatment devoid of any rational basis. Such departures from equal treatment impermissibly embedded racial bias into official University decisions, in direct violation of the Equal Protection Clause.

**Clearly Established Law Foreclosing Qualified Immunity**

79. By 2025, it was clearly established law that public officials may not:

(a) Intentionally discriminate against students on the basis of race or national origin (Washington v. Davis, 426 U.S. 229 (1976));

(b) Treat an individual differently from similarly situated peers without any rational basis (Village of Willowbrook v. Olech, 528 U.S. 562 (2000)); or

(c) Rely on racially coded stereotypes, contemporaneous statements, or procedural departures as bases for official action, all of which may evidence discriminatory intent (Village of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252 (1977)).

80. Defendants violated all three principles. Collectively, they: (a) converted stigmatizing racial stereotypes into official sanctions; (b) dismantled Plaintiff's signed one-on-one mentoring agreement; (c) imposed coerced co-mentorship; (d) deliberately repurposed a developmental self-assessment tool into a punitive device to fabricate a false narrative of "academic performance deficiency"; (e) reduced Plaintiff to provisional status at the start of the semester in direct violation of University policies and procedural safeguards; and (f) used that contrived downgrade to strip Plaintiff of his assistantship.

81. These actions were arbitrary, discriminatory, and wholly detached from Plaintiff's coursework, research, and professional competence.

82. Such measures constitute a substantial departure from accepted academic norms and a clear indicator of discriminatory intent, as recognized in Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985), and Arlington Heights, 429 U.S. at 267.

83. No reasonable official could have believed this conduct to be lawful. Qualified immunity does not shield actions where unlawfulness is apparent under pre-existing law (Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

84. As a direct and proximate result of Defendants' discriminatory and arbitrary conduct, Plaintiff has suffered:

(a) Reputational harm — stigmatization within his department, impairing his academic standing and diminishing future professional opportunities;

(b) Educational harm — disruption of his doctoral trajectory, erosion of stable mentoring support, and jeopardy to timely completion of his degree;

(c) Economic harm — loss of tuition remission, stipend, and health insurance, depriving Plaintiff of the

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

financial means necessary to remain enrolled;

(d) Immigration harm — jeopardy to Plaintiff's lawful presence in the United States, directly tied to the termination of assistantship funding and full-time enrollment status; and

(e) Emotional and psychological harm — sustained anxiety, stress, and loss of trust in the academic environment, caused by Defendants' coercive and discriminatory actions.

**Prayer for Relief**

85. Plaintiff respectfully seeks the following relief:

(a) **Declaratory Judgment** — declaring that Defendants violated the Equal Protection Clause of the Fourteenth Amendment by intentionally discriminating against Plaintiff on the basis of race and national origin, and/or by treating him differently from similarly situated peers without any rational basis.

(b) **Injunctive Relief** — issuing preliminary and permanent injunctions:

(i) Restoring Plaintiff's signed one-on-one mentoring agreement;

(ii) Vacating the August 21–22, 2025 downgrade of Plaintiff to provisional status and restoring him to full academic standing;

(iii) Reinstating Plaintiff's graduate assistantship eligibility, including stipend, tuition remission, and health benefits; and

(iv) Prohibiting Defendants from engaging in further disparate, arbitrary, or discriminatory treatment disguised as academic discretion.

(c) **Compensatory Damages** — awarding Plaintiff damages for financial losses, disruption of academic progress, reputational harm, and emotional and psychological distress proximately caused by Defendants' unlawful conduct.

(d) **Punitive Damages** — against the individual Defendants, in their personal capacities, for willful, malicious, and reckless disregard of Plaintiff's constitutional rights, in order to punish unlawful conduct and deter future violations.

(e) **Structural Relief** — requiring the University to implement measures ensuring transparency and accountability, including documenting, tracking, and publicly reporting all uses of provisional status classifications and related disciplinary measures in the Department of Pharmacy Administration, in order to prevent discriminatory misuse and protect students against arbitrary or retaliatory application.

(f) **Further Relief** — granting such other and additional relief, at law or in equity, as this Court deems just, proper, and necessary to fully vindicate Plaintiff's rights.

**COUNT III – VIOLATION OF DUE PROCESS**
*(Fourteenth Amendment to the U.S. Constitution, via 42 U.S.C. § 1983)*

**Against**: The University of Mississippi; Dr. Yi Yang (individual and official capacities); Dr. Marie Barnard (individual and official capacities); Dr. Annette Kluck (individual and official capacities); and Dr. Yinan Huang (individual and official capacities).

**Legal Authority**

(a) **U.S. Const. amend.** XIV, § 1 (no State shall "deprive any person of life, liberty, or property, without due process of law").

(b) **Dixon v. Alabama State Bd. of Educ.**, 294 F.2d 150 (5th Cir. 1961) — binding Fifth Circuit precedent requiring notice and hearing before expulsion or comparable sanctions.

(c) **Goss v. Lopez**, 419 U.S. 565, 574–79 (1975) — meaningful opportunity to be heard required before disciplinary sanctions.

(d) **Mathews v. Eldridge**, 424 U.S. 319, 333 (1976) — adequacy of procedures judged by balancing interests, risk of error, and burden of safeguards.

(e) **Carey v. Piphus**, 435 U.S. 247 (1978) — denial of due process is actionable per se.

(f) **Paul v. Davis**, 424 U.S. 693 (1976) — stigma-plus doctrine recognizes liberty interest in reputation when coupled with tangible harms.

(g) **Bd. of Curators v. Horowitz**, 435 U.S. 78 (1978); Regents of Univ. of Mich. v. Ewing, 474 U.S. 214 (1985) — judicial deference applies only to bona fide academic judgments, not retaliatory or arbitrary actions.

(h) **County of Sacramento v. Lewis**, 523 U.S. 833, 846–47 (1998) — substantive due process prohibits conduct that is arbitrary, conscience-shocking, or oppressive in the constitutional sense.

**Allegations**

**Constitutionally Protected Liberty and Property Interests**

86. Plaintiff possessed constitutionally protected liberty and property interests, including:

(a) Enrollment in good academic standing — a recognized interest essential to the pursuit of higher education, professional advancement, and future career opportunities;

(b) The Mentor–Mentee Agreement of July 19, 2024 — formally approved by the Department, which created enforceable contractual obligations and reliance interests central to Plaintiff's doctoral trajectory;

(c) Graduate assistantship, tuition remission, and health insurance benefits — historically renewed prior to the start of each academic term (typically June/July for the fall semester), giving rise to contractual entitlements and reasonable reliance interests; and

(d) Liberty interests in reputation and lawful F-1 visa status — both directly dependent on Plaintiff's academic standing and assistantship funding, and therefore imperiled by arbitrary or retaliatory adverse actions.

87. Graduate assistantships are recognized as protected property interests, reinforced by:

(a) Written policies — governing eligibility, renewal, and benefits, which establish definite criteria and expectations;

(b) Consistent departmental practice — of issuing renewal letters prior to the start of each academic

term (typically June/July for the fall semester), and before assigning assistantship duties, thereby creating a settled expectation of continuity; and

(c) Reasonable reliance interests — developed through Plaintiff's past renewals and institutional assurances, that continuation would occur absent cause and constitutionally adequate process. See Dixon v. Alabama State Bd. of Educ., 294 F.2d 150, 157 (5th Cir. 1961) (recognizing student property and liberty interests in continued enrollment absent fair notice and hearing).

88. Plaintiff also held protected liberty interests that were infringed, including:

(a) Continued enrollment in good standing, recognized by precedent as a protected liberty interest in higher education (Dixon, 294 F.2d at 157);

(b) Freedom from arbitrary stigma, where the false designation of "provisional status" branded Plaintiff as academically deficient and combined reputational injury with tangible deprivations (loss of assistantship, tuition remission, and health insurance), thereby satisfying the stigma-plus doctrine (Paul v. Davis, 424 U.S. 693, 708–09 (1976)); and

(c) Preservation of lawful F-1 visa status — directly jeopardized when Defendants revoked assistantship support and tuition remission, and further compounded by the imposition of "provisional status," which undermined Plaintiff's full-time enrollment, his lawful presence in the United States, and his ability to continue his doctoral education.

**Procedural Due Process Violations**

89. Defendants deprived Plaintiff of these protected interests without constitutionally required notice, hearing, or impartial review, in direct violation of the Fourteenth Amendment.

90. University safeguards — expressly requiring collective faculty review, reliance on documented academic deficiencies, and the imposition of sanctions "between semesters or enrollment periods" — were deliberately ignored and disregarded by Defendants.

91. Instead, Defendants manufactured a provisional downgrade at the very start of a semester, then invoked that contrived status as a circular justification to deny assistantship renewal, tuition remission, and health insurance. This circular sequence, by which Defendants manufactured a deficiency and then exploited it to terminate Plaintiff's enrollment benefits, is paradigmatic of unconstitutional arbitrariness.

92. Applying the Mathews v. Eldridge, 424 U.S. 319, 335 (1976), balancing test:

(a) Private Interest: Plaintiff's ability to continue his doctoral education, retain assistantship funding, maintain health insurance, and preserve lawful F-1 visa status — interests of the highest order.

(b) Risk of Error: Exceptionally high, as Plaintiff's detailed rebuttal letter was ignored, and no objective evidence supported the disproportionate sanction of downgrading him to provisional status.

(c) Burden of Safeguards: Minimal, as compliance with existing University policy, including collective faculty review, reliance on documented academic deficiencies, and the imposition of sanctions "between semesters or enrollment periods" would have imposed negligible cost while preventing erroneous or retaliatory action.

93. The deliberate omission of these safeguards stripped Plaintiff of even the minimal procedural protections guaranteed by the Fourteenth Amendment, rendering the proceedings constitutionally

inadequate under Dixon v. Alabama, 294 F.2d 150 (5th Cir. 1961), and Goss v. Lopez, 419 U.S. 565, 574–79 (1975). Moreover, under Carey v. Piphus, 435 U.S. 247, 266 (1978), the denial of due process is actionable per se, regardless of the ultimate outcome, further confirming the constitutional inadequacy of Defendants' actions.

## Substantive Due Process Violations

94. Beyond the procedural defects, Defendants' actions were arbitrary, retaliatory, discriminatory, and conscience-shocking, in violation of substantive due process. See County of Sacramento v. Lewis, 523 U.S. 833, 846–47 (1998) (substantive due process protects against exercises of power so egregious as to shock the conscience).

95. Defendants acted not from reasoned academic judgment but from retaliatory and discriminatory motives, abusing their authority to impose sanctions wholly detached from legitimate academic evaluation, by:

(a) Unilaterally dismantling Plaintiff's signed one-on-one Mentor–Mentee Agreement and coercively imposing co-mentorship with the Department Chair;

(b) Deliberately repurposing the Abilities Transcript — a developmental, non-evaluative tool — into a punitive device to fabricate a false narrative of "academic performance deficiency";

(c) Downgrading Plaintiff to provisional status at the very beginning of a semester — in direct violation of published University policies and safeguards expressly requiring that such changes occur "between semesters or enrollment periods"; and

(d) Using that contrived downgrade as the sole basis to strip Plaintiff of assistantship funding, tuition remission, health insurance, and visa eligibility.

96. These measures were circular, punitive, and devoid of legitimate academic purpose. Instead, they represent a substantial departure from accepted academic norms, confirming arbitrariness and bad faith. See Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985).

97. The cumulative effect — including severe economic losses, disruption of Plaintiff's education, jeopardy to his lawful immigration status, reputational stigma, and lasting psychological harm — is constitutionally intolerable and satisfies the "conscience-shocking" threshold recognized in substantive due process jurisprudence.

## Clearly Established Law Precluding Qualified Immunity

98. By 2025, it was clearly established that:

(a) Procedural Due Process — Students may not be deprived of enrollment, funding, or reputational standing without constitutionally adequate notice, hearing, and impartial review. See Dixon v. Alabama State Bd. of Educ., 294 F.2d 150, 157 (5th Cir. 1961); Goss v. Lopez, 419 U.S. 565, 574–79 (1975); Mathews v. Eldridge, 424 U.S. 319, 333 (1976).

(b) Substantive Due Process — Arbitrary, retaliatory, or conscience-shocking actions by state actors violate the Fourteenth Amendment, even if cloaked as academic discretion. See County of Sacramento v. Lewis, 523 U.S. 833, 846–47 (1998).

99. Defendants' conduct — manufacturing a downgrade of Plaintiff's academic standing to provisional at the beginning of the semester, deliberately repurposing and misusing a developmental tool as a

punitive device to fabricate a false narrative of "academic performance deficiency," dismantling Plaintiff's signed one-on-one Mentor–Mentee Agreement, and exploiting that contrived status change as a pretext to terminate Plaintiff's assistantship funding and jeopardize his lawful immigration status — violated both procedural and substantive due process principles.

100. No reasonable official could have believed such actions were lawful in light of decades of clearly established precedent. The rights at issue had been settled law, and Defendants' deliberate departures from constitutional requirements, University policies, and accepted academic norms underscore their bad faith. Accordingly, Defendants are not entitled to qualified immunity. See Hope v. Pelzer, 536 U.S. 730, 741 (2002) (qualified immunity does not shield conduct whose unlawfulness is apparent under pre-existing law).

101. As a direct and proximate result of Defendants' due process violations, Plaintiff has suffered:

(a) **Reputational harm** — stigmatization through the false designation of "provisional status," branding Plaintiff as academically deficient despite good standing, and impairing his future academic and professional opportunities;

(b) **Educational harm** — destabilization of his doctoral program, loss of continuity in his mentoring relationship, and jeopardy to timely degree progress;

(c) **Economic harm** — deprivation of tuition remission, stipend, and health insurance, which were contractually tied to Plaintiff's academic standing and assistantship eligibility, thereby undermining his ability to remain enrolled;

(d) **Immigration harm** — direct jeopardy to his lawful F-1 visa status, caused by the combined effect of assistantship termination and reclassification to provisional status, both of which undermined the full-time enrollment and financial support required to lawfully remain in the United States; and

(e) **Emotional and psychological harm** — sustained mental and emotional distress resulting from the coercive, arbitrary, and stigmatizing environment created by Defendants' deprivation of constitutionally protected liberty and property interests.

**Prayer for Relief**

102. Plaintiff respectfully seeks the following relief:

(a) **Declaratory Judgment** — declaring that Defendants violated Plaintiff's procedural and substantive due process rights under the Fourteenth Amendment;

(b) **Injunctive Relief** — issuing preliminary and permanent injunctions:

(i) Vacating the August 21–22, 2025 downgrade to provisional status;

(ii) Restoring Plaintiff's full academic standing and graduate assistantship eligibility, including stipend, tuition remission, and health benefits; and

(iii) Prohibiting Defendants from imposing further adverse actions absent constitutionally adequate notice, hearing, and impartial review;

(c) **Compensatory Damages** — awarding damages for financial losses, academic disruption, reputational injury, and emotional distress proximately caused by Defendants' unconstitutional conduct;

(d) **Punitive Damages** — against the individual Defendants, in their personal capacities, for deliberate, arbitrary, retaliatory, and conscience-shocking conduct in violation of clearly established constitutional rights;

(e) **Prospective Relief (Ex parte Young)** — requiring the University to implement and maintain transparent procedures, collective faculty review, and meaningful safeguards in graduate status determinations to ensure ongoing compliance with procedural due process;

(f) **Immigration-Specific Relief** — recognizing that Defendants' actions unlawfully jeopardized Plaintiff's lawful F-1 visa status, and issuing remedial orders sufficient to safeguard Plaintiff's ability to remain enrolled and lawfully present in the United States; and

(g) **Further Relief** — granting such other and additional relief, at law or in equity, as this Court deems just and proper.

## COUNT IV – BREACH OF CONTRACT
*(State Law Claim – Supplemental Jurisdiction under 28 U.S.C. § 1367)*

**Against**: The University of Mississippi

**Legal Authority**

(a) **Univ. of Miss. Med. Ctr. v. Hughes**, 765 So. 2d 528, 534 (Miss. 2000) — university handbooks and official publications may form enforceable contractual obligations.

(b) **Cenac v. Murry**, 609 So. 2d 1257, 1272 (Miss. 1992) — every contract contains an implied covenant of good faith and fair dealing, prohibiting arbitrary or pretextual performance.

(c) **Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.**, 908 So. 2d 107, 110 (Miss. 2005) — ambiguous contractual terms are construed against the drafter.

**Allegations**

103. Plaintiff maintained an enforceable contractual relationship with the University of Mississippi, arising from a combination of express and implied terms, each of which carried binding force and created mutual obligations between Plaintiff and the University. These included:

(a) Mentor–Mentee Agreement — The July 19, 2024 Agreement (Exhibit A), signed by Plaintiff and Dr. Yinan Huang and formally approved by the Department, guaranteeing a stable one-on-one mentoring relationship as a central component of Plaintiff's doctoral program;

(b) Departmental Policies — The Department of Pharmacy Administration's Policies and Procedures (Exhibit BB), which defined the Abilities Transcript as a developmental reflection tool and established rules governing mentoring structures;

(c) Graduate School Policies — The Graduate School Handbook and the M Book, which codify safeguards for student status changes, disciplinary procedures, and assistantship eligibility; and

(d) Established Practice — The Department's consistent issuance of annual assistantship renewal letters before the beginning of each semester (typically June/July for the fall semester) or academic term, creating reliance-based expectations of continuity absent cause.

104. Together, these sources formed an enforceable contractual framework governing Plaintiff's doctoral program and assistantship. Mississippi courts have expressly held that signed agreements, student handbooks, and official university policies with definite terms create enforceable contracts. Univ. of Miss. Med. Ctr. v. Hughes, 765 So. 2d 528, 534 (Miss. 2000).

105. This framework created enforceable contractual obligations and justified reliance interests, including:

(a) The right to stability of the one-on-one mentoring relationship expressly promised in the Mentor–Mentee Agreement;

(b) The right to transparent, consistent, and good-faith application of University and departmental policies, free from selective omission or distortion;

(c) The right to protection against reclassification to provisional status at the beginning of a semester, under the M Book safeguard requiring that such changes "ordinarily" occur between semesters or enrollment periods; and

(d) The right to be free from arbitrary, pretextual, or retaliatory alterations of academic standing, assistantship eligibility, or contractual benefits.

106. Plaintiff fully complied with his academic and professional obligations. He successfully completed coursework, actively engaged in research, and remained in good academic standing.

107. Plaintiff also invoked internal remedies in good faith, including his detailed July 9, 2025 rebuttal (Exhibit D) contesting the threatened sanction.

108. Despite Plaintiff's compliance and good-faith engagement, Defendants escalated adverse actions not based on any documented academic deficiency, but instead reflecting institutional bad faith, retaliation, and disregard of both express and implied contractual obligations.

109. The University materially breached its contractual obligations in multiple respects, including:

(a) Mentoring Agreement Violation — Dismantling Plaintiff's signed one-on-one mentor mentee agreement and imposing coerced co-mentorship with the Department Chair, in direct violation of the signed Agreement;

(b) Improper Status Change — Reclassifying Plaintiff to provisional status on August 21–22, 2025, in violation of the M Book safeguards requiring (i) timing between semesters or enrollment periods, (ii) recommendation by an appropriate faculty group, and (iii) reliance on documented academic deficiencies. No extraordinary justification was provided;

(c) Assistantship Withholding — Withholding Plaintiff's July renewal letter, despite established practice of issuance before any TA assignments; assigning TA duties nonetheless; then invoking the contrived downgrade to provisional status as a circular justification for declaring him "ineligible" for a graduate assistantship; and

(d) Pretextual and Shifting Justifications — Offering contradictory and unsupported explanations for dismantling the signed mentor mentee agreement — including "faculty protection," "faculty rights," and "faculty development" — which confirm pretext and breach of the implied covenant of good faith and fair dealing.

**Clearly Established Mississippi Contract Law**

110. By 2025, it was firmly established under Mississippi law that:

(a) University handbooks and official publications with definite terms form enforceable contractual obligations. Univ. of Miss. Med. Ctr. v. Hughes, 765 So. 2d 528, 534 (Miss. 2000).

(b) Every contract contains an implied covenant of good faith and fair dealing, which prohibits arbitrary, retaliatory, or pretextual performance. Cenac v. Murry, 609 So. 2d 1257, 1272 (Miss. 1992).

(c) Ambiguous terms are construed against the drafter, protecting students from manipulative or self-serving interpretations of vague policy language. Facilities, Inc. v. Rogers-Usry Chevrolet, Inc., 908 So. 2d 107, 110 (Miss. 2005).

111. Defendants' potential reliance on the M Book's qualifier "ordinarily" cannot shield their conduct. Mississippi courts strictly construe such qualifiers against the drafter. Exceptions to the timing safeguard must be extraordinary, well-documented, and grounded in good-faith academic judgment — none of which were present here.

112. Defendants further violated multiple mandatory safeguards:

(a) No academic performance deficiency was ever documented;

(b) No faculty group ever recommended Plaintiff's reclassification, as required by University policy; and

(c) The change in status and its immediate effects were imposed at the beginning of the semester, contrary to the university policies and procedures safeguard requiring such actions to "ordinarily" occur between semesters or enrollment periods.

113. Dean Annette Kluck's August 22, 2025 letter selectively misquoted University policy by omitting these protections. Coupled with the deliberate repurposing and misuse of the Abilities Transcript — a developmental reflection tool — as a punitive device to mischaracterize plaintiff and create a false narrative of "academic performance deficiency," these omissions confirm arbitrariness, pretext, and breach of both express contractual terms and the implied covenant of good faith and fair dealing.

114. As a direct, foreseeable, and proximate result of Defendants' contractual breaches, Plaintiff sustained significant harm, including:

(a) Loss of contractual benefits (expectation damages) — dismantling of the signed Mentor–Mentee Agreement and destruction of reliance interests in a stable mentoring relationship;

(b) Economic harm — denial of graduate assistantship funding, tuition remission, and health insurance historically tied to continued good standing;

(c) Reputational stigma (stigma-plus) — false designation as "provisional," branding Plaintiff as academically deficient despite continuous good standing, thereby jeopardizing academic and professional opportunities;

(d) Academic disruption (consequential damages) — destabilization of Plaintiff's doctoral trajectory, erosion of mentoring continuity, and delay in progress toward degree completion; and

(e) Emotional distress and professional diminishment (reliance damages) — anxiety, loss of trust in the academic environment, and long-term damage to career prospects.

115. These harms are not speculative but the natural, foreseeable, and proximate consequences of Defendants' breaches of both express contractual obligations and the implied covenant of good faith and fair dealing.

**Prayer for Relief**

116. Plaintiff respectfully seeks:

(a) Declaratory Relief — judicial declaration that the University materially breached its contractual obligations by dismantling the signed one-on-one mentor mentee agreement, violating the M Book's timing safeguard, and withholding assistantship renewal in bad faith.

(b) Compensatory Damages — recovery for economic losses, reputational injury, academic disruption, and emotional distress proximately caused by Defendants' breaches.

(c) Equitable Relief — restoration of Plaintiff's one-on-one mentoring relationship and vacatur of the August 21–22, 2025 downgrade to provisional status, returning Plaintiff as nearly as possible to the position he would have occupied absent the breach.

(d) Attorneys' Fees and Costs — to the extent authorized by law or equity.

(e) Alternative Relief — in recognition of sovereign immunity limitations, Plaintiff seeks declaratory and equitable relief in this Court, while expressly reserving the right to pursue monetary remedies for breach of contract in Mississippi state court.

**Deliberate Indifference to Consequences of Adverse Actions**

117. Defendants dismantled Plaintiff's signed one-on-one mentor mentee agreement, imposed surveillance, issued a misleading and factually inaccurate disciplinary memorandum, ignored his written rebuttal, violated University policy on status changes, and denied plaintiff's assistantship through manufactured ineligibility. These actions were coordinated, retaliatory, and deliberately targeted at Plaintiff's most vital interests.

118. The consequences were immediate and severe: Plaintiff lost tuition remission, stipend, health insurance, and assistantship funding, while his lawful F-1 visa status was placed in imminent jeopardy. Defendants knew with certainty that these benefits were Plaintiff's sole means of paying tuition, maintaining health insurance, covering living expenses, and preserving visa eligibility.

119. By targeting this singular lifeline, Defendants weaponized the one mechanism that would exert maximum coercive pressure. The combination of financial deprivation and immigration jeopardy amounted to constructive expulsion from Plaintiff's doctoral program — a sanction as devastating as, and legally indistinguishable from, formal dismissal.

120. Such sanctions would deter any reasonable student — and particularly an international student whose lawful presence depends on continuous enrollment and funding — from exercising protected rights. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

121. Defendants' conduct also created a broader chilling effect within the graduate student body. Students observed that objections to coercion or procedural violations resulted not in resolution, but in heightened surveillance, loss of funding, and visa jeopardy. The message was unmistakable: dissent or protected complaints would be punished through economic deprivation and immigration insecurity rather than academic evaluation. Courts have long recognized that retaliation is unlawful not only for

the harm to the individual, but because it "tends to chill" the exercise of rights across the community. See Burlington Northern, 548 U.S. at 68; Adler v. Pataki, 185 F.3d 35, 44 (2d Cir. 1999).

122. As a direct and proximate result, Plaintiff suffered:

(a) Property deprivations — loss of tuition remission, stipend, health insurance, assistantship, and academic standing;

(b) Liberty deprivations — stigmatizing reclassification to "provisional," reputational injury, and coercive surveillance;

(c) Academic disruption — destabilization of his doctoral trajectory, erosion of mentoring support, and jeopardy to degree completion;

(d) Immigration jeopardy — imminent risk of losing lawful F-1 visa status due to termination of assistantship funding and continuous enrollment;

(e) Psychological harm — anxiety, fear of reprisal, loss of trust in faculty, erosion of a safe learning environment, and chilling of willingness to assert federally protected rights; and

(f) Loss of access to court and remedies — constructive expulsion foreclosed Plaintiff's ability to remain enrolled, remain lawfully in the country, and thus preserve access to judicial relief. See Goss v. Lopez, 419 U.S. 565, 574 (1975); Elrod v. Burns, 427 U.S. 347, 373 (1976).

123. Upon information and belief, discovery will confirm that withholding Plaintiff's assistantship renewal letter, orchestrating the August 21–22 downgrade of plaintiff to provisional status, and denying his assistantship renewal were not ad hoc responses but deliberate steps in a coordinated scheme to punish Plaintiff for his protected objections and for his association with his brother's protected activity.

124. This inference is reinforced by:

(a) The close temporal proximity between Plaintiff's protected activity and adverse actions;

(b) The withholding of routine assistantship reappointment letter;

(c) The sudden and deliberate imposition of provisional status in violation of university policy and procedural safeguards; and

(d) The circular and inconsistent justifications subsequently advanced.

125. Such circumstantial evidence constitutes classic indicia of pretext and supports an inference of retaliatory motive, warranting full discovery into Defendants' internal deliberations. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804–05 (1973).

## Academic Deference as Potential Defense

126. Judicial deference to universities applies only to bona fide academic judgments — such as evaluations of coursework, examinations, or research quality made in good faith. Bd. of Curators v. Horowitz, 435 U.S. 78, 91 (1978). It does not extend to disciplinary or retaliatory measures disguised as academic discretion. Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985).

127. Defendants' actions fall squarely outside the realm of protected academic judgment. None

involved assessment of Plaintiff's coursework, research, or professional competence. Instead, Defendants engaged in administrative manipulations designed to punish Plaintiff, including:

(a) Dismantling a signed one-on-one mentoring agreement and imposing coerced co-mentorship with the Department Chair;

(b) Deliberately repurposing and misusing the Abilities Transcript — a non-evaluative reflection tool — as a punitive device to mischaracterize plaintiff and create a false narrative of "academic performance deficiency";

(c) Timing a downgrade to provisional status at the very beginning of a semester, in direct violation of university policy and procedural safeguard requiring such changes "between semesters" or enrollment periods; and

(d) Citing that contrived downgrade as the sole basis to deny assistantship renewal, despite simultaneously assigning Plaintiff TA duties.

128. These actions are disciplinary sanctions cloaked in academic language, not genuine faculty evaluations.

129. The arbitrariness of Defendants' conduct is confirmed by their ignoring Plaintiff's rebuttal letter, inventing new requirements post hoc, selectively omitting mandatory safeguards, and timing sanctions to maximize coercion. See Horowitz, 435 U.S. at 91; Ewing, 474 U.S. at 225. Courts routinely decline deference where actions are disciplinary, retaliatory, or undertaken in bad faith. Fellheimer v. Middlebury Coll., 869 F. Supp. 238, 246 (D. Vt. 1994). Moreover, under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804–05 (1973), once a plaintiff establishes a prima facie case, false or shifting justifications support an inference of unlawful motive.

130. In sum, Defendants' actions were not genuine academic evaluations but retaliatory and discriminatory sanctions cloaked in academic terminology. Because they represent a substantial departure from accepted academic norms, they fall outside the scope of judicial deference, thereby requiring full constitutional and contractual scrutiny.

## IV.    Irreparable Injury

Plaintiff faces immediate and irreparable harm that cannot be remedied by monetary damages alone. The combination of pretextual disciplinary measures, policy violations, and deliberate manipulation of Plaintiff's immigration and financial dependencies creates an urgent risk of permanent injury absent court intervention.

1. Provisional Status and Academic Stigma

On August 21–22, 2025, Defendants reclassified Plaintiff to "provisional" status. This punitive designation carries enduring stigma, undermines Plaintiff's record of good standing, and brands him as academically deficient despite the absence of academic failure. Such stigma permanently impairs academic and professional opportunities and satisfies the "stigma-plus" doctrine. Paul v. Davis, 424 U.S. 693, 708–09 (1976). The University's own M Book recognizes the gravity of such actions by requiring they occur "ordinarily … between semesters," or enrollment periods a safeguard Defendants deliberately ignored.

2. Retaliatory Sanctions Disguised as Academics

Defendants dismantled Plaintiff's signed one-on-one mentor mentee agreement, issued a false and misleading

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

disciplinary memorandum, and imposed a contrived downgrade to provisional status. These were not academic evaluations but disciplinary sanctions cloaked in academic language. Courts defer only to genuine academic judgment (Ewing; Horowitz), not to retaliatory measures designed to punish protected activity. Once imposed, such sanctions irreparably disrupt research continuity, mentoring trust, and doctoral progress — losses that cannot be remedied with damages.

3. Immigration and Financial Dependency

As an international student, Plaintiff's lawful F-1 visa status depends on continuous enrollment and assistantship support. The downgrade immediately stripped him of stipend, tuition remission, and health insurance — making continued enrollment impossible. Courts consistently recognize loss of lawful presence and immigration jeopardy as paradigmatic irreparable harms.

4. Constructive Expulsion Through Withholding of Assistantship

Assistantship renewal letters are ordinarily issued before the beginning of each semester (typically June/July for the fall semester). Here, Defendants deliberately withheld Plaintiff's renewal letter while simultaneously assigning him teaching duties, creating the false appearance that renewal was forthcoming. In reality, Defendants had already premeditated a denial of renewal and later invoked a contrived downgrade to "provisional status" as a post hoc justification for declaring Plaintiff "ineligible."

This circular maneuver weaponized Plaintiff's dependence on his assistantship — the sole mechanism by which he could fund tuition, cover living expenses, maintain health insurance, and preserve visa eligibility. By deliberately engineering the loss of this lifeline, Defendants forced Plaintiff's constructive expulsion from his doctoral program — a sanction legally indistinguishable from formal dismissal and thus subject to the same constitutional due process protections. Dixon v. Alabama State Bd. of Educ., 294 F.2d 150, 157 (5th Cir. 1961).

5. Psychological Harm and Loss of Safe Mentoring Environment

Defendants' coercive restructuring of plaintiff's established one-on-one mentor mentee agreement, surveillance of research meetings, and issuance of retaliatory disciplinary memoranda have caused severe anxiety and destroyed trust in faculty, impairing Plaintiff's ability to pursue his education in a safe environment. Courts recognize that such ongoing psychological injury, where it chills participation in education, constitutes irreparable harm.

6. Irreversible Educational Harm

Without immediate relief, Plaintiff's doctoral program faces permanent derailment. Loss of mentoring stability, funding, and lawful enrollment status interrupts degree progress and jeopardizes future academic and professional opportunities. The loss of educational opportunities, particularly where immigration consequences follow, cannot be compensated by damages.

Conclusion

Absent urgent intervention, Plaintiff faces constructive expulsion, loss of lawful immigration status, and irretrievable damage to his doctoral trajectory. Monetary damages cannot restore lost time, opportunities, or professional standing. Immediate injunctive relief is therefore necessary to prevent irreparable harm and preserve Plaintiff's constitutional rights pending judgment.

**Balance of Equities**

Plaintiff's Harm: Loss of funding, tuition remission, health coverage, lawful visa status, academic standing, and professional reputation. These harms are severe, permanent, and not compensable by damages.

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

Defendants' Burden: An injunction merely requires Defendants to follow their own rules, honor signed agreements, and refrain from retaliation. Compliance with existing policies imposes no hardship.

Weighing: Courts hold that when deprivation of constitutional rights is weighed against administrative inconvenience, the equities tip sharply in favor of the individual. Elrod v. Burns, 427 U.S. 347, 373 (1976).

**Public Interest**

Protecting constitutional rights is always in the public interest. Jackson Women's Health Org. v. Currier, 760 F.3d 448, 458 (5th Cir. 2014).

Ensuring fairness and integrity in federally funded universities is a matter of national concern.

Preventing constructive expulsion of international students protects U.S. interests in maintaining lawful, non-discriminatory treatment of foreign scholars.

Conclusion

The balance of equities and the public interest converge decisively in Plaintiff's favor. Granting preliminary relief will prevent constructive expulsion, protect constitutional rights, and uphold public confidence in higher education.

## V.    Relief

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and grant the following relief:

**1. Preliminary and Permanent Injunctive Relief**

a. Immediately enjoin Defendants from enforcing or acting upon the August 21–22, 2025 provisional status downgrade, and restore Plaintiff to full academic standing pending resolution of this matter;

b. Direct Defendants to honor and reinstate the signed July 19, 2024 one-on-one Mentor–Mentee Agreement, prohibiting further interference, coercive restructuring, or surveillance of Plaintiff's mentoring relationship absent Plaintiff's consent and transparent, policy-based justification;

c. Require Defendants to reinstate Plaintiff's graduate assistantship, including stipends, tuition remission, and health benefits, and enjoin Defendants from withholding such support on the basis of the contested provisional status;

d. Enjoin Defendants from imposing retaliatory, discriminatory, or pretextual sanctions or academic reclassifications against Plaintiff during the pendency of this litigation; and

e. Issue all such injunctive relief pursuant to Ex parte Young against Defendants in their official capacities, ensuring compliance with constitutional and statutory obligations.

**2. Declaratory Relief**

a. Declare that Defendants' actions violated Plaintiff's rights under the First Amendment, the Equal Protection Clause, and the Due Process Clause of the Fourteenth Amendment;

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

b. Declare that the University materially breached contractual obligations arising from the Mentor–Mentee Agreement, the Graduate School Handbook, and the M Book, including the safeguard that dismissal or status changes "ordinarily … take effect between semesters or enrollment periods"; and

d. Declare that Plaintiff retains the right to pursue his doctoral program free from retaliatory, discriminatory, or arbitrary interference.

### 3. Compensatory Damages

Award Plaintiff compensatory damages in an amount to be determined at trial for:

a. financial losses, including lost stipend, tuition remission, and health coverage;

b. academic disruption and delayed progress toward his doctoral degree;

c. reputational injury and professional harm; and

d. sustained emotional distress and psychological harm caused by Defendants' conduct.

### 4. Punitive Damages

Award punitive damages against the individual Defendants, in their personal capacities and to the extent permitted by law, for willful, malicious, or recklessly indifferent violations of Plaintiff's constitutional and statutory rights.

### 5. Attorneys' Fees and Costs

Award Plaintiff reasonable attorneys' fees and litigation costs pursuant to 42 U.S.C. § 1988(b), should Plaintiff retain counsel or otherwise qualify for recovery.

### 6. Additional and Equitable Relief

Grant such other and further relief, at law or in equity, as this Court deems just, proper, and necessary to redress the harms inflicted, prevent ongoing retaliation, and preserve Plaintiff's constitutional, statutory, and contractual rights.

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

## VI.  Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.  For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:  08/25/2025

Signature of Plaintiff

Printed Name of Plaintiff  Ehiremen Bennard Eriakha