*[Handwritten annotation at top: EXHIBIT D — Formal Response to Abilities Transcript Threats]*

| | |
|---|---|
| **TO:** | **Marie Barnard**, Graduate Program Coordinator |
| **CC:** | **Noel Wilkin**, Provost & Executive Vice Chancellor for Academic Affairs<br>**Annette S. Kluck**, Dean of the Graduate School<br>**Yi Yang**, Chair, Department of Pharmacy Administration |
| **FROM:** | Ehiremen (Bennard) Eriakha (Student Number 10955677) |
| **DATE:** | July 9, 2025 |
| **SUBJECT:** | Formal Response to June 30, 2025, Memorandum Alleging Failure to Meet a Non-Course Work Academic Performance Expectation |

**Dear Dr. Barnard,**

I hope this letter finds you well. I write this letter with deep concern and principled disappointment. The memorandum issued on June 30, 2025, titled *"Warning and Remediation Plan to Address Failure to Meet a Non-Course Work Academic Performance Expectation,"* presents a narrative that is not only factually and procedurally flawed, but also profoundly troubling in its disregard for the very values that should guide academic mentoring and student development.

At its core, the memorandum mischaracterizes my actions. It reframes structural barriers—created and sustained by the department—as evidence of personal noncompliance. It omits critical context, disregards written concerns I raised in good faith, and imposes a disciplinary framing on what has, from my side, been a consistent and professional effort to engage in a process that has systematically excluded me.

Most of all, it treats a developmental document—intended to foster reflection and growth—as a mechanism of enforcement. What should have been a collaborative process has instead become coercive. And what should have empowered me as a student has instead diminished my agency, silenced my voice, and eroded my sense of safety within the academic environment.

Below, I offer a detailed response and respectfully request a resolution grounded not only in policy, but in fairness, mutual respect, and the values we are expected to uphold as an academic community.

## 1. Incomplete and Selective Narrative

The June 30 memorandum presents a version of events that omits critical context: my efforts to complete the Abilities Transcript (AT) were repeatedly obstructed by a lack of procedural clarity, unilateral decision-making, and a breakdown of trust in the mentoring process.

It is deeply concerning that my documented communications—which raised timely and thoughtful concerns about informed consent, transparency, and psychological safety—were entirely excluded from the department's narrative. This omission does more than misrepresent my conduct; it erases the very real impact of the department's actions on my ability to engage meaningfully in a process that should have supported, rather than hindered, my development.

As the Graduate Program Coordinator and author of the memorandum, you were copied on these communications and were fully aware of both the barriers created by departmental decisions and the good-faith efforts I made to resolve them. Issuing a formal warning while omitting this critical context raises serious ethical concerns and significantly undermines the credibility of the memorandum as an institutional document.

The timing is especially concerning: the memorandum was issued shortly after I raised formal objections to two significant procedural changes—the unilateral restructuring of my signed mentoring agreement and the imposed in-person meeting format. These objections, grounded in university policy and professional ethics, constitute protected academic expression and may also

fall within the scope of federal civil rights protections, including those afforded under Title VI and Title IX.

The memorandum misrepresents the circumstances surrounding the non-submission of the Abilities Transcript (AT) by:

- Selectively referencing that I received multiple email reminders to submit the AT, while omitting my repeated and well-documented efforts to schedule the required mentoring session;
- Failing to acknowledge that the barriers to submission were created by departmental decisions—not by inaction on my part;
- Ignoring my documented concerns regarding informed consent, procedural transparency, and psychological safety;
- Overlooking the fact that these concerns remain unresolved; and
- Reframing department-created obstacles as evidence of personal "noncompliance."

Taken together, these omissions construct a narrative that is incomplete at best and misleading at worst. By advancing a partial account while excluding critical material facts, the memorandum falsely characterizes the situation as a *"failure to meet a non-course work academic performance expectation."*

Should institutional action proceed on the basis of such a narrative, it risks not only causing unwarranted harm to my academic standing, but also undermining the broader principles of fairness, transparency, and accountability that are meant to underpin graduate education.

In light of these omissions, I respectfully urge the department to reexamine the narrative presented in the June 30 memorandum and to consider whether it truly reflects the university's professed values of integrity, fairness, and transparency.

## 2. Unaddressed Concerns Continue to Obstruct AT Completion

To suggest that I have "failed" to submit the Abilities Transcript (AT) is not only inaccurate—it is deeply unjust. At no point have I refused to complete the transcript. What I have consistently sought is a mentoring environment that is respectful, student-centered, and aligned with institutional policy—conditions essential to authentic developmental mentoring engagement.

For the sake of transparency, I have included in the attachment an email thread that documents my sustained efforts and the department's lack of substantive response. As this record shows, I have:

- Repeatedly reached out to initiate and complete the AT process;
- Clearly communicated a willingness to proceed once key structural barriers were addressed;
- Requested clarification in accordance with university policy and professional norms; and
- Received, in return, either vague replies or no meaningful engagement at all.

Taken together, this record reflects consistent engagement on my part—marked by professionalism, clarity, and a sincere commitment to restoring a mentoring environment grounded in **trust, mutual respect, transparency,** and **psychological safety**.

## 3. Unilateral Restructuring of a Signed One-on-One Mentoring Agreement

Perhaps the most troubling of these unresolved obstructions is the department's unilateral restructuring of my signed one-on-one developmental mentoring agreement—carried out without prior discussion, mutual consent, or any opportunity for input.

This action directly contradicts the terms of the developmental mentoring agreement, an institutionally recognized commitment that outlines specific roles, expectations, and safeguards. That agreement explicitly states that *"the mentor will be committed to meeting **one-on-one** with*

*the student"* and is responsible for fostering a developmental space that is *"intellectually stimulating, emotionally supportive, safe, equitable, and free of harassment."*

This commitment affirms more than a meeting format; it guarantees a confidential one-on-one structure designed to promote professional growth in a psychologically safe environment. To alter that agreement without the student's knowledge or consent is not only **procedurally invalid**—it is **ethically indefensible**.

Despite this, on June 13, 2025, I was informed—without prior notice—that a co-developmental mentor had been added to my mentoring arrangement. No relevant policy was cited to justify this change. No consent was sought. I was given no opportunity to ask questions, raise concerns, or understand the rationale. Instead, I was presented with a finalized decision, justified solely on the grounds that it would support my assigned mentor's professional development.

While I respect and support faculty development in principle, it must never come at the expense of students' rights to a safe, supportive, and student-centered mentoring environment. Faculty development is not a valid justification for bypassing student agency or unilaterally altering a mentoring agreement grounded in mutual trust. Such objectives should be pursued through separate channels—not imposed at the expense of student rights.

In good faith, I raised formal concerns about the legitimacy of this restructuring. Specifically, I requested clarification as to what departmental or university policy—if any—permits the revision of a signed mentoring agreement without the mutual consent of both the mentor and the mentee. To date, this question has gone unanswered. My concerns have not been acknowledged, let alone addressed.

Compounding the issue, the June 30 memorandum replaced all references to "mentor" with "mentors," reinforcing the appearance that this restructuring was final, uncontested, and procedurally sound—when in fact it was imposed over my documented objections and without mutual consent.

While it might be convenient to describe what occurred as a lapse in communication, doing so obscures a deeper breakdown in process, transparency, and respect for student rights. When a one-on-one mentoring relationship is unilaterally converted into a multi-party arrangement; when that arrangement is imposed without consultation, consent, or policy basis; and when the student is excluded from decisions that directly affect their academic progress, the mentoring relationship ceases to be developmental. It becomes coercive.

### 4. Coercive Imposition of an In-Person Meeting Format

Further eroding my rights as a student was the department chair's unilateral attempt to impose an in-person format for my developmental mentoring session—despite a clearly communicated preference for a virtual meeting and a mutual agreement already established with my assigned mentor.

When a student articulates a clear preference—particularly regarding the setting or format of a developmental mentoring meeting—there is a reasonable expectation that it will be honored, or at the very least, discussed openly and respectfully. In this case, I respectfully requested that the meeting be held virtually. My assigned mentor affirmed that the request was entirely appropriate and agreed without hesitation.

That agreement was abruptly overridden—without notice—when, during a scheduled Zoom session with my assigned mentor, the department chair unilaterally mandated that the meeting take

place in person. This directive was issued without citing any applicable policy, without offering justification, and without regard for the preference I had clearly communicated. Beyond its procedural irregularity, the action was emotionally destabilizing and undermined the psychological safety essential for open reflection and honest dialogue.

Such a directive:

- Contradicts the ethical obligation of academic leaders to be accessible, responsive, and student-centered;
- Introduces a dynamic of compulsion that fundamentally compromises the mentoring relationship; and
- Replaces collaboration with a hierarchical assertion of control.

Unilateral decisions that override prior agreements and disregard student needs do not foster trust or development—they impose coercion. Mandating a change in meeting format under these circumstances violated the foundational principles of ethical mentorship.

Mentorship is not about enforcement. It is about fostering a relationship in which students are supported to grow, reflect, and navigate challenges within a space that is safe, affirming, and respectful. When that space is reshaped by pressure and disregard, the relationship ceases to be developmental. It becomes restrictive, adversarial, and ultimately counterproductive.

## 5. The Developmental Mentoring Meeting & The Abilities Transcript

The developmental mentoring meeting serves a vital purpose: to support the thoughtful and collaborative completion of the Abilities Transcript (AT). This document is intended to reflect a trust-based mentoring exchange—not one carried out under duress, coercion, or ethically

questionable conditions. Completing it under such circumstances would fundamentally compromise the integrity of the developmental process it is meant to represent.

Regrettably, the June 30 memorandum implies that non-submission of the AT may warrant reclassification to provisional status. This punitive framing distorts the transcript's intended role as a formative support tool. Repurposing it as an instrument of compulsion contradicts its core educational purpose and undermines the university's broader responsibility to promote ethical, student-centered mentorship.

At no point have I refused to complete the AT. On the contrary, I have consistently welcomed the opportunity to reflect on my academic progress—precisely what the AT was designed to support. I have repeatedly affirmed my readiness to proceed, once my formally signed one-on-one mentoring agreement is either honored or reconsidered through a transparent, policy-consistent, and mutually agreed process.

Given this clear and well-documented willingness, I find no valid justification for the June 30 memorandum's attempt to compel me—or any student—into submission under unresolved and ethically troubling conditions. Doing so risks turning a tool of academic reflection into an instrument of coercion, thereby undermining both the letter and the spirit of ethical graduate mentorship.

## 6. Remedies Requested

In light of the facts and concerns outlined above, I respectfully request the following actions to ensure that this matter is resolved in a manner that is fair, transparent, and consistent with the values of ethical graduate education:

- **Withdrawal of the June 30 memorandum,** along with the removal of any language that mischaracterizes my conduct as "failure" or "noncompliance";
- **Acknowledgment of my documented good-faith efforts,** as well as formal recognition of the department's procedural role in contributing to the delay;
- **Restoration of the original one-on-one mentoring agreement,** in accordance with the terms mutually signed by both mentor and mentee, with any future modifications made only through transparent discussion and mutual consent;
- **Reinstatement of the virtual meeting format,** unless a clearly documented institutional policy mandates otherwise, with any access-related considerations addressed collaboratively and in good faith,
- **Written assurance of non-retaliation,** including protections against adverse academic consequences or assistantship termination resulting from this unresolved matter; and
- **Disclosure of relevant written policies,** if they exist, that authorize:
    - The restructuring of a signed mentoring agreement by a third party without the consent of both mentor and mentee; and
    - The mandatory imposition of in-person meetings absent a documented policy or agreed rationale.

These remedies are not requested as a matter of preference, but as a matter of principle. They are submitted in the interest of restoring procedural fairness, reaffirming institutional commitments to ethical mentorship, and enabling me to continue my academic development in an environment grounded in mutual respect, trust, and student-centered values.

7. **Conclusion**

In closing, I wish to reiterate that mentorship must be a negotiated and collaborative process—not one imposed through unilateral decisions. When faculty convenience is prioritized over student well-being, when valid concerns are treated as obstacles rather than opportunities for reflection, and when policy is bypassed to enforce compliance rather than uphold fairness, the integrity of the educational process is fundamentally compromised.

Despite these concerns, my commitment to academic progress remains unchanged. I remain fully prepared to complete all program requirements, including submission of the Abilities Transcript, once the process is restored to a framework that is fair, respectful, and ethically sound. I respectfully urge the department of Pharmacy Administration to resolve this matter in a manner that reflects those values. My sincere hope is to continue my academic journey in an environment where **fairness, mutual respect**, and **student agency** are not merely stated ideals, but actively practiced.

At the same time, I must be clear about the boundaries of acceptable participation. While I remain open to constructive engagement, I cannot in good conscience participate in a mentoring structure shaped by **silence, coercion,** or **disregard for student rights**. If these concerns remain unresolved, I reserve the right to pursue redress through internal grievance procedures or external administrative channels, including the Office for Civil Rights.

Ultimately, this letter is not a rejection of mentorship—but a call to restore its meaning. I hope it is received in the spirit in which it was written: a principled appeal for **fairness, transparency,** and **mutual respect**.

Thank you for your time, attention, and consideration.

Sincerely,

**Ehiremen (Bennard) Eriakha**

Graduate Student, Department of Pharmacy Administration

The University of Mississippi