*EXHIBIT N — Formal Complaint Submitted to the Office of Civil Rights (Dept. of Education)*

**TO:** **Kristen R. Marrazza**, General Attorney, Office for Civil Rights

**FROM:** Ehiremen (Bennard) Eriakha (Student Number 010955677)

**DATE:** July 29, 2025

**SUBJECT:** Formal Complaint of Retaliation by Association and Retaliation for Engaging in Protected Activity

**Dear Attorney Marrazza,**

I appreciate your ongoing evaluation of my twin brother's complaint—Omokhodion (Alfred) Eriakha (Student Number 10859637)—against the University of Mississippi, a public institution of higher education that receives federal financial assistance.

I am writing in good faith and pursuant to my rights under federal civil rights law to formally submit a **complaint of retaliation by association** and **retaliation for engaging in protected activity**, carried out by the University of Mississippi through its Department of Pharmacy Administration.

On **June 30, 2025**, both Alfred and I were simultaneously issued coordinated disciplinary memoranda by the Department of Pharmacy Administration. These actions were not only abrupt and unjustified—they were deeply distressing and have caused lasting harm to our psychological and emotional well-being. To describe the impact on our mental health as serious would be a profound understatement.

Despite our sustained good-faith efforts to raise concerns with university leadership, we have received no meaningful support, remedy, or acknowledgment. Instead, the University's continued silence, deflection, and lack of accountability have only amplified the harm and compounded our vulnerability.

This submission is intended to both support Alfred's existing OCR complaint (#06252375, submitted July 1, 2025) and to serve as an independent formal complaint under federal civil rights law, as enforced by the U.S. Department of Education's Office for Civil Rights (OCR). Supporting documentation is included as Exhibits A through F. They include signed agreements, dated correspondence, formal memoranda, and email communications that collectively substantiate both the factual timeline and legal grounds for my complaint.

**I. Context**

I began attending the University of Mississippi in August 2023 as a graduate student in the Department of Pharmacy Administration and remain enrolled in the Ph.D. program as of the date of this submission.

Until recently, I was engaged in a productive, one-on-one developmental mentoring relationship with Dr. Yinan Huang, a faculty member in the Department of Pharmacy Administration. This relationship was formally established in Fall 2024 through a signed mentoring agreement approved by the Department. It fostered a supportive environment grounded in mutual trust, psychological safety, and clear academic guidance.

However, in Summer 2025, this mutually agreed-upon mentoring relationship was unilaterally restructured—**without my knowledge, consent, written explanation, or reference to any applicable policy or procedural basis**. Specifically, Dr. Yi Yang, the Department Chair, inserted herself as a co-mentor into what had previously been a clearly defined and effective one-on-one arrangement, directly violating the terms of the mentoring agreement signed by both Dr. Huang and me.

Around the same time, Dr. Yang also began attending weekly research meetings that had, up to that point, been held exclusively between Dr. Huang and me. These one-on-one meetings had been an essential source of academic feedback, professional development, and psychological safety.

These abrupt and unexplained changes occurred during the same period that my twin brother, Omokhodion (Alfred) Eriakha, submitted formal complaints raising protected concerns regarding breach of contract, due process violations, retaliation, and the denial of disability-related accommodations—all within the Department of Pharmacy Administration.

During this period, I respectfully expressed concerns about the coercive nature of the unilateral restructuring of my mentoring arrangement, the lack of transparency, and the sudden sense of heightened surveillance and pressure I began to experience. I communicated these concerns clearly, professionally, and in writing, explicitly noting the emotional distress these changes were causing.

Rather than engaging with my concerns in good faith, the Department responded with silence, deflection, and ultimately, retaliatory action.

## II. Heightened Scrutiny and Surveillance

Following Alfred's protected activities—most recently on June 3, 2025, when he formally raised concerns regarding departmental policy violations, denial of disability-related accommodations, and threats of retaliation—I experienced a marked increase in departmental scrutiny, coercion, intimidation, and ultimately, retaliation for raising protected concerns of my own. This escalation culminated in the issuance of a selectively framed disciplinary memorandum against me.

The timing, coordination, and lack of any legitimate justification for this adverse action strongly suggest that I am being targeted not only in response to my own protected activity but also in retaliation for my familial association with Alfred.

OCR's January 2025 *Revised Guidance on Retaliation* explicitly states that adverse actions taken against the family members or siblings of individuals who engage in protected activity may constitute unlawful retaliation—especially when such actions appear designed to penalize past reporting or deter future disclosures.

The following timeline illustrates the close temporal proximity between Alfred's protected disclosures and the sudden shift in my academic environment—marked by increased surveillance, coercive oversight, and adverse changes consistent with retaliation:

- **June 3, 2025:**

    *Alfred followed up with the Dean of the Graduate School, copying the Department Chair, Dr. Yi Yang, and Graduate Program Coordinator Dr. Marie Barnard, to report the Department's ongoing disregard for institutional policies, procedural fairness, and disability accommodation obligations.*

- **June 11, 2025:**

    *I was informed that Department Chair Dr. Yi Yang would begin attending my weekly research meetings with Dr. Yinan Huang. These meetings had previously been consistently one-on-one and served as a vital source of academic support, psychological safety, and professional development.*

- **June 13, 2025:**

    *I was notified that Dr. Yi Yang would now also serve as my co-developmental mentor alongside Dr. Huang. This abrupt and imposed change occurred without my request or consent and directly violated the mentoring agreement signed by Dr. Huang and me. No justification, policy reference, or procedural explanation was provided.*

Since these unilateral changes, what was once a supportive and secure mentoring environment has been replaced with one defined by intensified oversight, coercive pressure, and disregard for both procedural fairness and student well-being. I now question whether the Department Chair's presence extends to all of Dr. Huang's academic interactions—or whether this heightened scrutiny has been selectively and disproportionately imposed on me due to my familial association with Alfred, or for other undisclosed reasons.

### III. Shifting Rationales

The explanations I have received for the increased surveillance, heightened monitoring, and unilateral restructuring of my mentoring relationship have been consistently vague, contradictory, evasive, or entirely withheld. At no point have these justifications reflected transparency, consistency, or genuine concern for my academic development and psychological safety.

Instead, they appear designed primarily to protect or advance faculty interests—at the direct expense of student rights, autonomy, and well-being.

Specific examples of these shifting and inconsistent rationales include:

1. **Dr. Yi Yang** (Department Chair) initially stated that the restructuring was intended *"to support Dr. Yinan Huang's professional development,"* and claimed that it had been approved by *"all tenured faculty."*

2. **Dr. Yinan Huang**, however, disclosed during a virtual meeting on July 17, 2025, that Dr. Yang's decision to insert herself as co-mentor was actually to **"protect her"** (Dr. Huang), as she was planning to leave the university. This admission strongly suggests that the restructuring was not implemented to support my academic growth, but rather to shield faculty from

scrutiny—at the direct cost of my autonomy, psychological safety, and continuity of mentoring support.

3. **Dr. John Bentley**, another faculty member, explicitly told me that he could not disclose the reason for the restructuring due to unspecified "faculty rights." Yet in the same conversation, he advised me to set aside my concerns and to "just go along" without further inquiry—implicitly pressuring me to forfeit my rights in deference to unnamed faculty interests.

4. **Dr. Annette Kluck** (Dean of the Graduate School) offered only a generalized assertion that the changes were *"appropriate as outlined in the information provided by Dr. Yang."* She neither addressed the detailed concerns I had documented nor offered any policy-based justification for the abrupt restructuring or its psychological and procedural harms.

These justifications—not only inconsistent but wholly lacking in procedural transparency, educational rationale, or reference to written policy—appear deliberately opaque and self-protective.

Additional troubling remarks made by Dr. Huang during the July 17, 2025, meeting further underscore this problematic dynamic:

- *"I am still searching for a job, transitioning to California, she [Dr. Yang] wants to protect me, that's why we did not tell you the truth."*
- *"We need to keep the faculty happy. If they are not happy, we may not be able to use data for our projects."*
- *"Dr. Yang was the one who recruited me. She sponsored you during the summer. She pays you."*
- *"The developmental session wouldn't take much of your time. It could last only three minutes."*
- *"You don't need to say much during the developmental session—just do me the favor... I know it must be hard, but this is the decision."*
- *"You will be smart enough to make the right decision—to make my life easier, your life easier, and everybody's life easier."*

Following my respectful yet firm objections to the coercive and emotionally manipulative tone of this interaction, Dr. Huang sent a follow-up email (dated July 17, 2025) attempting to retroactively reframe the meeting as a neutral "notification." This after-the-fact recasting only reinforces the lack of transparency, the use of pressure tactics, and the overall pattern of bad-faith communication.

Taken together, these contradictory rationales, coercive strategies, and retroactive justifications reinforce the conclusion that the unilateral restructuring of my mentoring arrangement was neither procedurally legitimate nor educationally motivated—and may in fact have been pretextual.

This concerning pattern aligns directly with the U.S. Department of Education's January 2025 *Revised Guidance on Retaliation*, which cites **"inconsistent or shifting explanations"** as a core indicator of retaliatory motive—particularly in academic settings where power imbalances may be used to suppress student concerns and rights. The parallels here are unmistakable and strongly support the conclusion that the actions I experienced were retaliatory in nature.

### IV. Protected Activities

Between June 13 and June 24, 2025, I raised multiple good-faith concerns—each squarely within the domains of procedural fairness, transparency, mentoring integrity, and graduate student rights. These communications, which were made respectfully and in writing, addressed the following:

- The **coercive restructuring** of my mentoring agreement—specifically, the unilateral imposition of the Department Chair, Dr. Yi Yang, as a co-mentor for the 2024–2025 academic year. This unilateral restructuring directly violated a mutually signed, department-approved mentoring agreement (dated July 19, 2024) that formalized a one-on-one developmental mentoring relationship with Dr. Yinan Huang (see Exhibit A).

- The **breach of multiple provisions** of that agreement, executed without my knowledge, consent, or any policy-based explanation or procedural justification (see Exhibit D).
- Dr. Yi Yang's attempt to **impose an in-person meeting** format for my developmental mentoring sessions—despite my clearly documented preference for a virtual format and prior mutual agreement with Dr. Huang confirming virtual engagement (see Exhibit B).
- Unwarranted surveillance, intrusion, and coercive oversight by Dr. Yi Yang, who inserted herself into previously one-on-one weekly research meetings with Dr. Huang and intended to do the same for my developmental mentoring sessions.
- The resulting erosion of psychological safety, trust, and student autonomy within what had previously been a respectful and developmentally productive mentoring relationship.

These concerns were communicated clearly, respectfully, and in accordance with institutional policy to both departmental and university leadership. I made every effort to engage constructively, inviting dialogue and resolution. Yet rather than respond in good faith, the Department engaged in direct retaliation.

Several individuals were aware of my protected activities as well as the subsequent retaliatory actions taken against me. These include both witnesses and institutional actors who received direct communication about my concerns:

- **Alfred Eriakha**

    Relationship: Twin brother

    Email: eriakhab@gmail.com

    Role: Witness to multiple key events, including procedural concerns, written communications, adverse actions taken against me, and also a co-complainant in related retaliation concerns.

- **Dr. Yinan Huang**

   Role: Assigned developmental mentor, recipient of protected concerns

   Email: yhuang9@olemiss.edu

   Affiliation: Department of Pharmacy Administration, University of Mississippi

- **Dr. Yi Yang**

   Role: Chair, Department of Pharmacy Administration; directly implicated in both mentoring coercion and retaliatory action

   Email: yiyang@olemiss.edu

- **Dr. Marie Barnard**

   Role: Graduate Program Coordinator, author of the June 30 disciplinary memorandum

   Email: mbarnard@olemiss.edu

- **Dr. Annette Kluck**

   Role: Dean of the Graduate School; recipient of escalated concerns

   Email: askluck@olemiss.edu

- **Dr. John Bentley**

   Role: Faculty Member; copied on protected correspondence

   Email: phjpb@olemiss.edu

These individuals were either recipients of my protected communications or were directly involved in the retaliatory action(s). Documentation sent to them includes dated emails, attachments, and rebuttals outlining procedural irregularities, violations of the signed mentor-mentee agreement, and concerns regarding student agency, autonomy, and psychological safety.

I have no reason to believe that any of the witnesses or named individuals would refuse to speak with the Office for Civil Rights. I expect that they will provide truthful and accurate information if contacted, as they were directly involved in or informed of the relevant events.

## V. Retaliation for Protected Activities

On **June 30, 2025**—just days after my protected disclosures—I received a selectively framed disciplinary memorandum falsely alleging non-submission of the Abilities Transcript (AT). The memorandum not only misrepresented the facts, but also explicitly threatened punitive sanctions, including reclassification of my student status from full to provisional, if I did not comply with mentoring conditions I had explicitly identified as coercive and psychologically unsafe.

This adverse action was:

- **Factually inaccurate**, as I had repeatedly communicated my intent to complete the AT under fair and psychologically safe conditions (see Exhibit B),
- **Procedurally deficient**, as it was issued without addressing the unresolved protected concerns I had raised (see Exhibit C), and
- **Retaliatory in nature**, as it closely followed my protected activity and functioned as a punishment for asserting my rights (see Exhibit D).

My communications made clear that the sudden, unexplained restructuring of my mentoring agreement—and its psychological impact—had fundamentally disrupted the trust and developmental foundation the AT was meant to reflect. Rather than engage with these legitimate concerns, the Department chose to reframe my good-faith advocacy for a safe academic environment and a procedurally sound mentoring process as misconduct warranting discipline.

This constitutes a textbook case of retaliation under federal civil rights law. The temporal proximity, lack of justification, punitive tone, factually inaccurate, procedurally deficient, and selectively misleading nature of the June 30 memorandum all align with the indicators outlined in OCR's January 2025 *Revised Guidance on Retaliation*, including:

- Temporal proximity between protected activity and adverse action,
- Inconsistent or shifting explanations,
- Heightened scrutiny and surveillance,
- Disproportionate responses to student concerns, and
- Targeting of individuals who assert their rights.

I respectfully submit that my actions were not only protected but also undertaken in the spirit of promoting fairness, transparency, and accountability within an academic setting. The response I received was punitive, psychologically harmful, disproportionate, and unjust.

These adverse actions were taken by individuals within the Department of Pharmacy Administration, including:

- **Dr. Yi Yang**, Chair of the Department of Pharmacy Administration, co-authored the June 30, 2025, disciplinary memorandum and directly engaged in acts of coercion, intimidation, and retaliatory surveillance,

- **Dr. Marie Barnard**, Graduate Program Coordinator, who authored and signed the June 30, 2025, disciplinary memorandum threatening punitive academic sanctions tied to non-submission of the AT—despite having full knowledge of the coercive mentoring restructuring and the unresolved procedural concerns I had raised in good faith.

Even more troubling, the memorandum I received closely mirrored—in tone, timing, and authorship—the simultaneous disciplinary action taken against my twin brother, Omokhodion Alfred Eriakha, on the very same day.

Specifically, the June 30 disciplinary memorandum I received:

- Was authored and signed by the **same faculty members** who simultaneously sanctioned Alfred,
- Included **no reference to prior performance issues**, academic misconduct, or violations of clearly documented departmental or university policy,
- Contained explicit threats of punitive academic sanctions, including reclassification from full to provisional student status—threats that carry significant immigration-related consequences for international students, and
- Demanded compliance with mentoring conditions I had already identified as coercive, intimidating, and psychologically unsafe.

These actions have created an atmosphere of intimidation, surveillance, and coercive pressure—enforced under the looming threat of academic penalties and immigration-related consequences. The resulting psychological distress, disruption of academic development, and fear of reprisal have had a profound chilling effect on my ability to participate fully and meaningfully in my academic program. I now hesitate to assert my rights or raise concerns—rights that are explicitly protected under federal civil rights law—because past good-faith efforts have resulted only in punishment.

  o When I sought a clear rationale or policy-based justification for the mentoring changes, I received evasive, shifting, and contradictory explanations.
  o When I respectfully resisted coercion, I was accused of noncompliance.
  o When I documented my concerns and communicated them in writing, I was explicitly punished.

This pattern exemplifies unlawful retaliation—not only in form, but in sustained effect. It has disrupted my educational access, eroded my psychological safety, and left me uncertain whether

future academic interactions will be opportunities for mentorship or mechanisms of surveillance and reprisal.

The U.S. Department of Education's January 2025 *Revised Guidance on Retaliation* makes clear that retaliation includes not only discrete adverse actions but also ongoing behaviors and environmental conditions that deter protected activity, impair educational participation, or cause psychological harm. The conditions I have described meet that standard and continue to impact my academic standing, professional development, and personal well-being.

## VI. Legal Context and Request for OCR Action

I respectfully assert the following:

- My twin brother, Omokhodion Alfred Eriakha, engaged in protected activities by formally reporting concerns regarding breach of contract, denial of disability-related accommodations, and retaliation within the Department of Pharmacy Administration.
- In the immediate aftermath of Alfred's protected disclosures, I began to experience heightened surveillance, coercive pressure, and escalating psychological distress.
- Between June 13 and June 24, 2025, I personally engaged in protected activity by raising formal, written concerns regarding:
    - The **coercive restructuring** of my mentoring arrangement,
    - **Breaches** of a signed and department-approved mentoring agreement, and
    - The **loss of psychological safety** and **autonomy** within my academic environment.
- On June 30, 2025, I was issued a disciplinary memorandum falsely alleging failure to submit the Abilities Transcript (AT), despite:

- o My **documented willingness** and repeated good-faith efforts to complete the AT under psychologically safe and procedurally fair conditions,
- o My **repeated, good-faith requests** for clarification—none of which received a substantive response—regarding the unresolved restructuring,
- o And the **close temporal proximity**—just days—between my protected disclosures and the issuance of the adverse action.

The timing, coordination, and lack of legitimate, policy-based justification for the Department's June 30 actions—combined with prior coercive conduct—are strongly suggestive of pretextual and retaliatory intent. I believe these actions were taken to intimidate, silence, and punish me for asserting my own rights, for my familial association with Alfred, and to deter future lawful advocacy.

### VII. Request for OCR Action

In light of these facts, I respectfully request that the U.S. Department of Education, Office for Civil Rights (OCR):

1. **Formally incorporate this submission** into Complaint #06252375 as additional evidence of escalating retaliation and procedural violations carried out by the University of Mississippi through its Department of Pharmacy Administration,

2. **Alternatively,** docket this as a new but related complaint, with appropriate cross-referencing under OCR's procedural guidelines,

3. **Investigate the June 30, 2025, adverse actions** as part of a broader pattern of coordinated retaliation, coercion, and intimidation directed at both Alfred and me,

4. **Examine the Department of Pharmacy Administration's mentoring practices** for compliance with federal civil rights obligations—particularly the requirement that mentoring

relationships remain voluntary, developmentally appropriate, transparent, and free from coercion, retaliation, intimidation, surveillance, or psychological harm,

5. **Recommend corrective actions** necessary to restore an educational environment free from coercion, retaliation, and intimidation,

6. **Recommend specific remedies**, including:

    a. Immediate restoration of my **one-on-one mentoring relationship** with Dr. Yinan Huang, as formalized in the signed agreement dated July 19, 2024 (Exhibit A),

    b. **Removal** of the June 30, 2025, disciplinary memorandum—and any related threats, sanctions, or adverse notations—from my official student record,

    c. A formal written **non-retaliation assurance** from the University, guaranteeing my continued participation in graduate education free from reprisal, and

    d. **Implementation of independent oversight measures** to ensure all future mentoring arrangements are voluntary, transparently documented, and fully compliant with university policy and federal civil rights protections.

These requested remedies are essential for restoring procedural fairness, student autonomy, psychological safety, and institutional accountability within the University of Mississippi's Department of Pharmacy Administration.

I have not filed a lawsuit in state or federal court, and to the best of my knowledge, no federal, state, or local civil rights enforcement agency is currently reviewing, investigating, or has resolved the same allegations raised in this submission.

As of the date of this submission, the allegations remain unresolved. The University has not taken any steps toward resolution, remediation, or accountability. The June 30, 2025, disciplinary memorandum remains active, and the coercive mentoring structure and threat of reclassification

of my student status from full to provisional continue to impair my academic safety and participation.

## VIII. Supporting Exhibits

To substantiate the claims and factual narrative presented in this submission, I respectfully include the following exhibits:

- **Exhibit A**: Signed one-on-one mentoring agreement with Dr. Yinan Huang (dated July 19, 2024).

- **Exhibit B**: Email correspondence documenting my protected concerns and the Department's subsequent interference (June 13–24, 2025).

- **Exhibit C**: June 30, 2025, disciplinary memorandum issued against me by the Department of Pharmacy Administration.

- **Exhibit D**: Formal written rebuttal submitted in response to the June 30 disciplinary memorandum.

- **Exhibit E**: Email exchanges illustrating the Department's lack of transparency, evasiveness, and shifting explanations regarding the unilateral restructuring of my mentoring arrangement and related procedural concerns.

- **Exhibit F**: Email correspondence reflecting Dr. Yinan Huang's attempt to retroactively reframe the coercive July 17, 2025, meeting as a neutral "notification," despite prior pressured communication.

## IX. Final Reflection

At its core, this complaint concerns the inappropriate and unlawful exercise of institutional authority—particularly when students seek to assert their legally protected rights.

- I should not have to choose between safeguarding my autonomy, agency, and psychological safety, and preserving my academic standing.

- I should not be forced into silence or compliance out of fear of punitive sanctions, academic retaliation, immigration-related threats, or intrusive surveillance.

- I should never be punished or retaliated against for raising legitimate concerns—especially when those concerns are expressed respectfully, documented in writing, and communicated in good faith under both institutional policy and federal civil rights law.

The actions of the Department of Pharmacy Administration clearly violate the standards and prohibitions articulated under federal civil rights statutes, as enforced by the U.S. Department of Education's Office for Civil Rights (OCR). OCR explicitly prohibits intimidation, coercion, academic penalties, heightened scrutiny, or any form of reprisal in response to protected activity. Students must be able to raise concerns about discrimination, procedural injustice, or unsafe academic conditions without fear of retaliation.

The adverse actions described in this complaint—including the June 30, 2025, disciplinary memorandum, the resulting psychological harm, the coercive restructuring of my mentoring relationship, and the ongoing environment of intimidation—are all consistent with OCR's definition of unlawful retaliation.

I affirm that the information in this submission is true, accurate, and complete to the best of my knowledge. I remain fully willing to provide further documentation, clarification, or testimony as requested and commit to cooperating in good faith throughout the OCR's investigative and resolution process.

Respectfully submitted,

Ehiremen (Bennard) Eriakha

Email: eriakhabernard@gmail.com