

RECEIVED

SEP 19 2025

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

# UNITED STATES DISTRICT COURT

for the

Northern District of Mississippi

Oxford Division

| | | |
|---|---|---|
| Ehiremen Bennard Eriakha | ) | Case No. 3:25-cv-00250 |
| *Plaintiff(s)* | ) | |
| -v- | ) | |
| | ) | |
| University of Mississippi; Dr. Yi Yang; Dr. | ) | |
| Marie Barnard; Dr. Annette Kluck; Dr. Yinan | ) | |
| Huang | ) | |
| *Defendant(s)* | ) | |

# MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY

# INJUNCTION MOTION

1

# Table of Contents

MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION MOTION ....................... 1

STATEMENT OF FACTS ................................................................................................ 4

    Plaintiff's Academic Record: No Legitimate Basis for Sanction .............................................. 4

    Binding Mentor–Mentee Agreement Guaranteeing One-on-One Mentorship ........................... 5

    Coercive Restructuring and Surveillance in Violation of Mentoring Agreement....................... 5

    Complaint Regarding Increased Surveillance, Coercion, Psychological Safety, and Breach of
Signed Mentor-Mentee Agreement ........................................................................................... 6

    Inconsistent Justifications and Shifting Rationales.................................................................... 7

    Misuse and Repurposing of Developmental Tool...................................................................... 8

    Rebuttal Letter and Institutional Stonewalling ......................................................................... 9

    Downgrade to Provisional Status and Graduate Research Assistantship Termination .............. 9

    Consequences of Defendants' Actions...................................................................................... 10

ARGUMENT.................................................................................................................... 12

I.    Plaintiff Has a Substantial Likelihood of Success on the Merits........................................... 12

    A.    First Amendment Retaliation (Speech, Petition, and Association) .................................... 12

    B.    Equal Protection (Fourteenth Amendment / § 1983) ....................................................... 22

    C.    Violation of Due Process (Fourteenth Amendment / § 1983).......................................... 26

    D.    Mississippi Law: Breach of Contract, Implied Covenant, and Fiduciary Duty................ 31

E.    Cumulative Likelihood of Success ................................................................. 33

II.   Plaintiff Will Suffer Irreparable Injury Without the Injunction ............................................ 35

III.  The Balance of Equities Strongly Favors Plaintiff ............................................................. 43

IV.   The Public Interest Compels Granting the Injunction ....................................................... 46

V.    Anticipated Defenses Fail .................................................................................................. 49

PRAYER FOR RELIEF ................................................................................................................. 54

CONCLUSION .............................................................................................................................. 55

# STATEMENT OF FACTS

### Plaintiff's Academic Record: No Legitimate Basis for Sanction

Ehiremen (Bennard) Eriakha is a Ph.D. student in the Department of Pharmacy Administration at the University of Mississippi. Since beginning his program in August 2023, he has remained in continuous good standing, earning straight A+ grades across four consecutive semesters and maintaining a perfect 4.0 GPA. He has never failed a course, withdrawn, or been cited for any academic deficiency.

His record reflects consistent academic and professional distinction:

- In 2024, he presented research at the International Society for Pharmacoeconomics and Outcomes Research (ISPOR) national conference, where his abstract ranked in the top 5% of submissions.
- In 2024, he was inducted into Phi Kappa Phi, the nation's oldest and most selective all-discipline honor society, generally limited to the top 10% of graduate students.
- In 2024, he was named Teaching Assistant of the Year by the School of Pharmacy.
- In 2025, he was inducted into the Gamma Beta Phi National Honor Society and later into the Rho Chi Society, both of which recognize distinguished academic and professional achievement in pharmacy.

Taken together, this record establishes no legitimate academic basis for Defendants' sanctions. Plaintiff's performance is one of sustained excellence, not deficiency.

4

**Binding Mentor–Mentee Agreement Guaranteeing One-on-One Mentorship**

On July 19, 2024, Plaintiff executed a signed Mentor–Mentee Agreement with Defendant, faculty member Dr. Yinan Huang (Exhibit A). The Agreement, expressly approved by the Department, created a one-on-one developmental mentoring relationship intended to ensure stability, academic guidance, and professional growth. It was a core component of Plaintiff's doctoral program and an academic framework on which he reasonably relied in structuring his research, coursework, and long-term trajectory.

By documenting mentoring expectations in a signed, department-approved Agreement, the University created binding program obligations, limiting arbitrary alteration and foreclosing any claim that later departures were protected exercises of unfettered academic discretion. For nearly a year, Plaintiff and Dr. Yinan Huang maintained a stable, productive relationship marked by consistent feedback, collaborative research, and academic guidance. This trust and stability were essential to Plaintiff's progress and professional development.

**Coercive Restructuring and Surveillance in Violation of Mentoring Agreement**

On June 13, 2025, Department Chair Dr. Yi Yang unilaterally dismantled Plaintiff's mentoring arrangement with Dr. Yinan Huang. Without consent, notice, or reference to any written policy, Dr. Yi Yang imposed an involuntary "co-mentorship," directly violating the signed Mentor–Mentee Agreement. The Fall 2025 Mentor Assignment List demonstrates that, unlike all other students who retained a single mentor, Plaintiff alone was involuntarily subjected to dual mentorship despite multiple documented objections (Exhibit O).

Beyond unilaterally altering the mentoring structure, Dr. Yi Yang began attending Plaintiff's weekly research meetings with Dr. Yinan Huang. These sessions had been forums for feedback,

5

collaboration, and professional development. Dr. Yi Yang's unexplained presence fundamentally altered the nature of these weekly research meetings, transforming them from academic discussions into exercises in surveillance and coercion.

This selective and abrupt departure from established practice and written commitments:

- Breached the stability and expectations guaranteed by the signed Mentor-Mentee Agreement;
- Undermined Plaintiff's mentoring relationship by replacing collaboration with coercive imposition; and
- Introduced intrusive monitoring into research meetings under the guise of "co-mentorship," without any legitimate academic justification.

## Complaint Regarding Increased Surveillance, Coercion, Psychological Safety, and Breach of Signed Mentor-Mentee Agreement

Between June 13 and June 24, 2025, Plaintiff submitted written objections to the dismantling of his one-on-one mentoring agreement and the imposition of coerced co-mentorship. These objections were directed to Dr. Yinan Huang (developmental mentor), Dr. Yi Yang (Department Chair), Dr. Marie Barnard (Graduate Program Coordinator), and Dr. Annette Kluck (Dean of Graduate School).

Plaintiff explained that the restructuring:

- Violated the plain text of the signed Mentor–Mentee Agreement, which expressly guaranteed **one-on-one** mentoring on a regular basis (Exhibit A: "*the developmental mentor will be committed to meeting **one-on-one** with the student on a regular basis*");
- Had no basis in any written policy; and
- Compromised the psychological safety essential to an effective mentoring relationship.

6

He specifically requested that the Department honor the signed Mentor-Mentee Agreement and adopt transparent, non-coercive, and psychologically safe mentoring practices. These objections placed Defendants on clear notice that Plaintiff opposed mentoring practices that were coercive, unsupported by policy, and contrary to established professional norms.

**Inconsistent Justifications and Shifting Rationales**

Despite multiple written complaints, Defendants refused to address Plaintiff's objections and instead offered shifting and contradictory explanations to justify dismantling the signed one-on-one Mentor-Mentee Agreement.

- Dr. Yi Yang initially claimed the restructuring was for "*Dr. Huang's professional development*" and had been "*approved by all tenured faculty.*"
- In a July 17, 2025, virtual meeting, Dr. Yinan Huang admitted the changes were imposed to "*protect*" her as she prepared to leave the University and to "*keep the faculty happy*" in order to preserve access to research data.
- In the same meeting, Dr. Yinan Huang added, "*Dr. Yang was the one who recruited me. She sponsored you during the summer. She pays you.*" This remark was intended to pressure Plaintiff into compliance with actions unsupported by any policy, in direct violation of the signed Mentor-Mentee Agreement, inconsistent with accepted mentoring practices, and already identified by Plaintiff as detrimental to his mental health and psychological safety.

These shifting rationales confirm that the restructuring was not a bona fide academic judgment but a coercive, retaliatory measure. Contradictory justifications of this kind are recognized as classic evidence of pretext and unlawful motive.

**Misuse and Repurposing of Developmental Tool**

On June 30, 2025—only six days after Plaintiff objected to the dismantling of his signed Mentor-Mentee Agreement—Defendants Dr. Marie Barnard and Dr. Yi Yang issued a disciplinary memorandum falsely alleging that Plaintiff had *"failed to meet a non-coursework academic performance expectation"* by *"refusing"* to submit his Abilities Transcript ("AT") (Exhibit C). The disciplinary memorandum threatened to downgrade Plaintiff to provisional status on this basis. This marked the first formal sanction against Plaintiff and followed immediately from his protected objections.

The disciplinary memorandum was both factually inaccurate and procedurally defective:

- Plaintiff had repeatedly confirmed his willingness to complete the AT under safe and transparent mentoring conditions and had actively sought to finalize the process. Defendants disregarded these communications and rebranded Plaintiff's objections to coercive mentoring as "noncompliance."

- The AT is not a graded assignment, qualifying examination, or research deliverable. It is a developmental reflection tool intended to support self-assessment, guide professional growth, and facilitate consultation with the mentor. University documents explicitly describe the AT in these terms (Exhibits P, Q).

By mischaracterizing the AT as an 'academic performance expectation,' Defendants distorted program policy and converted a formative, self-reflective, non-punitive tool into an illegitimate basis for severe sanction.

8

### Rebuttal Letter and Institutional Stonewalling

On July 9, 2025, Plaintiff submitted a detailed rebuttal letter (Exhibit D) contesting the June 30 memorandum as factually inaccurate, procedurally defective, and retaliatory. The rebuttal identified multiple defects: (1) the memorandum's incomplete and misleading narrative; (2) unresolved barriers to Abilities Transcript (AT) completion created by departmental decisions; (3) unilateral restructuring of the signed one-on-one Mentor-Mentee Agreement; (4) coercive imposition of an in-person meeting format; and (5) the improper repurposing of the AT as a disciplinary tool.

The letter was addressed to Dr. Marie Barnard, Graduate Program Coordinator, and copied to Dr. Yinan Huang (Developmental Mentor), Dr. Yi Yang (Department Chair), Dr. Annette Kluck (Dean of Graduate School), Dr. Jennifer Simons (Assistant Provost), Dr. Noel Wilkin (Provost), and the Office of the Provost. It proposed concrete remedies, including withdrawal of the June 30 memorandum, restoration of the one-on-one Mentor-Mentee Agreement, written assurances of non-retaliation, and disclosure of policies authorizing the challenged actions.

Despite this comprehensive and formally documented submission, Defendants gave no acknowledgement or response to the rebuttal letter. Plaintiff thus raised his concerns in good faith through every available institutional channel, thereby exhausting internal remedies.

### Downgrade to Provisional Status and Graduate Research Assistantship Termination

On August 21, 2025, without addressing Plaintiff's July 9 rebuttal letter, Graduate Program Coordinator Dr. Marie Barnard issued a disciplinary memorandum recommending that Plaintiff be reduced to provisional status. This was the second formal sanction, escalating the measures already

imposed. The disciplinary memorandum introduced new conditions for regaining full standing that had not previously been identified as deficiencies.

On August 22, 2025, Dean Annette Kluck ratified the downgrade of Plaintiff to provisional status (Exhibit M). The letter from Dean Annette Kluck cited Graduate School policy but omitted safeguards expressly required by the University of Mississippi's M Book (Exhibit R):

1. **Faculty Group Recommendation** – The M Book requires that changes in student status be recommended by an appropriate faculty group, such as an advisory committee or graduate education committee. Neither Dr. Marie Barnard's August 21 memorandum nor Dean Annette Kluck's letter identifies any faculty group recommendation in support of the downgrade.

2. **Documented Academic Deficiency** – The policy allows sanctions only for documented academic deficiencies. No such deficiencies were cited. Instead, the Abilities Transcript, a developmental tool, was referenced.

3. **Timing** – The policy provides that dismissals or status changes "ordinarily ... take effect between semesters or enrollment periods." Plaintiff's downgrade was imposed immediately at the start of the Fall 2025 semester.

Later on August 22, Chair Dr. Yi Yang responded to Plaintiff's August 19 inquiry regarding his missing Graduate Research Assistantship renewal letter. Dr. Yi Yang stated that Plaintiff had become "not eligible" for an assistantship because of the provisional status imposed earlier that day.

**Consequences of Defendants' Actions**

Between June and August 2025, Plaintiff experienced immediate and severe harm as a direct result of Defendants' actions:

1. **Loss of Graduate Research Assistantship** – the termination of stipend, tuition remission, and essential financial support has deprived Plaintiff of the means to continue his studies.

2. **Jeopardized F-1 Visa Eligibility** – lawful status requires continuous full-time enrollment and financial stability, both of which have been placed at risk.

3. **Disruption of Doctoral Progress** – the sanctions have resulted in what is effectively constructive expulsion from the program.

4. **Damage to Reputation and Career Prospects** – the notation of provisional status on Plaintiff's academic record has created a lasting stigma.

5. **Psychological and Emotional Distress** – instability and coercive treatment have caused significant personal harm.

6. **Risk of Losing Access to Federal Court** – the potential loss of lawful status has threatened and continues to threaten Plaintiff's ability to litigate constitutional claims.

These harms remain immediate, concrete, and irreparable. They continue to endanger Plaintiff's academic trajectory, livelihood, immigration status, and access to justice.

11

## ARGUMENT

Preliminary injunctive relief is warranted where the movant demonstrates: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm absent relief, (3) that the balance of equities favors the movant, and (4) that the injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)*; *Canal Auth. of Fla. v. Callaway, 489 F.2d 567, 572 (5th Cir. 1974)*.

The Supreme Court has clarified that irreparable harm must be "likely," not merely possible. *Winter, 555 U.S. at 22*. The Fifth Circuit applies these factors flexibly and holistically, rather than in a rigid or mechanical fashion. *Canal Auth., 489 F.2d at 572*. A particularly strong showing on the likelihood of success and irreparable harm may be decisive. *Janvey v. Alguire, 647 F.3d 585, 595–96 (5th Cir. 2011)*.

## I.      Plaintiff Has a Substantial Likelihood of Success on the Merits

### A.   First Amendment Retaliation (Speech, Petition, and Association)

Under *42 U.S.C. § 1983*, a public university may not retaliate against a student for exercising rights protected by the First Amendment. To prevail on such a claim in the Fifth Circuit, a plaintiff must show: (1) engagement in protected activity, (2) a materially adverse action, and (3) a causal connection between the two. *Keenan v. Tejeda, 290 F.3d 252, 258–59 (5th Cir. 2002)*. An action is materially adverse if it "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id. at 259*; *see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)*.

### 1.  Protected Activity

Plaintiff engaged in multiple acts of protected speech, petitioning, and association, including:

a. Submitting written objections (June 13–24, 2025) contesting the dismantling of his signed one-on-one Mentor-Mentee Agreement;

b. Raising concerns regarding coercion, psychological safety, retaliation, and procedural fairness; and

c. Filing a formal rebuttal on July 9, 2025 (Exhibit D) to the June 30 memorandum, contesting its factual inaccuracies, procedural defects, and retaliatory purpose, and requesting redress.

These communications are protected expression and petitioning within a public university. See *Healy v. James, 408 U.S. 169, 180 (1972)* (student speech on campus entitled to full First Amendment protection); *Garcetti v. Ceballos, 547 U.S. 410, 420–21 (2006)* (petitioning government officials for redress is a core protected activity).

Additionally, Plaintiff exercised protected associational rights by visibly supporting his twin brother, Omokhodion Alfred Eriakha, whose own protected activities—including complaints of retaliation, breach of contract, due process violations, and denial of disability accommodations—were known to the Department and University. Retaliation for this association strikes at the heart of the First Amendment. *See Colson v. Grohman, 174 F.3d 498, 508 (5th Cir. 1999)* (retaliation-by-association claims recognized); *Roberts v. U.S. Jaycees, 468 U.S. 609, 617–18 (1984)* (freedom of association protects personal and family relationships).

Defendants were fully aware of Plaintiff's protected activities, as well as those of his brother, and acted with knowledge of these ongoing objections and complaints. The first element of the Fifth Circuit's retaliation test is therefore satisfied.

## 2. Materially Adverse Actions

Shortly after Plaintiff and his brother engaged in these protected activities, Defendants imposed escalating sanctions that would plainly deter a person of "ordinary firmness" from continuing to exercise protected rights. ***Keenan v. Tejeda, 290 F.3d 252, 258–59 (5th Cir. 2002)***.

- **June 13, 2025** – Chair Dr. Yi Yang dismantled Plaintiff's signed one-on-one Mentor–Mentee Agreement by inserting herself as a "co-mentor," despite the Agreement's guarantee of regular one-on-one mentoring (Exhibit A). Dr. Yi Yang then began attending Plaintiff's weekly research meetings, converting mentoring sessions into monitored environments. The U.S. Department of Education identifies surveillance and heightened scrutiny as classic indicators of retaliation. These interventions chilled academic discourse and replaced collaboration with intimidation.

- **June 30, 2025** – Within days of Plaintiff's objections and his twin brother Alfred's protected activities, Defendants issued a disciplinary memorandum recharacterizing the Abilities Transcript—a tool expressly designed to be developmental and non-evaluative—into a punitive instrument, while further threatening Plaintiff with reclassification to "provisional" status for alleged "non-submission" (Exhibit C).

- **August 21–22, 2025** – On August 21, Dr. Marie Barnard recommended, and on August 22 Dean Annette Kluck ratified, Plaintiff's downgrade to provisional status (Exhibits J, M). A few hours later that same day, Dr. Yi Yang invoked that downgrade to declare Plaintiff ineligible for his Graduate Research Assistantship (Exhibit L).

Because Plaintiff's F-1 visa requires continuous full-time enrollment and financial stability, Defendants' severe and conscience-shocking actions have jeopardized his lawful immigration status and ability to remain in the United States. The consequences have been immediate and ongoing: loss of livelihood, disruption of doctoral progress, reputational stigma, constructive

14

expulsion from the program, psychological distress, and risk of deportation. Arbitrary sanctions of this magnitude would unquestionably deter a student of ordinary firmness from exercising First Amendment rights. *Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).*

### 3. Causal Connection

The detailed chronology set forth below provides compelling evidence of causation between Plaintiff's protected activities and Defendants' escalating sanctions.

### a. 2025 – Background

Defendants knew that Plaintiff and his twin brother, Omokhodion (Alfred) Eriakha, depended on their graduate assistantship for financial survival. They were fully aware of Alfred's formal complaints alleging retaliation, breach of contract, due process violations, and denial of accommodations. On June 3, 2025, Alfred filed his most recent complaint, specifically identifying procedural and policy violations. Rather than address those concerns, the Department and University evaded accountability, quietly amending their Policies and Procedures Guide later that month to remove the very safeguard Alfred had identified as violated (see Exhibit T), and soon thereafter imposing sanctions against him.

### b. June 13, 2025 – Increased surveillance, monitoring, and coercion

Around this period, Plaintiff began experiencing heightened surveillance, intimidation, and coercive pressure. On June 13, 2025, Department Chair Dr. Yi Yang unilaterally dismantled Plaintiff's signed one-on-one Mentor-Mentee Agreement with Dr. Yinan Huang, inserting herself as a "co-mentor" without consent, notice, or any policy basis. Dr. Yi Yang then began attending Plaintiff's weekly research meetings, transforming previously collaborative sessions into monitored environments. This forced oversight was inherently intimidating and constitutes a

15

materially adverse action, as it would deter a reasonable student from speaking openly. *Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)*.

Defendants' explanations shifted over time. Dr. Yi Yang initially asserted the restructuring was for "*Dr. Huang's professional development*" and had been approved by tenured faculty. Dr. Huang later acknowledged it was imposed to "*protect*" her because she intended to leave the University and to "*keep the faculty happy*" to preserve access to research data. Such inconsistent and self-serving justifications are classic hallmarks of pretext. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000)*.

Comparator evidence confirms selective targeting. Exhibit O shows that every other student retained a single mentor, while Plaintiff alone was assigned dual mentorship. Such disparate treatment is compelling proof of retaliatory intent. *Keenan v. Tejeda, 290 F.3d 252, 259 (2002)*.

## c. June 13–24, 2025 – Protected Activities

Between June 13 and June 24, Plaintiff submitted multiple written objections to the dismantling of his one-on-one Mentor-Mentee Agreement, and the imposition of coerced co-mentorship. These objections were directed to Dr. Yinan Huang (Developmental Mentor), Dr. Yi Yang (Department Chair), Dr. Marie Barnard (Graduate Program Coordinator), and Dr. Annette Kluck (Dean of Graduate School).

In these submissions, Plaintiff explained that the restructuring violated the signed Mentor–Mentee Agreement, had no policy basis, and undermined the psychological safety essential to an effective mentoring relationship. He specifically requested that the Department honor the signed Mentor-Mentee Agreement and implement transparent, non-coercive mentoring practices.

16

These objections were core speech and petitioning activity under the First Amendment. They placed Defendants on clear notice that Plaintiff opposed coercive mentoring practices and departures from established professional norms.

### d. June 30, 2025 – Disciplinary Memorandum

On June 30, 2025—just six days after Plaintiff's written objections—Defendants Dr. Marie Barnard and Dr. Yi Yang issued a memorandum alleging Plaintiff had "*failed to meet a non-coursework academic performance expectation*" by "*failing*" to submit his Abilities Transcript ("AT") and threatened reclassification to provisional status (Exhibit C).

The close temporal proximity to Plaintiff's objections, coupled with Defendants' mischaracterization of the Abilities Transcript—a developmental, non-punitive tool—as evidence of fabricated academic deficiency, underscores the retaliatory nature of their actions. Such deliberate distortion of an academic instrument constitutes a substantial departure from accepted academic norms and eliminates any presumption of judicial deference. ***Bd. of Curators v. Horowitz, 435 U.S. 78, 91 (1978); Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985).***

### e. July 9, 2025 – Rebuttal Letter

On July 9, 2025, Plaintiff submitted a detailed rebuttal letter (Exhibit D) contesting the June 30 memorandum as factually inaccurate, procedurally defective, and retaliatory. The letter was directed to Graduate Program Coordinator Dr. Marie Barnard and copied to Dr. Yinan Huang (Developmental Mentor), Dr. Yi Yang (Department Chair), Dr. Annette Kluck (Dean of Graduate School), Dr. Jennifer Simons (Assistant Provost), Dr. Noel Wilkin (Provost), and the Office of the Provost.

17

This submission constituted core petitioning activity protected by the First Amendment. *Garcetti v. Ceballos, 547 U.S. 410, 421 (2006)*. It invoked Plaintiff's due process rights by raising contractual, procedural, and constitutional objections, and by formally requesting redress. Defendants provided no acknowledgement or response to Plaintiff's detailed letter, thereby denying him a meaningful opportunity to be heard. *Goss v. Lopez, 419 U.S. 565, 579 (1975)*.

By addressing every level of authority—mentor, Chair, Graduate Program Coordinator, Dean, Assistant Provost, and Provost—Plaintiff exhausted all internal remedies. The refusal to acknowledge or respond to Plaintiff's detailed letter, followed weeks later by reliance on a manufactured "provisional status" to terminate his assistantship, confirms that Defendants acted not on bona fide academic grounds but as part of a coordinated retaliatory scheme.

### f. August 2025 – The Assistantship Non-Renewal and Retaliatory Scheme

By August 2025, Defendants had already targeted Plaintiff's twin brother, Omokhodion (Alfred) Eriakha—issuing a false "disruption" allegation, placing him on indefinite probation, terminating his assistantship, and downgrading him to provisional status. Even under these sanctions, Alfred continued exercising his constitutional rights. To escalate coercive pressure, Defendants then extended retaliation to Plaintiff, depriving both brothers of their sole financial support and source of livelihood. This constituted retaliation not only for Plaintiff's own protected activities but also for his close familial association with Alfred—conduct squarely prohibited by the First Amendment. *Colson v. Grohman, 174 F.3d 498, 508 (5th Cir. 1999)*.

Because Plaintiff maintained a flawless academic and professional record, Defendants had no legitimate basis for terminating his assistantship or simultaneously depriving both brothers of funding. Instead, they manufactured a false "academic deficiency" through the contrived

18

imposition of provisional status, using it as a pretext to justify termination and to exert maximum coercive pressure.

The retaliatory scheme is evident from the sequence of events. In prior years, renewal letters for Fall assistantship appointments were consistently issued in June or July, creating a settled expectation of reappointment before teaching or proctoring duties commenced. In 2025, however, Defendants withheld Plaintiff's renewal letter while still assigning him assistantship duties. Only days into the semester, on August 21, they manufactured a downgrade to provisional status and then invoked that contrived status as a post hoc justification for Graduate Research Assistantship non-renewal.

The sequence unfolded as follows:

- **August 6, 2025** – Associate Dean Dr. Alicia Bouldin informed Plaintiff that Chair Dr. Yi Yang had listed him as a Teaching Assistant for the Fall 2025 semester.

- **August 8, 2025** – Dr. Bouldin formally assigned Plaintiff to PHCY 502 and PHCY 581 (Exhibit G), despite no renewal letter being issued—a departure from established practice, in which renewal letters were always issued in June or July before any assignments.

- **August 18, 2025** – PHCY 502 Team Leader Dr. James Pitcock onboarded Plaintiff by granting Blackboard access, assigning proctoring duties, and confirming his instructional role (Exhibits H, I).

- **August 19, 2025** – Plaintiff inquired with Dr. Yi Yang about the missing renewal letter. No response was provided.

- **August 21, 2025** – Graduate Program Coordinator Dr. Marie Barnard issued a memorandum recommending that Plaintiff be downgraded to provisional status.

- **August 22, 2025 (morning)** – Dean Annette Kluck ratified the recommendation, formally reducing Plaintiff to provisional status (Exhibit M).

- **August 22, 2025 (evening)** – Dr. Yi Yang belatedly responded to Plaintiff's August 19 inquiry, citing the newly imposed provisional status as the reason Plaintiff was "not eligible" for Graduate Research Assistantship renewal (Exhibit L).

The contradiction is unmistakable: Defendants withheld the routine renewal letter, assigned and onboarded Plaintiff into teaching roles, and then—only days into the semester—invoked a provisional downgrade as a justification for termination, doing so only after Plaintiff inquired about the missing renewal letter. This sequence constitutes precisely the type of "smoking gun" evidence of pretext recognized by the Supreme Court, thereby confirming that the asserted rationale was fabricated to conceal an unlawful retaliatory motive. *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)*.

Taken together—the dismantling of Plaintiff's signed Mentor-Mentee Agreement, coercive surveillance of research meetings, close temporal proximity of Defendant's retaliatory actions to Plaintiff's protected activities, shifting justifications, comparator evidence, and the Graduate Research Assistantship non-renewal scheme targeting both Plaintiff and his brother—establishes that Plaintiff's protected speech and association were motivating factors in Defendants' actions. Under *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283–84 (1977)*, the causation element is satisfied.

### 4. Unconstitutional Conditions Doctrine

In addition to establishing a prima facie case of retaliation, Plaintiff's claims are reinforced by the unconstitutional conditions doctrine, which prohibits the government from conditioning benefits

on the surrender of constitutional rights. *Perry v. Sindermann, 408 U.S. 593, 597 (1972)*. Even discretionary benefits may not be withheld for reasons that infringe constitutionally protected interests. *Id.*; see also *Elrod v. Burns, 427 U.S. 347, 359 (1976)*. This doctrine applies with particular force in higher education, where enrollment, tuition remission, and graduate assistantships are indispensable to academic opportunity and professional advancement.

Here, Defendants conditioned Plaintiff's Graduate Research Assistantship—providing stipend support, tuition remission, and health insurance—on acceptance of a retaliatory *"provisional status"* downgrade. In an August 22, 2025, email, Department Chair Dr. Yi Yang confirmed that Plaintiff was denied his assistantship *"because of his provisional status"* (Exhibit L). That status, however, was not the result of bona fide academic evaluation; it was manufactured in retaliation for Plaintiff's protected activities, including objecting to the dismantling of his signed Mentor–Mentee Agreement, opposing coerced co-mentorship, and submitting his July 9 rebuttal (Exhibit D).

This circular maneuver forced Plaintiff into an unconstitutional bind: either remain silent in the face of retaliation and coercive mentoring practices, or exercise his First Amendment rights and forfeit indispensable benefits—stipend, tuition remission, health insurance, and, as an F-1 visa holder, lawful immigration status. The Constitution does not tolerate such a choice. *Perry v. Sindermann, 408 U.S. 593, 597 (1972); Elrod v. Burns, 427 U.S. 347, 359 (1976).*

Exhibit L provides direct and unambiguous evidence that the denial of the Graduate Research Assistantship flowed from a retaliatory downgrade to *"provisional status"* manufactured in response to Plaintiff's protected conduct. This eliminates any need for inference: Defendants themselves expressly tied the denial of benefits to the retaliatory downgrade. The record thus establishes both that (i) the denial of benefits was a materially adverse action intended to deter

21

protected speech and association, and (ii) the assistantship was withheld as an impermissible condition on the exercise of constitutional rights.

Accordingly, the unconstitutional conditions doctrine supplies an independent and complementary basis for finding a substantial likelihood of success on the merits and granting injunctive relief.

### 5. Strict Scrutiny Applies

Government actions that burden core First Amendment rights are presumptively unconstitutional and subject to strict scrutiny. *Elrod v. Burns, 427 U.S. 347, 362 (1976)*. Under this standard, the government must demonstrate both a compelling interest and that its actions are narrowly tailored to achieve that interest. *Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015)*.

Defendants' sanctions directly burdened Plaintiff's rights of speech, petition, and association. No compelling interest justifies these measures, and they were not narrowly tailored; rather, they were retaliatory, overbroad, punitive, and conscience-shocking. Because these actions cannot withstand strict scrutiny, Plaintiff demonstrates a substantial likelihood of success on his First Amendment retaliation claim.

### B. Equal Protection (Fourteenth Amendment / § 1983)

The Equal Protection Clause requires public universities to treat similarly situated students alike and prohibits intentional discrimination on the basis of race or national origin. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266–68 (1977)*. Discriminatory purpose may be established through contemporaneous statements, procedural departures, or disparate treatment. Race-based classifications are inherently suspect and subject to strict scrutiny. *Adarand Constructors, Inc. v. Peña, 515 U.S. 200, 227 (1995)*; *City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)*.

22

Equal Protection also prohibits arbitrary targeting. Under the "class-of-one" doctrine, liability arises where a plaintiff is intentionally treated differently from similarly situated individuals without a rational basis. *Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).*

1. **From Stereotypes to Sanctions and Policy: Climate of Racialized Labeling Infusing Administrative Actions**

Plaintiff and his twin brother, both Black international students from Africa, were repeatedly subjected to stigmatizing labels by faculty and peers—"*bullies*," "*dominant*," and later "*disruptive*." These labels arose not from misconduct but from their active participation in classroom discussion and academic engagement.

These descriptors reflect racially coded stereotypes long used to portray the engagement of Black men as aggressive or threatening. By reframing ordinary academic contributions in this way, Defendants infused racial bias into faculty perceptions and departmental decision-making.

A contemporaneous statement by Department Chair Dr. Yi Yang underscores this bias. Dr. Yi Yang told Plaintiff that "*other faculty members are concerned that you and your brother dominate conversations and are not allowing other students to shine.*" As the Department's chief decisionmaker, Dr. Yi Yang's remark is direct evidence that racially coded stereotypes shaped faculty perceptions—probative of discriminatory intent under *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267 (1977).*

This bias crystallized into formal sanctions on June 30, 2025. On that day, four faculty members—Drs. Erin Holmes, Marie Barnard, Meagen Rosenthal, and Yi Yang—labeled Alfred "*disruptive*" without citing any specific conduct or following University safeguards. That same day, Plaintiff

23

was threatened with reclassification to provisional status through a memorandum falsely alleging *"failure"* to submit the Abilities Transcript (Exhibit C).

The timing is telling. Alfred had just filed formal complaints alleging procedural and policy violations, while Plaintiff had submitted written objections to coercive mentoring practices. Within days, Alfred was branded *"disruptive,"* Plaintiff was accused of fabricated deficiencies, and both were downgraded to provisional status. This close temporal proximity between protected activity and punitive measures is powerful evidence of retaliatory and discriminatory intent.

Thus, informal stereotypes (*"bullies,"* *"dominant"*) escalated into formal sanctions—indefinite probation for Alfred, provisional status and termination of assistantship funding for both brothers. These sanctions were punitive and conscience-shocking, depriving the brothers of academic standing and essential financial support despite Defendants' knowledge of the severe consequences. By embedding racialized perceptions into official memoranda and status determinations, Defendants transformed bias into institutional policy. This progression—from stereotype to sanction to policy—demonstrates discriminatory purpose under *Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977)*, and confirms that race and national origin were impermissible motivating factors in Defendants' actions.

## 2. Disparate Treatment

The dismantling of Plaintiff's one-on-one Mentor-Mentee Agreement on June 13, 2025, cannot be separated from the racialized climate already described. Against this backdrop, the Department justified the unilateral restructuring of this signed agreement on the grounds of *"protecting"* a faculty member who planned to leave the University—a rationale that echoed racially coded stereotypes portraying Black students as threatening or domineering.

Ordinarily, when a mentor departs, students are reassigned to another faculty member to ensure continuity. Instead, Dr Yi Yang imposed coercive surveillance and dual mentorship on Plaintiff alone. Exhibit O confirms that every other student retained a single mentor. This selective treatment demonstrates Plaintiff was targeted not on academic grounds, but through a racialized lens that recast him as a source of danger rather than as a student entitled to good-faith support.

The selective invocation of *"protection,"* particularly where the decisionmaker (Dr. Yi Yang) and the faculty member (Dr. Yinan Huang) purportedly being *"protected"* share a racial background distinct from Plaintiff's, underscores how bias shaped departmental action. The Equal Protection Clause prohibits such race-based decision-making. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267 (1977)*.

Again, taken together—the racialized climate, selective targeting, and departure from standard practice—constitute exactly the kind of historical background, disparate treatment, and procedural deviations that *Arlington Heights* recognizes as probative of discriminatory intent.

### 3. Comparator Evidence

Exhibit O (Fall 2025 Mentor Assignment List) provides direct documentary proof of disparate treatment. Every other student in the Department of Pharmacy Administration was assigned a single mentor. Plaintiff alone was subjected to dual mentorship after the unilateral dismantling of his signed one-on-one Mentor Mentee Agreement.

This deviation from standard practice demonstrates that Plaintiff was intentionally singled out. Upon information and belief, no similarly situated white or U.S.-born student has ever been:

a. Placed in dual mentorship contrary to a signed Mentor-Mentee Agreement;

b. Subjected to compelled oversight by the Department Chair; or

25

c.  Downgraded to provisional status at the beginning of a semester—with assistantship eligibility simultaneously revoked—in contravention of the M Book safeguard requiring such changes to occur "*between semesters or enrollment periods.*"

The contrast documented in Exhibit O underscores intentional discrimination and constitutes classic comparator evidence of unequal treatment under the Equal Protection Clause. *Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)*.

## C. Violation of Due Process (Fourteenth Amendment / § 1983)

The Fourteenth Amendment prohibits public universities from depriving students of liberty or property interests without a constitutionally adequate process. *Dixon v. Alabama, 294 F.2d 150, 157–58 (5th Cir. 1961); Goss v. Lopez, 419 U.S. 565, 574–79 (1975)*. The sufficiency of process is measured under the *Mathews v. Eldridge* test, which weighs: (1) the significance of the private interests at stake, (2) the risk of erroneous deprivation and the value of additional safeguards, and (3) the government's asserted interests. *424 U.S. 319, 335 (1976)*.

## 1. Protected Interests and Process Deprivation

Plaintiff held constitutionally protected liberty and property interests that were infringed without due process:

a.  **Continued enrollment in good academic standing** — This is a recognized liberty interest indispensable to higher education and professional advancement. *Dixon v. Alabama, 294 F.2d 150, 157 (5th Cir. 1961)*. Defendants deprived Plaintiff of this interest by imposing a retaliatory downgrade to "*provisional status*" without notice or hearing.

b.  **Graduate assistantship and tuition remission** — These benefits constitute property interests grounded in written policies, a consistent history of renewal before each term, and Plaintiff's

26

reasonable reliance on uninterrupted continuation absent cause. Their termination without notice or an opportunity to be heard violated established due process norms.

c. **Mentor–Mentee Agreement (July 19, 2024)** — Formally approved by the Department, this agreement created contractual and reliance interests integral to Plaintiff's doctoral trajectory. Its unilateral dismantling, without a fair process, violated Plaintiff's protected interests.

d. **Reputation and visa eligibility** — The false designation of *"provisional status"* inflicted reputational harm and, when combined with the loss of funding and tuition remission, triggered the stigma-plus doctrine. ***Paul v. Davis, 424 U.S. 693, 708–09 (1976)***. It also jeopardized Plaintiff's lawful F-1 visa status, which depends on both full-time enrollment and financial stability.

Taken together—continued enrollment in good academic standing, assistantship support, contractual mentoring, reputation, and lawful immigration status—these interests were arbitrarily deprived without notice, opportunity to be heard, or impartial review. Under ***Mathews v. Eldridge, 424 U.S. 319, 335 (1976)***, the weight of these interests and the high risk of erroneous deprivation, set against the minimal burden of providing basic safeguards, underscore the constitutional inadequacy of Defendants' actions.

## 2. Procedural Due Process Violations

The Fourteenth Amendment guarantees that before a student is stripped of academic standing, assistantship funding, or related benefits, fair procedures must be afforded. ***Dixon v. Alabama, 294 F.2d 150, 157–58 (5th Cir. 1961)***; ***Goss v. Lopez, 419 U.S. 565, 574–79 (1975)***.

The University's M Book mandates specific safeguards before any dismissal or change of status for failure to meet non-coursework academic performance expectations: (1) written warning of

alleged academic performance deficiencies, (2) review by a faculty advisory or graduate education committee, (3) a recommendation forwarded with concurrence of the graduate coordinator or chair, and (4) final action by the Graduate Dean, ordinarily "between semesters or enrollment periods" (Exhibit R).

Here, these safeguards were wholly disregarded. Plaintiff never received a written warning of bona fide academic performance deficiencies, as none existed; no evidence of review by a faculty advisory or graduate education committee, and no evidence of actual academic performance deficiencies was documented. Instead, Defendants unilaterally manufactured a *"provisional status"* downgrade at the very start of a semester, in direct violation of the M Book's requirement that such actions occur "between semesters or enrollment periods." On August 22, 2025, Dean of Graduate School Annette Kluck compounded these violations by ratifying the downgrade after the fall semester had already begun. In doing so, the Dean acted with full knowledge that multiple M Book safeguards had been bypassed and issued an official letter that deliberately omitted any reference to those procedural requirements—thereby entrenching the defects at the institutional level rather than remedying them.

Defendants may argue that the June 30 memorandum or the July 19 email regarding the Abilities Transcript provided prior notice. They did not. Both communications improperly recast a developmental, non-evaluative tool into a punitive device, fabricating an academic performance deficiency where none existed. Neither document identified any specific evidence of academic performance deficiencies, nor did they afford Plaintiff a meaningful opportunity to contest the allegations before an impartial body. Such a sham notice—circular, retaliatory, and untethered to the procedural safeguards mandated by the M Book—cannot satisfy constitutional due process.

28

*Dixon v. Alabama, 294 F.2d 150, 158 (5th Cir. 1961)*; *Mathews v. Eldridge, 424 U.S. 319, 335 (1976)*.

Under *Mathews v. Eldridge, 424 U.S. 319, 335 (1976)*, the due process violation is unmistakable:

- **Private Interest**: Plaintiff's doctoral education, assistantship funding, health insurance, and F-1 visa status—interests of the highest constitutional and practical significance.
- **Risk of Error**: Extreme, as no bona fide academic performance deficiencies were documented and Plaintiff's detailed rebuttal letter was disregarded.
- **Burden of Safeguards**: Minimal, since adherence to the M Book's safeguards would have imposed negligible cost while ensuring basic fairness.

By disregarding both constitutional mandates and the University's own governing policies, Defendants deprived Plaintiff of even the most basic procedural protections. The Supreme Court has made clear that such denial of due process is actionable in itself, irrespective of outcome. *Carey v. Piphus, 435 U.S. 247, 266 (1978)*.

### 3. Substantive Due Process Violations

The Fourteenth Amendment protects students from arbitrary and abusive exercises of government power that "shock the conscience." *Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846–47 (1998)*. Courts extend deference to genuine academic judgments, but not to sanctions imposed in bad faith, for retaliatory motives, or wholly detached from legitimate academic standards. *Bd. of Curators v. Horowitz, 435 U.S. 78, 91 (1978)*; *Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985)*.

Here, Defendants' actions were not rooted in bona fide academic evaluation but in retaliatory abuse of authority. Their conduct was conscience-shocking in at least four respects:

29

1. **Fabricated Deficiency** — Defendants repurposed a developmental, non-evaluative tool into a punitive device, manufacturing a false "academic performance deficiency" that had no basis in fact or policy.

2. **Circular Sanctioning** — Defendants engineered a provisional status downgrade at the start of the semester and then invoked that contrived status as the exclusive basis to terminate Plaintiff's assistantship, tuition remission, health insurance, and visa eligibility.

3. **Arbitrariness and Bad Faith** — The sanctions disregarded established safeguards and timing requirements, departed from recognized academic norms, and served no legitimate educational purpose. Their function was not to uphold academic standards but to punish Plaintiff for his protected speech and association.

4. **Foreseeable and Severe Harm** — Defendants acted with full knowledge that Plaintiff's assistantship was his sole source of livelihood, covering food, housing, medical care, and tuition. They also knew that F-1 visa regulations categorically prohibit outside employment, rendering the assistantship indispensable to maintaining lawful status and continuous enrollment. By terminating this sole lifeline for both Plaintiff and his brother, Defendants not only eliminated their means of survival but also deliberately placed their immigration status and academic future in jeopardy. This calculated infliction of maximal harm elevates Defendants' conduct beyond mere arbitrariness into conscience-shocking abuse.

The cumulative effect of these sanctions—imposed in bad faith, punitive in nature, untethered from legitimate academic standards, and carried out in a manner that shocks the conscience—establishes a substantial likelihood of success on Plaintiff's substantive due process claim under the Fourteenth Amendment and 42 U.S.C. § 1983.

## D. Mississippi Law: Breach of Contract, Implied Covenant, and Fiduciary Duty

Mississippi law provides independent and complementary grounds for relief. Even if the Court were to defer on Plaintiff's federal constitutional claims, he is substantially likely to prevail under state law. Claims for breach of contract and breach of fiduciary duty each independently warrant injunctive relief. Together, they confirm and reinforce the same pattern of retaliatory and arbitrary misconduct demonstrated throughout this case.

### 1. Breach of Contract

Mississippi courts recognize the student–university relationship as contractual, enforceable through signed agreements, published policies, and established practices. *Univ. of Miss. Med. Ctr. v. Hughes, 765 So. 2d 528, 534 (Miss. 2000).* Plaintiff fully performed under this contractual framework, maintaining perfect academic standing and fulfilling all assistantship responsibilities.

Key contractual sources included:

- **Mentor–Mentee Agreement (July 19, 2024):** A signed, department-approved contract guaranteeing Plaintiff a one-on-one mentoring relationship (Exhibit A).
- **Graduate School Policies (M Book):** Safeguards requiring written notice of bona fide academic performance deficiencies, review by an appropriate faculty group, and that any status change ordinarily takes effect "between semesters or enrollment periods" (Exhibit R).
- **Established Departmental Practice:** Consistent issuance of assistantship renewal letters in June or July prior to Fall teaching assignments, creating settled expectations of continuity in funding and benefits.

Defendants materially breached these obligations by:

31

- Dismantling the signed one-on-one Mentor-Mentee Agreement;

- Misusing the Abilities Transcript—expressly designed as a developmental, non-evaluative tool—as a punitive device to fabricate an academic performance deficiency;

- Disregarding M Book safeguards requiring written notice of bona fide academic performance deficiencies, review by an appropriate faculty group, and that any status change ordinarily takes effect "between semesters or enrollment periods" (Exhibit R); and

- Withholding the customary renewal letter while simultaneously onboarding Plaintiff into assistantship duties.

These breaches caused immediate and severe harm: loss of stipend, tuition remission, mentoring stability, and reputational standing. Mississippi law prohibits such arbitrary and bad-faith frustration of contractual benefits. ***Cenac v. Murry, 609 So. 2d 1257, 1272 (Miss. 1992)***.

Even if Defendants argue that no express contractual term was technically breached, Mississippi law recognizes an implied covenant of good faith and fair dealing in every contract. ***Cenac v. Murry, 609 So. 2d 1257, 1272 (Miss. 1992)***. By repurposing developmental tools, withholding renewal letters, engineering a retaliatory downgrade to provisional status, and then using that contrived downgrade to terminate Plaintiff's assistantship, Defendants acted in bad faith and frustrated the core expectations of stable mentoring, fair evaluation, and continued funding that formed the foundation of Plaintiff's contractual relationship with the University.

## 2. Breach of Fiduciary Duty

In addition, Mississippi law imposes fiduciary duties where one party places trust and confidence in another who exercises influence or control. ***Lowery v. Guaranty Bank & Tr. Co., 592 So. 2d 79, 83 (Miss. 1991)***. This principle applies with particular force in the academic mentoring context,

where faculty wield direct authority over a student's academic progress, evaluation, and professional development. The Mississippi Educator Code of Ethics reinforces this duty, requiring mentors to act in the student's best interest, provide fair guidance, and avoid unnecessary harm. *10 Miss. Code R. § 403-6.1.*

As Plaintiff's formally assigned mentor under a signed Mentor–Mentee Agreement, Dr. Yinan Huang occupied a position of trust carrying fiduciary obligations independent of contractual terms. Rather than safeguarding Plaintiff's academic trajectory, Dr. Yinan Huang acquiesced in unilaterally dismantling the signed one-on-one Mentor–Mentee Agreement and facilitated coerced dual mentorship under the Department Chair Dr. Yi Yang. By subordinating fiduciary obligations of care and good faith to departmental pressures, Dr. Yinan Huang compromised the integrity of the mentoring relationship, exposed Plaintiff to retaliatory harm, and undermined Plaintiff's justified reliance on the signed Mentor–Mentee Agreement.

This breach caused concrete harms: disruption of Plaintiff's doctoral progress, erosion of confidence in the integrity of the mentoring relationship, and heightened exposure to retaliatory sanctions. Because fiduciary duties flow from the relationship of trust itself—independent of formal policies or written agreements—this violation supplies an independent ground for relief under Mississippi law and further confirms the broader pattern of arbitrary and bad-faith misconduct.

### E. Cumulative Likelihood of Success

In conclusion, each of Plaintiff's claims, standing alone, demonstrates a substantial likelihood of success. Taken together, they render success on the merits overwhelmingly probable. Thus, the first Winter factor is not only satisfied but reinforced across multiple, independent grounds. Even

if one theory were discounted, the convergence of several well-supported claims confirms Plaintiff's strong likelihood of prevailing. That convergence also magnifies the irreparable nature of the harms and underscores the necessity of urgent injunctive relief.

## II. Plaintiff Will Suffer Irreparable Injury Without the Injunction

Absent immediate relief, Plaintiff will suffer constructive expulsion from his Ph.D. program, loss of livelihood, termination of lawful F-1 visa status, and foreclosure of access to this Court—harms that are immediate, irretrievable, and irreparable.

### 1. Irreparable by Nature

Courts consistently hold that constitutional violations, disruption of education, and loss of lawful immigration status are paradigmatic forms of irreparable harm. The Fifth Circuit has emphasized that *"when an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."* **Opulent Life Church v. City of Holly Springs, 697 F.3d 279, 295 (5th Cir. 2012)**. The Supreme Court likewise recognizes that *"the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."* **Elrod v. Burns, 427 U.S. 347, 373 (1976)**. And in the educational context, the principle is equally clear: *"an education once lost is irretrievable."* **Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 157 (5th Cir. 1961)**.

Here, Defendants' retaliatory sanctions have inflicted cascading harms—educational, financial, reputational, immigration-related, and psychological. Each injury is independently irreparable; together they constitute catastrophic harm that no later judgment could remedy.

### 2. Academic Standing and Degree Progress

The downgrade to *"provisional status"* (Exhibits J, M) constitutes constructive expulsion. Stripped of assistantship support, tuition remission, and good standing, Plaintiff cannot lawfully remain enrolled, conduct research, or advance toward his Ph.D. Each day under this status compounds the loss. Courts have long recognized that interruption of a student's education is paradigmatic

irreparable harm. *Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 157 (5th Cir. 1961)*; *Bd. of Curators v. Horowitz, 435 U.S. 78, 91–92 (1978)*.

The harm is both immediate and enduring. The "*provisional status*" label permanently stains Plaintiff's academic record, delays or prevents degree completion, and forecloses professional opportunities that no later judgment or monetary award can restore. A diploma withheld cannot be retroactively granted, and the professional momentum lost through interruption of study is irretrievable.

This injury is compounded by Defendants' dismantling of the July 19, 2024, signed Mentor–Mentee Agreement (Exhibit A), which guaranteed Plaintiff a stable one-on-one mentoring relationship central to his doctoral progress. By coercing dual mentorship under the Department Chair, Dr. Yi Yang, and misusing the Abilities Transcript as a disciplinary device, Defendants destroyed the very framework contractually promised to sustain Plaintiff's academic development. Courts give particular weight to irreparable harm flowing from breached written commitments, as is the case here.

Absent immediate injunctive relief, Plaintiff's doctoral education remains indefinitely stalled. Even a single lost semester threatens to derail his academic and professional trajectory. Such a loss is the very definition of irreparable harm: *no later judgment can restore timely Ph.D. completion under promised conditions or remove the taint from his academic record*.

### 3. Graduate Assistantship and Livelihood

The Graduate Research Assistantship was not mere employment but the essential foundation of Plaintiff's doctoral program. It provided tuition remission, stipend support, and health insurance—

36

resources indispensable to full-time enrollment and doctoral progress. Its termination dismantled the very framework necessary for academic continuation.

For an F-1 visa holder, the stakes are even higher. Federal law requires both proof of financial support and continuous full-time enrollment. By eliminating tuition remission and stipend funding, Defendants knowingly eradicated the very conditions required to maintain lawful status. The harm is immediate and inevitable: *without the assistantship, Plaintiff cannot remain enrolled or lawfully stay in the United States.*

The termination also eliminated Plaintiff's sole livelihood, severing access to food, housing, and medical care. These cascading harms—loss of basic survival resources, health coverage, academic continuity, and lawful presence—are immediate, compounding, and quintessentially irreparable.

Absent injunctive relief restoring the assistantship, Plaintiff faces collapse of his doctoral program and loss of lawful U.S. presence—consequences that would not only devastate his education but also extinguish this Court's jurisdiction to adjudicate his claims.

### 4. Provisional Status and Academic Record

The August 21–22 downgrade to *"provisional status"* (Exhibits J, M) inflicted classic stigma-plus harm forbidden by the Due Process Clause. *Paul v. Davis, 424 U.S. 693, 710–12 (1976)*; *Doe v. Purdue Univ., 928 F.3d 652, 662–63 (7th Cir. 2019).* Defendants branded Plaintiff as *"provisional"* on the basis of fabricated academic deficiencies, thereby both falsely signaling failure and stripping him of concrete entitlements—assistantship funding, tuition remission, and health insurance.

This reputational harm is enduring. Once entered on a doctoral transcript, *"provisional status"* operates as a scarlet mark that shadows Plaintiff in applications for fellowships, internships, and

37

employment. No monetary award can erase the notation or restore lost credibility. Courts consistently recognize this stigma-plus combination—false reputational injury coupled with deprivation of concrete entitlements—as paradigmatic irreparable harm. *Tex. Faculty Ass'n v. Univ. of Tex. at Dallas, 946 F.2d 379, 383–84 (5th Cir. 1991).*

The downgrade also endangers Article III jurisdiction. By altering Plaintiff's status and cutting off funding, Defendants destabilized the conditions required to maintain lawful F-1 status. If compelled to leave the United States, Plaintiff would lose standing to obtain relief on the merits, be unable to participate in hearings or discovery, and face arguments that the case is moot. Federal courts consistently grant preliminary injunctive relief to prevent defendants from mooting litigation through the very conduct under challenge. *Friends of the Earth v. Laidlaw, 528 U.S. 167, 189 (2000).*

Accordingly, the August 21–22 reclassification to provisional status inflicts immediate and ongoing stigma-plus harm—permanently marking Plaintiff's academic record, stripping him of educational and financial entitlements, and placing this Court's jurisdiction at risk by threatening his lawful presence in the United States.

## 5. Immigration Status and Lawful Presence

Federal regulations require F-1 students to maintain both continuous full-time enrollment and documented financial support for tuition and living expenses. *8 C.F.R. § 214.2(f)(5), (6), (7)(i).* By reclassifying Plaintiff to *"provisional status"* (Exhibits J, M) and cutting off the Graduate Research Assistantship that furnished tuition remission, stipend, and health insurance (Exhibit L), Defendants eliminated the very conditions necessary for lawful presence.

The consequence is inevitable: *without full-time enrollment and funding, SEVIS will terminate Plaintiff's F-1 status*. Loss of lawful presence would not merely pause his education—it would end his doctoral career, foreclose professional opportunities, and inflict harms no damages could repair. Courts consistently hold that immigration-related harms of this nature constitute irreparable injury. *See Chavez v. INS, 783 F.2d 1342, 1346 (5th Cir. 1986)*; *Texas v. United States, 809 F.3d 134, 187 (5th Cir. 2015)*; *Nken v. Holder, 556 U.S. 418, 435 (2009)*. And unlike the generalized removal concerns in *Nken*, Defendants here deliberately created conditions that make loss of status a certainty absent relief.

Accordingly, preserving Plaintiff's lawful presence is essential both to avert catastrophic, irreparable harm to his education and career and to protect this Court's jurisdiction to decide the case on the merits.

## 6. Professional Reputation and Career Prospects

The downgrade to *"provisional status"* (Exhibits J, M) imposed reputational stigma that directly undermines Plaintiff's professional future. In academia, a transcript entry of academic deficiency shadows every application for fellowships, internships, and academic or professional positions. Once recorded, the *"provisional status"* label becomes a lasting mark of failure that no damages award or later vindication can erase from evaluators' perceptions.

This harm is especially grave because academic advancement depends on demonstrated competence and uninterrupted doctoral progress. The false stigma of academic deficiency undermines Plaintiff's credibility, excluding him from grants, collaborations, and career-building opportunities at the most critical stage of his professional development.

Even a later victory at trial cannot undo the damage: *diminished competitiveness and compromised recommendations are irretrievable*. These harms are immediate, compounding, and irreparable—providing an independent and sufficient basis for injunctive relief.

## 7. Psychological Harm and Chilling Effect

Defendants' retaliatory actions inflicted profound psychological harm and chilled constitutionally protected activity. Instead of pursuing his doctoral research and academic responsibilities, Plaintiff has been forced into a climate of intimidation and uncertainty. The dismantling of his July 19, 2024, signed Mentor–Mentee Agreement (Exhibit A), surveillance of research meetings, and racially coded labeling ("bullies," "dominant") triggered severe anxiety, depression, and loss of trust in the academic environment. These harms are ongoing, cumulative, and irreparable.

Courts consistently hold that psychological distress linked to professional identity and constitutional violations constitutes irreparable harm. *Chalk v. U.S. Dist. Ct., 840 F.2d 701, 709–10 (9th Cir. 1988)*. The Fifth Circuit likewise presumes irreparable harm whenever constitutional rights are at stake. *Opulent Life Church v. City of Holly Springs, 697 F.3d 279, 295 (5th Cir. 2012)*.

The chilling effect is equally clear. By retaliating against Plaintiff for objecting to coerced co-mentorship and procedural violations, Defendants conveyed that engaging in protected activity would be punished. The Supreme Court has held that chilling First Amendment activity constitutes irreparable harm. *Elrod v. Burns, 427 U.S. 347, 373 (1976)*. In the academic context, the harm is heightened: the Court has emphasized that *academic freedom is "a special concern of the First Amendment"* and that *its suppression undermines the "marketplace of ideas" essential to higher education. Keyishian v. Bd. of Regents, 385 U.S. 589, 603 (1967)*.

40

These harms—psychological distress, erosion of trust, and suppression of protected expression—cannot be remedied through damages or delayed reinstatement. They represent a distinct and paradigmatic form of irreparable injury, independently warranting immediate injunctive relief.

## 8. Jurisdiction at Risk

Finally, and most critically, absent immediate injunctive relief, Defendants' actions jeopardize this Court's ability to adjudicate the case on the merits. By stripping away the conditions required for continued enrollment and lawful presence, Defendants have created a concrete risk of Plaintiff's constructive removal from both his doctoral program and the United States.

If compelled to leave the United States, Plaintiff would lose standing to obtain relief on the merits, be unable to participate meaningfully in hearings or discovery, and expose the case to arguments of mootness. Federal courts routinely invoke their equitable authority to prevent defendants from undermining judicial review through the very conduct being challenged. *Friends of the Earth v. Laidlaw, 528 U.S. 167, 189 (2000)*. Courts have likewise enjoined student disciplinary actions where loss of enrollment or status would otherwise foreclose meaningful adjudication. *Doe v. Univ. of Cincinnati, 872 F.3d 393, 407 (6th Cir. 2017)*.

Accordingly, preliminary relief is essential to protect Plaintiff's rights and to preserve this Court's Article III jurisdiction by ensuring Plaintiff can remain in the United States to fully litigate his claims on the merits.

## Summary of Irreparable Harm

Plaintiff faces overlapping harms that are immediate, compounding, and irreparable. Defendants' actions have derailed his doctoral progress, stripped him of the financial and institutional support required for enrollment, jeopardized his lawful F-1 status, imposed reputational stigma, and

inflicted psychological harm while chilling protected expression. Each has been recognized as a paradigmatic irreparable injury. See *Elrod v. Burns, 427 U.S. 347, 373 (1976)* (loss of constitutional freedoms is irreparable); *Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 157 (5th Cir. 1961)* (education once lost is irretrievable); *Opulent Life Church v. City of Holly Springs, 697 F.3d 279, 295 (5th Cir. 2012)* (no further showing needed where constitutional rights are implicated).

Preliminary injunctive relief would simply preserve the status quo—continued enrollment in full standing, funding, and lawful presence—until the Court adjudicates the merits. The equities therefore tip decisively in Plaintiff's favor, and the second Winter factor weighs heavily toward injunctive relief.

## III. The Balance of Equities Strongly Favors Plaintiff

The third Winter factor—the balance of equities—overwhelmingly favors Plaintiff. The University needs only to take a single, routine step: *preserve Plaintiff's full standing academic status*. Because the assistantship termination was expressly predicated on the manufactured downgrade of Plaintiff to "provisional status", restoring Plaintiff's status to full standing effectively reinstates tuition remission, stipend funding, and health insurance. This modest administrative action imposes no meaningful burden on the University, while denial of relief would inflict catastrophic, irreversible, and life-altering harm on Plaintiff.

## 1. Preserving the Status Quo

The relief Plaintiff seeks is narrowly tailored and restorative: *preservation of his full academic standing status as it existed before August 22*. This is the "last peaceable status quo" that preliminary injunctions are designed to maintain. ***Canal Auth. of State of Fla. v. Callaway, 489 F.2d 567, 576 (5th Cir. 1974).***

Such relief would not alter academic standards or intrude on faculty judgment. It would merely suspend disputed sanctions until their legality is resolved. For the University, compliance entails only routine administrative action. For Plaintiff, denial of relief means continued exposure to sanctions already shown to cause irreparable harm.

## 2. No Cognizable Harm to the University

Defendants may argue that interim relief intrudes on academic autonomy. But broad claims of "institutional discretion" cannot excuse violations of constitutional and contractual rights. As the Fifth Circuit has held, a public university "*has no legitimate interest in enforcing an unlawful policy.*" ***Janvey v. Alguire, 647 F.3d 585, 600 (5th Cir. 2011).***

Moreover, the burden of compliance is minimal. Restoring Plaintiff's full academic standing status requires only routine administrative steps that the University already performs each semester. Faculty remain free to evaluate his coursework and research under existing standards; the injunction merely suspends enforcement of the disputed sanctions pending judicial review.

By contrast, denying relief would result in constructive expulsion, loss of livelihood, termination of lawful immigration status, and permanent reputational stigma—harms courts have consistently deemed irreparable. See *Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 157–58 (5th Cir. 1961)*; *Doe v. Univ. of Cincinnati, 872 F.3d 393, 401–02 (6th Cir. 2017)*.

Accordingly, Defendants face no cognizable harm from complying with constitutional and contractual obligations, while Plaintiff faces catastrophic, irreparable harm if injunctive relief is denied. The balance of equities, therefore, weighs decisively in Plaintiff's favor.

### 3. Overwhelming Harm to Plaintiff if Denied

The harms Plaintiff faces absent relief are neither speculative nor remediable. They are immediate, compounding, and irreversible. As shown in prior sections, Defendants have:

- terminated Plaintiff's Graduate Research Assistantship, eliminating the financial and institutional foundation required for enrollment and lawful presence;

- imposed a false *"provisional status"* classification, inflicting reputational stigma inseparably tied to the loss of concrete entitlements; and

- dismantled the conditions necessary to maintain F-1 visa eligibility, making removal from both his program and the United States a certainty absent relief.

Individually, each of these harms is recognized as irreparable under binding precedent. Collectively, they amount to constructive expulsion, with cascading consequences to Plaintiff's

44

education, livelihood, immigration status, and professional trajectory. Courts have consistently held that the loss of constitutional rights, the interruption of education, or the loss of lawful presence in the United States each constitutes irreparable injury. *Elrod v. Burns, 427 U.S. 347, 373 (1976)*; *Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 157 (5th Cir. 1961)*; *Chavez v. INS, 783 F.2d 1342, 1346 (5th Cir. 1986)*.

Accordingly, the equities compel only one conclusion: *preliminary injunctive relief is of the utmost need*. Denial would result in constructive expulsion, loss of lawful status, and permanent damage to Plaintiff's professional future—injuries courts uniformly deem irreparable. Granting injunctive relief, by contrast, imposes only the minimal obligation of preserving the status and benefits Plaintiff lawfully held before the challenged sanctions. Where the burden on Defendants is negligible and the burden on Plaintiff is catastrophic, equity weighs decisively in Plaintiff's favor.

## IV.    The Public Interest Compels Granting the Injunction

Preliminary injunctive relief serves not only Plaintiff's interests but also the public's compelling stake in enforcing constitutional guarantees, civil rights protections, and the integrity of higher education. As the Supreme Court emphasized, "*there is the highest public interest in the due observance of all the constitutional guarantees.*" ***Elrod v. Burns, 427 U.S. 347, 373 (1976).*** The Fifth Circuit likewise confirms that "*it is always in the public interest to prevent the violation of a party's constitutional rights.*" ***Opulent Life Church v. City of Holly Springs, 697 F.3d 279, 295 (2012).*** Enjoining Defendants therefore advances the public interest by ensuring that a publicly funded university complies with constitutional and statutory mandates, protects fair access to higher education, and maintains the integrity of academic processes pending final adjudication.

### 1.  Protecting Constitutional Guarantees.

The public has a compelling interest in ensuring that public universities act within constitutional limits. As the Supreme Court has emphasized, "*there is the highest public interest in the due observance of all the constitutional guarantees.*" ***Elrod v. Burns, 427 U.S. 347, 373 (1976).*** The Fifth Circuit likewise holds that "*it is always in the public interest to prevent the violation of a party's constitutional rights.*" ***Opulent Life Church v. City of Holly Springs, 697 F.3d 279, 295 (2012).***

Enjoining Defendants from enforcing retaliatory and procedurally defective sanctions vindicates not only Plaintiff's rights but also the broader public interest. Upholding constitutional protections in this case ensures accountability in publicly funded institutions and reaffirms the principle that students cannot be punished for exercising protected rights.

### 2.  Safeguarding Equal Access and Academic Freedom.

46

Equal access to higher education is a matter of compelling public concern. Retaliation in academic settings has systemic effects: *it deters students from exercising protected rights and undermines the integrity of the academic environment*. The Supreme Court has made clear that retaliatory acts are unlawful when they *"dissuade a reasonable person"* from engaging in protected activity. ***Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)***.

Here, defendants' sanctions send a broader signal that engaging in protected activity invites reprisal—through academic penalties, financial loss, or immigration jeopardy. Such practices chill academic freedom, suppress equal participation, and undermine public confidence in the integrity of higher education.

Preliminary injunctive relief safeguards more than Plaintiff's rights; it advances the public's compelling interest in preserving universities as forums of learning and the *"marketplace of ideas,"* free from retaliation. ***Keyishian v. Bd. of Regents, 385 U.S. 589, 603 (1967)***.

### 3. Academic Autonomy and Legal Boundaries.

Defendants may invoke "academic autonomy" as a shield, but that discretion is limited. Courts defer only to bona fide academic judgments—not to sanctions that are retaliatory, pretextual, or so arbitrary as to violate constitutional rights. See ***Doe v. Univ. of Cincinnati, 872 F.3d 393, 401–02 (6th Cir. 2017)***; ***Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985)***.

The sanctions at issue were not genuine academic evaluations but administrative retaliation cloaked in academic language. Enjoining them would not intrude on legitimate faculty prerogatives. Professors would retain full authority to assess Plaintiff's coursework and research under established standards. The injunction would simply ensure that academic discretion operates within lawful boundaries, free from pretext and constitutional violations.

47

### 4. Broader Public Policy and Institutional Integrity

The public has no legitimate interest in allowing a state university to persist in unlawful retaliation or discrimination. On the contrary, the public interest is served when courts hold public institutions accountable to constitutional and statutory mandates. As the Fifth Circuit has made clear, *"a party suffers no harm from being prevented from violating the law." Janvey v. Alguire, 647 F.3d 585, 600 (5th Cir. 2011).*

Granting relief here ensures that public resources support lawful education, not unlawful exclusion, and affirms the values of accountability, fairness, and integrity in higher education. Enjoining Defendants thus serves more than Plaintiff's rights; it vindicates the public's stake in ensuring universities operate within constitutional limits and sustain public trust in the academic system.

### 5. Conclusion

Taken together, these considerations confirm that the public interest overwhelmingly favors preliminary injunctive relief. Upholding constitutional guarantees, protecting equal access to higher education, and ensuring that academic discretion is exercised within lawful limits are all compelling public purposes. Denial of relief would not only devastate Plaintiff but also erode confidence in the fairness of higher education and weaken the rule of law. By contrast, granting relief preserves constitutional norms, safeguards equal opportunity, and sustains public trust in institutions funded by and accountable to the public. The fourth *Winter* factor is therefore decisively satisfied.

48

## V.    Anticipated Defenses Fail

Defendants may attempt to evade judicial review through several doctrinal defenses. None withstands scrutiny.

### 1.  Sovereign Immunity

Eleventh Amendment immunity poses no bar. Under *Ex parte Young*, sovereign immunity does not shield state officials from suits seeking prospective injunctive relief to halt ongoing violations of federal law. *209 U.S. 123, 159–60 (1908)*.

Plaintiff seeks only forward-looking relief—reinstatement of his Graduate Research Assistantship and suspension of unlawful sanctions. Reinstatement is a classic form of prospective relief, and no retroactive damages are sought from the state treasury.

The Fifth Circuit has reaffirmed this principle: *"Ex parte Young permits suits for injunctive relief against state officials in their official capacities to end ongoing violations of federal law." NiGen Biotech, L.L.C. v. Paxton, 804 F.3d 389, 394 (5th Cir. 2015)*. That is precisely the relief sought here.

### 2.  Qualified Immunity

Qualified immunity does not shield the individual Defendants. That doctrine protects officials only when their conduct does not violate *"clearly established"* rights that a reasonable person would have known. *Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)*.

For decades, it has been clearly established that:

- **Due Process Rights**: Public university students hold constitutionally protected property and liberty interests in continued enrollment in good standing, financial aid, and academic

49

reputation. These cannot be taken without notice and a meaningful opportunity to be heard. *Goss v. Lopez, 419 U.S. 565, 579 (1975); Bd. of Curators v. Horowitz, 435 U.S. 78, 85–86 (1978).*

- **Freedom from Retaliation**: State officials may not punish individuals for exercising constitutional rights, including free speech and petitioning activity. *Elrod v. Burns, 427 U.S. 347, 359–60 (1976); Keenan v. Tejeda, 290 F.3d 252, 258–59 (5th Cir. 2002).*

The Fifth Circuit has repeatedly denied qualified immunity in cases where state actors disregarded these principles. See *Keenan, 290 F.3d at 259* (First Amendment retaliation clearly established); *Frazier v. Garrison I.S.D., 980 F.2d 1514, 1526 (5th Cir. 1993)* (student due process rights clearly established); *Beattie v. Madison Cnty. Sch. Dist., 254 F.3d 595, 601 (5th Cir. 2001)* (continued enrollment is a protected property interest).

No reasonable university official could have believed it lawful to unilaterally and coercively dismantle a signed Mentor-Mentee Agreement, impose *"provisional status"* without notice or hearing, or terminate a Graduate Research Assistantship on contrived grounds. These actions directly violated clearly established law safeguarding students' due process and First Amendment rights.

Because Defendants' conduct falls squarely within well-settled prohibitions, qualified immunity is unavailable.

### 3. Academic Judgment

Defendants may argue their actions constitute *"academic judgments"* entitled to deference. That contention fails. The Supreme Court has long distinguished between bona fide academic evaluations—such as grading or research review—and punitive measures imposed for non-

academic reasons, which warrant no deference. *Bd. of Curators v. Horowitz, 435 U.S. 78, 85–86 (1978)*; *Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985)*.

Deference applies only to judgments about academic competence, not to sanctions divorced from scholarship. *Powell v. Syracuse Univ., 580 F.2d 1150, 1153 (2d Cir. 1978)*. When universities disregard their own rules or constitutional protections, judicial oversight is not only proper but necessary. *Doe v. Univ. of Cincinnati, 872 F.3d 393, 401–02 (6th Cir. 2017)*. Retaliation and discrimination, moreover, fall outside the sphere of academic freedom. *Zahorik v. Cornell Univ., 729 F.2d 85, 92 (2d Cir. 1984)*.

Here, Plaintiff's strong academic record was unblemished. Defendants nonetheless repurposed the Abilities Transcript—explicitly defined as *"developmental and non-evaluative"* (Exhibits P, Q)—to fabricate an "academic performance deficiency", reclassify him as "provisional," and terminate his assistantship. That misuse of a non-evaluative tool, contrary to binding policy, was administrative retaliation cloaked in academic terms.

The Supreme Court has emphasized that deference disappears where sanctions reflect "*a substantial departure from accepted academic norms*." *Horowitz, 435 U.S. at 85–86*; *Ewing, 474 U.S. at 225*. Defendants' shifting rationales, retaliatory timing, and disregard of policy confirm that no bona fide academic judgment occurred.

Accordingly, Defendants cannot shield retaliation under claims of academic discretion. Judicial deference has no application to sanctions imposed in bad faith or in violation of constitutional and contractual guarantees. In such cases, federal courts not only may—but must—intervene.

## 4. At-Will Employment

51

Defendants may argue that Plaintiff's Graduate Research Assistantship was terminable "*at will*." Mississippi law forecloses that defense.

First, the public policy exception applies. Mississippi recognizes that termination in retaliation for asserting statutory or constitutional rights violates public policy. *McArn v. Allied Bruce-Terminix Co., 626 So. 2d 603, 607 (Miss. 1993)*. Plaintiff's termination followed directly from his exercise of protected rights and falls squarely within McArn.

Second, university policies create binding obligations. The Mississippi Supreme Court has held that handbooks, policies, and appointment letters are enforceable contracts. *Univ. of Miss. Med. Ctr. v. Hughes, 765 So. 2d 528, 534–35 (Miss. 2000)*. Plaintiff's assistantship was governed by such documents, which permitted termination only for cause, bona fide funding shortfalls, or programmatic need—not retaliation.

Third, Mississippi law imposes an implied covenant of good faith and fair dealing, even where discretion exists. *Cenac v. Murry, 609 So. 2d 1257, 1272 (Miss. 1992)*. Defendants violated this covenant by using the provisional status downgrade and termination of assistantship as retaliatory tools against Plaintiff's protected activity.

Thus, Defendants cannot shield their conduct under "*at-will*" employment. Plaintiff's assistantship was contractually protected, and its retaliatory termination is unlawful under both Mississippi's public-policy exception and settled contract law. This further strengthens Plaintiff's likelihood of success and the equities supporting preliminary injunctive relief.

## 5. Exhaustion of Remedies

Defendants may argue that Plaintiff was required to exhaust internal grievance procedures or administrative remedies before filing suit. That argument fails.

First, exhaustion is not required for constitutional claims. The Supreme Court has held that § 1983 plaintiffs alleging constitutional violations may proceed directly to federal court. *Patsy v. Bd. of Regents of State of Fla., 457 U.S. 496, 516 (1982)*.

Second, any further pursuit would have been futile. Plaintiff submitted detailed rebuttals (Exhibit D), which Defendants ignored or dismissed. Courts do not require exhaustion where remedies are inadequate or futile. *McCarthy v. Madigan, 503 U.S. 140, 148 (1992)*. Plaintiff's July 9 letter—seeking transparency and fairness—was disregarded, confirming that additional steps would have been meaningless.

Third, Plaintiff's filing with the U.S. Department of Education's Office for Civil Rights (OCR) does not bar this action. OCR complaints are non-exclusive and cannot foreclose parallel judicial relief, particularly where immediate injunctive relief is required to prevent irreparable harm.

Accordingly, exhaustion poses no barrier. Plaintiff acted diligently, pursued remedies in good faith, and properly invoked this Court's jurisdiction.

In conclusion, none of the Defendants' anticipated defenses—including sovereign immunity, qualified immunity, academic deference, at-will employment, or exhaustion—survive scrutiny. Their collapse confirms that Plaintiff's claims are properly before this Court and that judicial intervention is necessary to halt ongoing violations of federal rights.

# PRAYER FOR RELIEF

For the reasons stated above, Plaintiff respectfully requests that this Court issue a preliminary injunction granting the following narrowly tailored relief pending final judgment:

1. **Restoration of Academic Status.** Maintain Plaintiff's enrollment as a full-time doctoral student in full academic standing by vacating the August 21–22, 2025, sanctions and removing all "provisional status" designations from his record.

2. **Reinstatement of Graduate Assistantship.** Order Defendants to prospectively restore and maintain Plaintiff's Graduate Research Assistantship (or equivalent appointment), including stipend, tuition remission, and health insurance. Because the assistantship termination was based solely on the contrived "provisional status" downgrade, reinstatement necessarily results in preservation of the status quo ante, restoring Plaintiff's academic status to full standing.

3. **Enforcement of Signed Mentorship Agreement.** Enforce the July 19, 2024, signed Mentor– Mentee Agreement by restoring Plaintiff to a one-on-one faculty mentoring arrangement. Dr. Yi Yang should be removed as an imposed "co-mentor," and Plaintiff permitted to continue with Dr. Yinan Huang (or another qualified faculty member, if necessary) as his primary mentor. Any future changes must comply with written policy and require Plaintiff's informed consent.

4. **Expungement of Retaliatory Records.** Expunge—or at a minimum seal—from Plaintiff's academic file all retaliatory or procedurally defective documents, including the June 30, 2025 memorandum, the August 21 recommendation, the August 22 letter, and related accusations of "non-compliance." These records shall not be used or disseminated for any academic or professional purpose.

5. **Prohibition of Retaliation**. Enjoin Defendants and their agents from engaging in any further retaliatory, coercive, or intimidating actions against Plaintiff, including changes to academic status, termination of financial support, or new disciplinary measures arising from the incidents underlying this action.

6. **Waiver or Nominal Bond**. Pursuant to Rule 65(c), waive the security requirement or, in the alternative, set bond at a nominal amount not exceeding $1. Courts have discretion to minimize bond where, as here, equitable relief advances the public interest and imposes no cognizable harm on Defendants. See *City of Atlanta v. Metro. Atlanta Rapid Transit Auth., 636 F.2d 1084, 1094 (5th Cir. 1981)*.

## CONCLUSION

Absent immediate injunctive relief, Plaintiff will suffer constructive expulsion, loss of lawful F-1 status, and lasting damage to his academic and professional future. Termination of enrollment, loss of assistantship funding, tuition remission, health insurance, and visa eligibility are quintessential forms of irreparable harm that no later remedy can cure. See *Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 157 (5th Cir. 1961)*.

The relief requested does not waive academic standards or confer unearned benefits. It simply preserves the status quo ante—Plaintiff's good standing, assistantship, and access to education—pending adjudication. That is the core purpose of Rule 65: *to prevent irreparable injury while the Court considers the merits*. See *Winter v. Nat. Res. Def. Council, 555 U.S. 7, 20 (2008)*.

Because Plaintiff has shown (1) a strong likelihood of success, (2) grave and irreparable harm absent relief, (3) no cognizable burden on Defendants, and (4) the public's compelling interest in protecting constitutional rights, this Court should grant his Motion for Temporary Restraining

Order and Motion for Preliminary Injunction. Immediate restoration of his full academic standing and assistantship is essential to prevent ongoing violations and preserve the Court's ability to afford complete justice.

Respectfully submitted,

Ehiremen Bennard Eriakha

Plaintiff, Pro Se

1802 Jackson Avenue West

Oxford, MS 38655

Phone: (662) 281-4676

Email: eriakhabernard@gmail.com

Date: September 8, 2025