# UNITED STATES DISTRICT COURT

RECEIVED
OCT 09 2025
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

for the

Northern District of Mississippi

Oxford Division

| | | | |
|---|---|---|---|
| Ehiremen Bennard Eriakha | ) | Case No. | 3:25-cv-00250 |
| *Plaintiff(s)* | ) | | |
| -v- | ) | | |
| | ) | | |
| University of Mississippi; Dr. Yi Yang; Dr. | ) | | |
| Marie Barnard; Dr. Annette Kluck; Dr. Yinan | ) | | |
| Huang | ) | | |
| *Defendant(s)* | ) | | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1

## I.     INTRODUCTION

Defendants' Motion to Dismiss (doc. 28-29) rests not on law but on distortion—anchored in overbroad claims of immunity and selective mischaracterizations of the record. Plaintiff does not challenge academic discretion, contest grades, or pursue monetary damages from the State of Mississippi. His claims seek prospective, equitable relief to remedy ongoing constitutional violations: retaliation for protected advocacy, unequal treatment based on race and national origin, and deprivation of protected liberty and property interests without due process. Each violation was carried out under color of state law by identifiable University officials acting beyond the bounds of lawful authority.

At this stage, the Court's role is limited and precise: *to assess whether the pleadings, taken as true, plausibly state a claim for relief*—not to weigh evidence or adjudicate factual disputes. ***Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)***; ***Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)***. Under this standard, every well-pleaded fact must be accepted as true and all reasonable inferences drawn in Plaintiff's favor. Viewed through that lens, the Complaint not only meets but exceeds the ***Rule 12(b)(6)*** threshold.

## II.     MISCHARACTERIZATION OF PLAINTIFF AND THE RECORD

Defendants' briefing relies on a pattern of rhetorical inversion—using words such as "*refused*," "*on his own terms*," "*obstinate*," "*insubordinate*," and "*mentor of his choice*" to invert the truth of Plaintiff's conduct. These are not factual descriptions at all, but unfounded characterizations designed to recast Plaintiff's policy-based advocacy as misconduct. The purpose is transparent: to divert attention from Defendants' own procedural violations.

2

Plaintiff's communications, contemporaneous emails, and attached exhibits reflect a consistent pattern of professionalism and good faith. He sought only what University policies require: transparency, fairness, and mutual respect. His actions were anchored in respect for institutional norms, not defiance of them. He advocated for a mentoring environment that was collegial, equitable, and psychologically safe—principles the University itself publicly espouses.

Mischaracterizations of the record burden not only the Plaintiff but also the Court. *Rule 11* requires parties to present factual and legal contentions that are grounded in evidence and to refrain from knowingly misrepresenting the record. When advocacy crosses into distortion, it threatens the integrity of judicial proceedings. Plaintiff raises this concern not as a matter of personal indignation, but as one of institutional importance: the justice system can only function when the facts before the Court reflect reality, not a strategic fiction.

The Court should accordingly view Defendants' characterizations for what they are—efforts to obscure the constitutional substance of this case beneath a veneer of caricature. Plaintiff's conduct was never "*insubordinate*"; it was principled. It was not "*on his own terms,*" but within the terms the University itself prescribed. His record is one of compliance, consultation, and courage in the face of pressure.

Accordingly, the following section sets forth, with precision and documentation, the principal factual and legal misstatements contained in Defendants' memorandum, alongside the contemporaneous evidence that corrects them. These corrections are necessary not only to protect the integrity of this proceeding but to ensure that this Court's review proceeds on a foundation of accuracy and truth.

## III.    FACTUAL AND LEGAL CORRECTIONS

1. **The Record Contradicts Defendants' Claim That Plaintiff Refused to Complete the Abilities Transcript**

Defendants' memorandum (doc. 29) opens with the unfounded assertion:

> *"Plaintiff Ehiremen Bennard Eriakha, a doctoral student in the University of Mississippi's Department of Pharmacy Administration* refused *to complete a required self-assessment unless the Department provided him with a* mentor of his choice *and* excused him *from an in-person meeting with the mentor".*

The contemporaneous record clearly shows that Plaintiff never "*refused*" to complete the Abilities Transcript ("AT"); he sought only to ensure that its completion occurred within lawful, policy-compliant mentoring conditions. As documented in *Exhibit D (July 9, 2025 – Response to Abilities Transcript Threats),* Plaintiff repeatedly affirmed his willingness to complete the AT in accordance with the procedures established in the *July 19, 2024 Mentor–Mentee Agreement (Exhibit A)* and the *Department's own Abilities Transcript policy and guide (Exhibits P and Q).* Those documents expressly required that the AT process occur within a mentoring environment that is supportive, psychologically safe, and professionally respectful—conditions the Department itself pledged to uphold.

The record contains no evidence that Plaintiff ever sought "*a mentor of his choice.*" His position was not one of preference, but of policy continuity—to preserve the mentoring relationship that had already been formalized, documented, and approved by the Department. He sought adherence to the existing structure, not alteration of it.

Likewise, Defendants' claim that Plaintiff sought to be "*excused*" from an in-person meeting is a gross distortion. The record shows that Plaintiff objected only to being compelled into a closed-door, in-person meeting with two faculty members in violation of the signed Mentor–Mentee

4

Agreement, principles of mentoring ethics, and the University's own Title IX–aligned standards of professional conduct.

Plaintiff sought only that the Department honor the express terms of the formally signed Mentor-Mentee Agreement that explicitly guaranteed: *"one-on-one mentorship"*; *"a mentoring environment that is intellectually stimulating, emotionally supportive, safe, equitable, and free of harassment"*; and *"respect for students as individuals regardless of age, sex, gender, race, color, national origin, religion, disability or sexual orientation."* Those expectations were not inventions of convenience; they are explicitly embedded in the ***Mentor–Mentee Agreement (Exhibit A)*** and in the Department's own policies.

## 2. Procedural Violations, Not Academic Judgment, Led to the Provisional Status and Assistantship Termination

Defendants attempt to portray procedural violations as a routine "academic measure", with the statement:

> *"After several warnings, Plaintiff was placed on 'provisional status' but 'was not removed' from his program of study. Because he was on provisional status, Plaintiff was not eligible to serve as a graduate assistant during the Fall 2025 semester."*

collapses under the weight of evidence to the contrary. Plaintiff was downgraded to "provisional status" on **August 21, 2025**—after the start of the academic semester—in direct violation of the University's mandatory procedural safeguards. Under the University's M Book, such a downgrade may occur only **(1)** between semesters or enrollment periods, **(2)** following a documented academic performance deficiency, and **(3)** after formal review by an appropriate faculty committee. None of these conditions was met.

The following day, **August 22, 2025**, the status downgrade was ratified by the Dean of the Graduate School, and that same day, Plaintiff's Graduate Research Assistantship was terminated by the Department Chair, expressly invoking the newly imposed provisional status as the sole justification. The timing speaks for itself—an academic downgrade in the morning followed by termination that same evening. These events, thoroughly documented in Plaintiff's Memorandum of Law (***Docket. 23, pp. 19–22; Exhibits. L & M***), reveal a pattern of premeditated planning and calculated coordination.

Defendants' assertion that Plaintiff *"was not removed"* from the program is form over substance. It is as inaccurate as it is dismissive. It ignores the constitutional and practical reality that the combined effect of their actions—an unauthorized status downgrade immediately followed by the termination of all financial support—operated as a constructive expulsion. The Graduate Research Assistantship was not a peripheral privilege; it formed the foundation of Plaintiff's academic continuity, providing his sole income and enabling his enrollment, housing, and F-1 visa compliance. Out of necessity, Plaintiff and his twin brother have established a verified GoFundMe campaign to secure minimal support for food, rent, and other basic living expenses during this period of deprivation (available at *https://shorturl.at/Qzkr0*).

To claim that Plaintiff *"remained in the program"* while deliberately stripping away the means necessary to remain enrolled reflects not academic oversight, but administrative indifference of a constitutional magnitude. The knowing deprivation of livelihood, standing, and legal status under the pretense of discretion is not an exercise of professional judgment—it is conscience-shocking conduct.

### 3. The Mentor–Mentee Agreement Was Binding and Could Not Be Unilaterally Altered

Defendants attempt to undermine their own department-approved, signed formal Mentor-Mentee Agreement with the statement:

> *"This document discussed the parameters of the mentoring relationship between Plaintiff and Dr. Huang, but it did not prohibit the Department from assigning Plaintiff a different mentor for 'any reason'."*

provides further evidence of the unethical practices and procedural irregularities that Plaintiff advocates against. Contrary to Defendants' assertion, the Department had no authority to unilaterally restructure Plaintiff's signed mentoring agreement without his consent or policy authorization. The assertion misconstrues both the language and the legal character of the ***July 19, 2024 Graduate Mentor–Mentee Agreement (Exhibit A)***. The Mentor-Mentee Agreement is not a casual administrative form; it is a bilateral commitment designed to safeguard the quality, stability, and integrity of graduate mentorship. It expressly guarantees regular *one-on-one* meetings and obligates the mentor to provide an environment that is *"intellectually stimulating, emotionally supportive, safe, equitable, and free of harassment."* These are enforceable institutional promises rooted in professional ethics and the University's own published policy.

## 4. The Abilities Transcript is a Reflective Tool, not a Graded Assignment or Disciplinary Tool

The evidence shows that the Abilities Transcript ("AT") was designed for developmental self-assessment—not as an evaluative instrument to justify termination of Graduate Research Assistantship or downgrade to "provisional status."

> *"Plaintiff and Dr. Huang corresponded between June 11 and 13, 2025, to discuss a time to meet to discuss and complete his Abilities Transcript, a project he acknowledged was 'required' to be completed by June 15."*

7

The AT is not an academic "*project*" or graded deliverable—it is a formative mentoring tool, expressly designed to promote self-reflection and constructive dialogue between a graduate student and their assigned mentor. Its stated purpose is developmental, not evaluative. The University's own AT Student Manual makes this clear, describing the AT as "*not a grading instrument, but a tool to aid in fostering growth and development*". (***Exhibit Q – 2024 AT Guide***).

Similarly, the Department's Policies and Procedures (***Exhibit S***) define the AT as an element of the annual mentoring process—specifically, an "Abilities Consensus Meeting" intended to promote reflection, identify developmental goals, and strengthen the trust and psychological safety essential to effective mentorship. Nowhere do these policies describe the AT as evaluative, coercive, or disciplinary in nature. Repurposing such a document into a mechanism for sanction fundamentally distorts both its design and the spirit of the policies that govern it.

## 5. The June 13 "Co-Mentorship" Decision Was Unsupported by Policy and Lacked Mutual Consent

Defendants' description of the **June 13** restructuring:

> "*On June 13, 2025, Defendant Yi Yang, the Department Chair, informed Plaintiff that she would 'serve as Plaintiff's co-developmental mentor with Dr. Huang.'*"

omits that the Department Chair's self-appointment as "co-mentor" occurred without mutual consent and outside any established procedural framework. Dr. Yang's unilateral decision to insert herself as "co-developmental mentor" was an unauthorized restructuring of a mentoring relationship that had been formally established, approved, and documented under a signed Mentor–Mentee Agreement (***Exhibit A – July 19, 2024***).

8

That Agreement expressly adopted a *one-on-one* mentoring model between Plaintiff and Dr. Yinan Huang. It emphasized the creation of an environment that was *"intellectually stimulating, emotionally supportive, safe, equitable, and free of harassment."* The Agreement was not a mere formality; it was a bilateral commitment that bound both parties—and, by extension, the Department itself—to a relationship founded on trust, transparency, mutual respect, and psychological safety.

Neither the Department's Policies and Procedures (***Exhibit S***) nor the executed Mentor–Mentee Agreement authorizes the unilateral restructuring of a mentoring relationship into a *two-on-one* arrangement without prior consultation, documentation, or mutual consent. Dr. Yang's self-appointment as co-mentor was therefore an extraordinary procedural deviation.

## 6. The June 18 Meeting Was Imposed, Not Mutually Scheduled

While defendants selectively frame the **June 18** meeting by stating:

> *"Dr. Yang scheduled an in-person meeting for herself, Plaintiff, and Dr. Huang on June 18, and she confirmed that the deadline for Plaintiff to submit his Abilities Transcript would be extended through June 19."*

the record clearly shows that the **June 18** meeting was not arranged through mutual agreement or collaboration—it was a meeting imposed over Plaintiff's documented objections, and while his procedural concerns remained unresolved. As shown in ***Exhibit B (June 24, 2025 Email Thread)***, Plaintiff consistently affirmed his willingness to complete the Abilities Transcript ("AT") but requested two simple clarifications before proceeding: **(1)** the policy basis for the sudden and unilateral "co-mentorship" restructuring that violated the signed Mentor–Mentee Agreement (***Exhibit A***), and **(2)** the rationale for attempting to compel a closed-door, in-person meeting

9

between plaintiff and two faculty members when a virtual format had already been approved by his assigned mentor.

Despite Plaintiff's measured and policy-grounded requests for clarification, the Department Chair unilaterally insisted on an in-person meeting—disregarding both the good-faith nature of Plaintiff's procedural inquiries and the University's own mentoring safeguards.

## 7. Plaintiff's June 13 Email Reflected Policy Inquiry

Defendants attempt to misstate the '*tone and substance*' of Plaintiff's **June 13** correspondence, which raised legitimate policy questions about mentoring structure—questions that were neither answered nor acknowledged by departmental leadership by selectively stating:

> "*Plaintiff responded the same day and told Dr. Yang he had 'reviewed the departmental policies and did not see any provision stating that developmental mentors can be reassigned or restructured without mutual agreement between the mentor and mentee.' Plaintiff also expressed a preference for a virtual meeting rather than the in-person meeting Dr. Yang had proposed.*"

This selective framing again collapses under the weight of evidence and factual record. The record shows that at the time of this correspondence, the only operative document—the duly executed **UMSOP Mentor–Mentee Agreement** (attached as **Exhibit A**)—formally established a *one-on-one* mentoring relationship between Plaintiff and Dr. Yinan Huang.

On **June 13, 2025**, Dr. Yi Yang unilaterally announced her self-appointment as "co-developmental mentor" absent Plaintiff's consent or mutual agreement. Recognizing that this sudden change violated the terms of his existing Mentor–Mentee Agreement with Dr. Yinan Huang and appeared to contravene department policy, Plaintiff sought clarification rather than blindly acquiescing.

Plaintiff's **June 13** email sought to clarify whether any departmental or university policy authorized such a unilateral restructuring of the established mentoring agreement. In the same

10

correspondence, he reaffirmed his preference for a virtual meeting—a format already accepted by his assigned mentor, Dr. Yinan Huang, and fully consistent with the University's own principles of mutual consent, collaboration, and psychological safety in mentoring (*Exhibit B, June 11–13 emails*).

## 8. Defendants' Evolving Justifications Reveal the Lack of Policy Basis for the Restructuring

The Department's justification for unilaterally altering Plaintiff's mentoring structure has shifted repeatedly—each iteration further undermining its credibility. The initial claim:

> *"Dr. Yang responded that the change in Plaintiff's developmental mentor structure was approved by all tenured faculty recently in the department to support Dr. Huang's professional development as a faculty member."*

was later reframed as an act of "*faculty protection*," and eventually rebranded as one of "*mentoring continuity.*" None of these explanations is supported by contemporaneous documentation or any policy authorizing such a structural alteration. The evolution of these rationales reveals not a legitimate academic purpose but a post hoc rationalization of an act that was procedurally and ethically defective from its inception.

The *UMSOP Mentor–Mentee Agreement* (*Exhibit A*) was not merely an administrative form—it was a mutual commitment establishing a *one-on-one* mentoring relationship defined by transparency, respect, and consent. By unilaterally inserting herself as co-mentor, Dr. Yi Yang breached both the letter and the spirit of the agreement, thereby compromising the trust and confidentiality essential to mentorship. A mentoring process that excludes the student from decisions about his own professional development is not supportive—it is coercive.

## 9. The Record Refutes Defendants' Account of the Meeting Format and Intent

What Defendants portray as routine "confirmation":

> *"She also stated that she had confirmed Dr. Huang had intended for the developmental meeting to be in person. Dr. Huang confirmed that the developmental meeting would be in person."*

was, in truth, an administrative override of a prior agreement—an act inconsistent with policy, unsupported by authority, and emblematic of the procedural irregularities at the heart of this case. As reflected in *Exhibit B* (*June 2025 Email Thread*), Dr. Yinan Huang initially expressed complete flexibility regarding the meeting format and explicitly agreed to conduct the mentoring meeting virtually. That agreement was consistent with both the letter and spirit of the Mentor–Mentee Agreement (*Exhibit A*) and established practice.

The record clearly shows that the shift and imposition of an in-person requirement did not originate from Dr. Yinan Huang but from Department Chair Dr. Yi Yang, who entered Dr. Huang's office during a virtual (Zoom) research meeting between Plaintiff and Dr. Huang, unilaterally declaring that the meeting "must be held in person." Discovery will provide further details regarding this event. No departmental policy, Graduate School rule, or University regulation authorized that a developmental mentoring meeting must be held in person, nor was any written rationale ever provided. This abrupt reversal, imposed by administrative fiat rather than mutual consent, disregarded both the governing mentorship agreement and the student's right to a mentoring environment grounded in respect, transparency, psychological safety, and free of harassment and intimidation.

## 10. Plaintiff's June 14 Email Was a Policy-Grounded Clarification

Defendants attempt, yet again, to misstate the '*tone and substance*' of Plaintiff's **June 14** correspondence, which raised legitimate ethical and policy questions about mentoring structure

and practices—questions that were neither answered nor acknowledged by departmental leadership, by selectively stating:

> *"Plaintiff responded with an email the next day 'challenging' Dr. Yang's participation in his mentoring process, asserting without explaining that her involvement would 'override [his] right to a safe, supportive, and non-coercive mentoring environment' and 'bypass [his] agency or compromise the autonomy that is fundamental to effective mentorship.'"*

This selective framing of '*tone and substance*' collapses yet again under the weight of the evidence and factual record. Plaintiff did not "*challenge*" authority or "*refuse*" to engage in the mentoring process. Rather, upon learning that his signed *one-on-one* Mentor–Mentee Agreement (*Exhibit A*) had been unilaterally altered—without consultation, documentation, or any citation to policy— Plaintiff exercised his right and duty to seek clarification.

The **June 14, 2025** correspondence (*Exhibit B*) demonstrates a tone of professionalism and respect throughout. Plaintiff expressed gratitude for the faculty's time, reiterated his willingness to complete the Abilities Transcript, and calmly requested clarification regarding the administrative authority and procedural basis for the sudden restructuring of his mentoring arrangement. His concurrent request to continue with a virtual meeting format—already accepted by Dr. Huang— was a principled, policy-based request that aligned with both the letter and spirit of the Mentor– Mentee Agreement and established practice. Defendants' decision to mischaracterize this correspondence as a "*challenge*", despite the record's clear tone of professionalism, underscores the heart of this dispute.

## 11. The Request for a Virtual Meeting Reflected Ethical Prudence

Defendants' attempt to mischaracterize Plaintiff's effort to preserve transparency, balance, and psychological safety within the mentoring environment as "objection" further strikes at the heart of this dispute:

> *"Plaintiff also 'objected' to meeting in person, claiming that imposing an in-person format without clear justification or mutual agreement risks compromising psychological safety and may diminish the openness and quality of the mentoring exchange."*

Plaintiff's assigned mentor, Dr. Yinan Huang, had already expressed full flexibility regarding a virtual format under the signed Mentor–Mentee Agreement (***Exhibit A***)—an agreement explicitly designed to ensure mentoring interactions occur within a *"safe, equitable, and supportive environment."* It was Dr. Yi Yang—who is not Plaintiff's mentor and who held administrative authority over both parties—that unilaterally imposed an in-person format, without reference to any University policy or procedural authority authorizing such action.

Even assuming, arguendo, that Plaintiff's assigned mentor had not previously agreed to a virtual meeting, given the unexplained departure from normal protocol and the power imbalance inherent in such a meeting, Plaintiff's preference for a transparent, open format was ethically justified, professionally sound, and fully consistent with University policy and mentoring best practices. The record reflects that two faculty members sought to compel Plaintiff into a closed, in-person meeting involving only the three of them—despite Plaintiff's documented and reasonable concerns regarding psychological safety and the need for transparency. The insistence and imposition of an in-person format disregarded well-established principles of mentoring ethics, power-balance awareness, and Title IX-aligned standards of professional conduct, all of which emphasize the student's right to a psychologically safe and non-coercive environment.

14

As Plaintiff rightly noted at the time: *"No student should be coerced into a private meeting that compromises comfort, transparency, or perceived safety, particularly where a reasonable alternative exists."*

### 12. Plaintiff's Policy Clarification Was Fully Supported by Departmental Rules

Defendants' reliance on a single sentence from the Department Chair's email:

> *"Dr. Yang told Plaintiff that '[t]he developmental mentor for PHAD graduate students is assigned by the department chair.'"*

misrepresents both the scope and the substance of the governing policies. The *2024–2025 Department of Pharmacy Administration Policies and Procedures Manual* provides that the Chair assigns each student's initial developmental mentor, not that the Chair may unilaterally restructure an existing mentoring relationship or override a signed Mentor-Mentee agreement.

Plaintiff's assigned mentor is Dr. Yinan Huang. On **July 19, 2024**, at the outset of his doctoral studies, Plaintiff and his assigned mentor, Dr. Yinan Huang, signed a formal **Mentor–Mentee Agreement** (*Exhibit A*). That agreement established a *one-on-one* relationship built on mutual trust, respect, and confidentiality, explicitly guaranteeing a mentoring environment that was "intellectually stimulating, emotionally supportive, safe, equitable, and free of harassment."

Plaintiff's **June 14, 2025** correspondence (***Exhibit B***) properly invoked this agreement, requesting clarification of the policy basis for its sudden alteration. Rather than provide a substantive response or cite any applicable rule, the Department later inserted new language into its recent *2025-2026 Policies and Procedures Guide*—retroactively authorizing the very discretion Plaintiff had questioned. In an **August 29, 2025** email, the department's chair, Dr. Yi Yang, wrote:

15

> *"You will have the same developmental mentor throughout your time in our program unless the department chair or faculty determine that a change in mentorship is necessary due to special circumstances." (Exhibit Y)*

This post hoc revision confirms what Plaintiff's inquiry had already revealed: at the time of the June restructuring, no policy authorized the Department Chair to unilaterally impose or alter a signed *one-on-one* mentorship agreement.

## 13. Requests for Clarification Were Grounded in Documented Policy, Not Personal Preference

Defendants' characterization of Plaintiff's communications as mere "concerns" or "preferences" misrepresents their substance and purpose:

> *"Plaintiff responded that his concerns about the mentoring process and preference for a virtual meeting were 'neither acknowledged nor addressed.'"*

In reality, Plaintiff's correspondence identified clear and verifiable violations of the Department's own Policies and Procedures and of the executed *2024–2025 Mentor–Mentee Agreement (**Exhibit A**)*. His **June 14** and **June 24, 2025** emails (***Exhibit B***) did not express personal dissatisfaction— they raised concrete procedural issues, including the Department's unilateral alteration of his mentoring structure and the imposition of an in-person meeting without policy authority, documentation, or mutual consent. Rather than address these legitimate inquiries, the Department ignored its own procedural safeguards and escalated directives. The question was never one of Plaintiff's compliance, but of the Department's adherence to its own rules.

## 14. The June 18 Exchange Must Be Understood Within Its Full Procedural Context

Defendants' reliance on the isolated statement:

> *"On the date and time of the scheduled June 18 meeting, Dr. Huang emailed to ask whether Plaintiff intended to attend."*

misrepresents both the sequence and the substance of events. The **June 18** exchange cannot be divorced from the procedural context that defined it.

Plaintiff did not "fail to attend" a validly convened meeting. Rather, he paused participation pending clarification of a newly imposed and procedurally irregular structure—an in-person "co-mentorship" meeting mandated without policy authority, without mutual consent, and in direct conflict with the signed *2024–2025 Mentor–Mentee Agreement* (***Exhibit A***).

As reflected in his **June 14** and **June 17, 2025,** correspondences (***Exhibit B***), Plaintiff explicitly confirmed his willingness to engage in the mentoring process once the Department clarified the administrative authority and procedural basis for the restructuring. The **June 18** exchange, viewed in its proper context, evidences Plaintiff's respect for institutional policy and adherence to due process.

## 15. The Record Demonstrates Plaintiff's Willingness to Complete the Abilities Transcript in Accordance with Policy

Defendants' assertion:

> *"He again acknowledged the importance of completing the Abilities Transcript and noted that Dr. Marie Barnard, the Graduate Program Coordinator, had 'recently followed up' to remind him about that requirement."*

mischaracterizes both the substance and spirit of Plaintiff's position. Plaintiff never opposed the Abilities Transcript ("AT") or questioned its value. His communications consistently affirmed the AT's intended purpose as a formative, self-reflective instrument to promote open dialogue between mentor and mentee—not as a tool of coercion or discipline. From the outset, Plaintiff demonstrated

17

readiness to complete the AT within the procedural and ethical boundaries set forth by the University's own mentoring policies, emphasizing mutual consent, professional respect, and transparency.

## 16. Protected Advocacy Cannot Be Miscast as Defiance

Defendants' attempt to portray Plaintiff's principled insistence on procedural fairness as "defiance"—using phrases like "*on his own terms*"—collapses under the weight of the record itself:

> *"Plaintiff told Dr. Yang he was 'eager' to complete the task, but only 'in a mentoring environment that is respectful, student-centered, and aligned with institutional expectations.' In other words, he would only agree to complete the assignment on his own terms."*

The **June 24, 2025** correspondence (***Exhibit B***) reveals a student eager to complete the Abilities Transcript ("AT") in full compliance with the University's own mentoring framework, ethical standards, and signed agreements.

He asked for nothing more than adherence to the very principles the University itself proclaims: respect, transparency, mutual consent, and psychological safety. These were not *"Plaintiff's own terms—They are the University's"*.

## 17. The Dean's Endorsement Provided No Policy or Evidentiary Support

Defendants cite the Dean's email response:

> *"The Dean of the Graduate School, whom Plaintiff had added to this email exchange several days earlier, responded the same day and confirmed that '[t]he change in mentor structure is appropriate as outlined in the information provided by Dr. Yang.'"*

But this statement carries no independent weight. The Dean's message merely echoed departmental assertions, offering neither citation to governing policy nor reference to any

18

evidentiary record supporting the unilateral restructuring. It identified no provision of the *2024-2025 Department's Policies and Procedures Manual*, no clause of the *signed Mentor–Mentee Agreement* (*Exhibit A*), and no record of faculty deliberation authorizing such a unilateral change. The email provides no indication of what "*information provided by Dr. Yang*" was reviewed, what standard guided the Dean's assessment, or whether Plaintiff's documented procedural and ethical objections were considered in good faith.

**18. The Record Exposes Retaliatory Pretext Disguised as Mentoring Oversight**

Defendants' narrative that:

> "*Dr. Barnard also responded to Plaintiff's June 24 email to inform him that the faculty needed his Abilities Transcript to discuss his performance and progress and that his reappointment for a graduate assistantship 'hung in the balance'.*"

collapses under the weight of its own contradictions. The record shows that rather than address Plaintiff's valid procedural questions, Defendants escalated the situation almost immediately after **June 18**. On **June 24, 2025**, Dr. Marie Barnard warned Plaintiff that his graduate assistantship "*hung in the balance*" unless the Abilities Transcript ("AT") was submitted within twenty-four hours. Yet less than a week later, on **June 30, 2025**, the same administrator abruptly abandoned that "*employment-related consequence*" and invoked an entirely new justification: "*academic discipline*"—threatening to recommend a downgrade to "provisional status" if the AT remained incomplete. These rapid, unexplained shifts—from employment-based coercion to academic sanction reveal the retaliatory intent.

Such oscillating justifications are the unmistakable hallmark of pretext. When a university repeatedly shifts its rationale after the fact to defend punitive action, especially in the wake of a student's protected advocacy for procedural fairness, its motives lose any pretense of educational

19

legitimacy and reveal themselves as retaliatory. No University policy authorizes the termination of employment or the downgrading of academic status based on a reflective, non-evaluative self-assessment form. The absence of any governing authority, combined with these contradictory explanations, exposes the actions for what they were: administrative reprisals carried out without due process, devoid of legitimate academic purpose, and in violation of the very institutional integrity the University claims to uphold.

**19. The June 30 Memorandum Functioned as a Coercive Threat, Not an Academic Warning**

The **June 30, 2025** memorandum (***Exhibit C***) was not a legitimate "formal warning," as Defendants claim:

> *"When Plaintiff still did not submit his Abilities Transcript, Dr. Barnard sent him a 'formal warning' on June 30 informing him that his failure to do so by August 15 would 'result in a recommendation to the Graduate Dean that you have a change of status to provisional status.'"*

rather, it was a coercive threat—an instrument of retaliation aimed at punishing protected advocacy and compelling compliance with a procedurally irregular directive.

By the University's own policies (***Exhibits P and Q***), the Abilities Transcript ("AT") is a developmental self-assessment tool intended to promote reflection and mentoring dialogue, not a disciplinary or evaluative device. Repurposing that form as a condition for continued enrollment or employment represented a fundamental departure from established policy, a violation of procedural fairness, and a misuse of administrative power.

The memorandum's timing and tone reveal its retaliatory purpose. Issued just days after Plaintiff's written requests for clarification of procedural irregularities, it transformed a non-evaluative mentoring exercise into a disciplinary weapon. The threat to alter Plaintiff's academic standing for opposing the irregular, unconstitutional, and procedurally defective manner in which Defendants

20

attempted to enforce completion of a non-evaluative tool (AT) was arbitrary, capricious, and retaliatory on its face. It functioned not as an academic notice but as a coercive lever to silence lawful advocacy and coerce submission to an unlawful process.

## 20. The July 9 Letter Was an Evidence-Based Rebuttal, Not "Relitigation"

Defendants' attempt to recast Plaintiff's **July 9, 2025,** letter as mere "relitigation" misrepresents both its purpose and its substance:

> *"Plaintiff responded to Dr. Barnard with an eleven-page memorandum that relitigated his complaints about the mentorship process and the in-person meeting requirement but did not dispute the fact that he had not completed the Abilities Transcript."*

Plaintiff's **July 9, 2025,** letter (***Exhibit D***) was a detailed, evidence-based rebuttal that addressed the procedural violations and administrative irregularities contained in the University's **June 30** memorandum. It identified, with precision, three central breaches of institutional policy: **(1)** the unilateral alteration of a duly executed and signed Mentor–Mentee Agreement, absent mutual consent, and academic justification; **(2)** the coercive directive to attend an in-person meeting with two faculty members despite an established virtual arrangement consistent with University policy and the principles of psychological safety and mutual respect; and **(3)** the repurposing of a non-evaluative, developmental tool—the Abilities Transcript ("AT")—into a coercive instrument for sanction, contrary to University and Graduate School policy.

## 21. The July 17 "Co-Mentorship" Explanation Was Pretextual and Retaliatory

By **July 17,** the Department had abandoned its original rationale for the unilaterally imposed "co-mentorship" arrangement and substituted a new, contradictory one:

> *"On July 17, Dr. Huang informed Plaintiff that Dr. Yang was serving as his co-mentor because Dr. Huang would be leaving the University within the next year and asked him to meet with Drs. Yang and Huang to complete the Abilities Transcript by the August 15 deadline."*

This newly asserted rationale stands in direct conflict with prior explanations. Dr. Yang first claimed the restructuring was implemented *"to support Dr. Huang's professional development."* The Graduate Dean later echoed that justification, deeming the change *"appropriate"* based solely on undisclosed *"information provided by Dr. Yang"*—information never cited, identified, or preserved in any contemporaneous record. Yet Dr. Huang herself later contradicted both accounts, admitting that the change was made *"to protect me,"* acknowledging her planned departure from the University and describing the decision as one intended *"to keep the faculty happy."* These shifting explanations cannot all be true—and their inconsistency is telling.

If, as Dr. Huang admitted, the restructuring was undertaken *"to protect"* faculty members rather than to advance the student's educational development, it constitutes an abuse of administrative authority fundamentally at odds with both constitutional principles and the University's own policies. At a minimum, these contradictions raise material factual disputes regarding motive, fairness, and compliance with the **First Amendment**, the **Due Process Clause**, and the **Equal Protection Clause**—disputes that cannot be resolved on a motion to dismiss.

## 22. The July 18–21 Correspondence Demonstrates Policy-Based Advocacy

Defendants' account of the **July 18–21** correspondence:

> *"On July 18, Dr. Yang emailed Plaintiff and again reminded him that the Abilities Transcript was a mandatory requirement for all students, that he must complete it by August 15, and that failure to do so would result in a recommendation to the Graduate Dean to change his enrollment status to provisional. After Plaintiff again complained about the change to his mentorship arrangement and the in-person meeting requirement, the Graduate Dean responded to the email thread."*

22

omits the very context that gives it meaning. Dr. Yi Yang's email acknowledged that "*you may have concerns regarding the AT process,*" yet when Plaintiff responded, measuredly and respectfully, by asking why those legitimate concerns had been met with escalating sanctions rather than constructive dialogue, Dr. Yang did not reply. That silence speaks volumes: it underscores the central issue in this case—the Department's unwillingness to engage in the very accountability its own policies require.

At no point did any University official—Dr. Yang, Dr. Barnard, or Dean Kluck—acknowledge or address the detailed procedural violations and due process deficiencies documented in Plaintiff's **July 9** submission. Instead, they escalated punitive pressure, compounding threats of disciplinary action while ignoring the substantive policy concerns Plaintiff raised in good faith. This pattern raises clear factual issues of motive, fairness, and constitutional compliance—matters that cannot be resolved on the pleadings and that warrant full discovery and judicial scrutiny.

## 23. The August 21–22 Actions Were Procedurally Defective and Retaliatory

Defendants' account of the **August 21–22, 2025** events:

> "*Plaintiff did not complete the Abilities Transcript. On August 21, Dr. Barnard sent Plaintiff a memorandum informing him the Department was recommending to the Graduate Dean that Plaintiff be placed on provisional status. [Doc. 9-10]. The memo also informed Plaintiff he could return to full standing for the Spring 2026 semester if he met with his mentor and completed the Abilities Transcript, met weekly with his thesis advisor to make progress on his thesis, and successfully completed his Fall 2025 classes. Id. The Graduate Dean accepted this recommendation. [Doc. 9-13]. Dr. Yang, the Department Chair, confirmed to Plaintiff by email that he was not eligible for a graduate assistantship during the Fall 2025 semester because of his provisional status.*"

conceals more than it reveals. In both timing and substance, the **August 21–22** actions constituted administrative reprisals, motivated by retaliation, flawed in process, and wholly unsupported by

law or policy. The stated justification for sanctioning Plaintiff, his alleged "failure" to complete the Abilities Transcript ("AT"), collapses under scrutiny.

The Abilities Transcript ("AT") is a developmental, non-evaluative self-assessment tool designed to encourage reflection and mentorship—not a mechanism for grading, discipline, or employment action. According to the department's own description (***Exhibits P & Q, Department guidance on the Abilities Transcript***), the AT is intended to be a *formative* tool to facilitate honest self-reflection and open dialogue between the student and mentor, helping to identify areas for professional development. In keeping with that purpose, the AT process is supposed to occur in a supportive, non-punitive environment. Plaintiff understood this and, at all times, communicated that he valued the AT exercise, was eager and fully committed to completing the AT "*in a mentoring environment that is respectful, student-centered, and aligned with policy expectations.*" In other words, he sought only the adherence to the University's own professed standards of mentorship: respect, transparency, and freedom from coercion.

While wholly disregarding Plaintiff's detailed **July 9** rebuttal letter and depriving him of a meaningful opportunity to be heard, Defendants' decided to weaponize the Abilities Transcript ("AT") as a pretext for punitive measures. This marked a profound departure from established academic norms, procedural due process, and institutional integrity.

On **August 21, 2025**, Dr. Marie Barnard issued a memorandum recommending that Plaintiff be placed on provisional status. The very next day, Dean Annette Kluck ratified that recommendation (***Exhibit M***), issuing a letter that conspicuously omitted every procedural safeguard required under University policy. Within hours, Department Chair Dr. Yi Yang invoked the newly imposed provisional status to terminate Plaintiff's Graduate Research Assistantship (***Exhibit L***)—his sole source of income and the financial condition necessary for continued enrollment. The rapid

24

temporal sequence of these actions—recommendation, ratification, and termination within twenty-four hours—underscores not academic deliberation but retaliatory coordination.

Each action, procedurally defective, substantively baseless, and temporally aligned with Plaintiff's protected advocacy, underscores precisely why this case must proceed beyond the pleadings.

## IV.    DEFENDANTS' ARGUMENTS FAIL

### 24. Defendants' Rule 12(b)(6) Argument Misstates Both Law and Pleading Standard

Plaintiff incorporates by reference the factual chronology and legal arguments in his Memorandum of Law in Opposition to the Motion to Dismiss and attached exhibits, to the fullest extent permitted. See *Fed. R. Civ. P. 10(c)*. A motion to dismiss under *Rule 12(b)(6)* tests the sufficiency of the complaint, not the merits of the case. To survive dismissal, a complaint must contain sufficient factual matter, accepted as true, to *"state a claim to relief that is plausible on its face."* This "plausibility" standard is not a probability requirement; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence to support the claim. Plaintiff's complaint exceeds that threshold with detailed factual allegations of constitutional violations. The Court must accept all well-pleaded facts as true and draw every reasonable inference in Plaintiff's favor. *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)*; *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)*. Accepting the facts as pleaded, Plaintiff's claims are more than plausible—they reveal a coherent pattern of retaliatory, arbitrary, and conscience-shocking conduct—each tied to named defendants and supported by contemporaneous documents. The motion to dismiss should therefore be denied in its entirety.

### 25. Sovereign Immunity Does Not Bar Prospective Relief Against Ongoing Constitutional Violations

25

Defendants' reliance on sovereign immunity collapses under long-settled constitutional doctrine. Under *Ex parte Young, 209 U.S. 123 (1908)*, state officials may be sued in their official capacities for prospective equitable relief to halt ongoing violations of federal law. Plaintiff seeks exactly that—reinstatement of his graduate assistantship and academic standing, expungement of retaliatory sanctions, and declaratory relief ensuring compliance with constitutional safeguards. These forward-looking remedies fall squarely within the *Ex parte Young* exception. See *Edelman v. Jordan, 415 U.S. 651, 664 (1974)*. While the University of Mississippi, as an arm of the State, may enjoy immunity from damages, that protection does not extend to officials who act outside the bounds of lawful authority. *Hafer v. Melo, 502 U.S. 21, 31 (1991)*. Plaintiff alleges exactly that—deliberate constitutional violations by Drs. Yi Yang, Marie Barnard, Annette Kluck, and Yinan Huang, each acting under color of state law to fabricate a non-existent deficiency, bypass due process, and terminate Plaintiff's employment and standing without cause. As the Supreme Court made clear, officials who act unconstitutionally "are stripped of their representative character." *Scheuer v. Rhodes, 416 U.S. 232, 237–38 (1974)*.

Each named Defendant maintains an active and continuing enforcement connection to the challenged deprivations: Dr. Marie Barnard initiated the downgrade to "provisional" status with deliberate indifference to procedural safeguards; Dr. Yi Yang approved and implemented the downgrade and termination despite full knowledge of their illegality; Dr. Annette Kluck, as Dean, ratified both actions, conferring institutional legitimacy on conduct she had the authority—and duty—to prevent; Dr. Yinan Huang, Plaintiff's assigned mentor, acquiesced in and enforced the coercive "co-mentorship" structure that served as the retaliatory pretext. Each defendant therefore satisfies *Ex parte Young's* "connection with enforcement" requirement. Because the resulting

26

deprivations of academic standing, livelihood, and reputation are ongoing, dismissal of the official-capacity claims would be premature.

## 26. Qualified Immunity Cannot Shield Knowing Retaliation or Procedural Abuse

### a. Defendants argue:

> *"The individual defendants are entitled to qualified immunity."*

**Plaintiff Responds:**

Qualified immunity shields only reasonable mistakes made in good faith—not deliberate retaliation, coercion, or procedural manipulation. ***Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)***. Plaintiff's allegations, accepted as true, describe intentional misconduct far outside lawful discretion: transforming a self-reflective mentoring tool into a disciplinary weapon, downgrading academic status in disregard of due process, and terminating employment within twenty-four hours. No reasonable official could believe such conduct lawful. ***Hope v. Pelzer, 536 U.S. 730, 739–41 (2002)***. The rights at stake—freedom from retaliation (***Pickering***), procedural due process in disciplinary actions (***Dixon***; ***Goss***), and equal protection from arbitrary treatment (***Olech***)—were long and clearly established.

### b. Defendants contend:

> *"Plaintiff has not alleged that any defendant violated his clearly established first amendment rights."*

**Plaintiff responds:**

The record establishes precisely the opposite. Between **June 14** and **August 22, 2025**, Plaintiff engaged in protected advocacy—raising documented, policy-based concerns about procedural violations and due process—only to face escalating retaliation, including threats, disciplinary

memoranda, a downgrade to provisional status, and termination of his assistantship. This sequence forms a clear and compelling causal chain: protected activity followed by adverse action.

**c. Defendants argue:**

> *"The University has found no clearly established law holding that a student's refusal to accept department instructions related to his academic program constitutes protected activity. In fact, at least in the public employment context, "it is firmly established that the first amendment's shield does not extend to speech and conduct amounting to insubordination directed at school officials. The speech for which plaintiff seeks protection was his repeated refusal to attend a developmental meeting and complete his abilities transcript unless the department met his demands. Even if plaintiff plausibly alleged that his series of obstinate emails was a motivating factor in the decision to move him to provisional status, he cannot establish that those emails were protected speech."*

**Plaintiff responds:**

Raising documented concerns about due process and policy violations is not *"refusal"* to accept departmental instructions—it is the exercise of a constitutional right. Defendants' characterization of Plaintiff's advocacy as *"insubordination"* collapses under scrutiny. The record shows that Plaintiff's communications were professional, evidence-based, and rooted in legitimate requests for adherence to University policy and procedural fairness. Rather than engaging those substantive concerns, Defendants rely on conclusory labels like *"obstinate"* and *"insubordination,"* devoid of factual support.

**d. Defendants argue:**

> *"Plaintiff has also failed to plausibly allege that any of the defendants took steps to place him on provisional status because he sent a series of emails refusing to comply with their instructions. He does not allege there is any direct evidence of such a motive, and the chronology of events formed by documents referenced in the pleadings makes clear that he was placed on provisional status because he failed to complete the abilities transcript, even after his deadline to do so had been extended three times."*

28

**Plaintiff responds**

Defendants' contention that Plaintiff "*has failed to plausibly allege*" retaliatory motive ignores both the chronology and the context of the record. Plaintiff has, in fact, established a clear prima facie case of retaliation supported by well-pleaded factual allegations. The issue is not what the Department's post hoc documents claim—but what discovery will reveal about the underlying motive, timing, and irregularity of those actions. The chronology tells a consistent story. The **June 24** threat, the **June 30** disciplinary memorandum, the **August 21–22** downgrade, and the **August 22** termination each followed Plaintiff's protected advocacy for procedural fairness and adherence to policy. Discovery will reveal the answers Defendants now evade: Why did scrutiny of Plaintiff suddenly intensify as his twin brother engaged in protected advocacy?; Why was he coerced into a co-mentorship arrangement contrary to a signed agreement?; Why did the University offer shifting, contradictory explanations for its actions?; Why was he pressured into a closed-door meeting with two faculty members despite prior approval for a virtual meeting?; Why were threats of academic and employment sanctions issued days apart by the same administrator?; Why was a non-evaluative, self-assessment tool repurposed as a punitive mechanism—contrary to written policy?; and Why were disciplinary rationales fabricated after the fact to justify a downgrade imposed days into the semester without evidence of academic deficiency or committee review?

Each question underscores the retaliatory pattern that Defendants now seek to obscure behind conclusory denials. At this stage, Plaintiff is not required to prove motive—only to allege facts that plausibly suggest it. He has done so with precision and corroborating documentation. Whether retaliation motivated these actions is a factual question reserved for discovery, not dismissal.

**e. Defendants argue:**

29

*"The record is also clear that defendants would have taken the same action if plaintiff had failed to complete the abilities transcript but had not complained about it. Dr. Yang's July 18 email specifically addressed this…Dr. Kluck echoed this…In other words, Plaintiff was specifically warned that he would face consequences for refusing to complete the abilities transcript regardless of whether he shared concerns about the process. Plaintiff cannot use the First Amendment to forestall these consequences by simply complaining about the mentoring process."*

**Plaintiff responds**

That argument collapses under both logic and chronology. How could a **July 18 email** retroactively justify threats and sanctions that began weeks earlier on **June 24**? Defendants' own timeline betrays their position: the **June 24** threat, the **June 30** disciplinary memorandum, the **August 21-22** downgrade, and the **August 22** termination all followed Plaintiff's protected advocacy—each escalation occurring after he raised documented concerns about procedural irregularities, coercive mentorship restructuring, and policy violations. As the **July 18** correspondence shows, Dr. Yang explicitly acknowledged that Plaintiff *"may have concerns regarding the AT process."* Plaintiff replied respectfully, asking why those concerns were met with punitive measures instead of constructive dialogue. Dr. Yang never responded.

**f. Defendants argue:**

*"Plaintiff also alleges he exercised first amendment rights by maintaining familial association with his twin brother, Omokhodion Alfred Eriakha…the contours of a first amendment retaliation claim for a family member's speech are not at all clear. Plaintiff's complaint cites Adler v. Pataki, in which the second circuit…However, there is no clearly established law in the fifth circuit giving rise to such a cause of action, much less extending it to a relationship between siblings…the individual defendants are entitled to qualified immunity."*

**Plaintiff responds**

That contention fails both logically and constitutionally. The absence of a Fifth Circuit case addressing identical facts does not obscure the clearly established principle that government actors

30

may not punish one individual for another's protected speech. *Adler v. Pataki, 185 F.3d 35 (2d Cir. 1999)*. The Supreme Court has repeatedly held that officials are not entitled to immunity when their conduct "transgresses bright lines of constitutional protection." *Hope v. Pelzer, 536 U.S. 730, 739–41 (2002)*. Every circuit to consider this principle has condemned such conduct, and its logic is self-evident: the Constitution forbids punishing an individual for the protected advocacy of someone with whom they share a close familial bond.

**g. Defendants argue further:**

> *"Even if plaintiff's relationship with his brother could give rise to a potential associational claim, plaintiff has failed to plausibly allege that his brother's complaints were the cause of plaintiff's change to provisional status...plaintiff has failed to state a viable first amendment claim, and the individual defendants are entitled to qualified immunity."*

The record demonstrates the opposite. Plaintiff has plausibly alleged, and documented in his memorandum of law (*Docket. 23, p. 15*), a clear causal sequence linking his brother's protected advocacy to the retaliatory actions taken against him. The events unfolded in a predictable progression: following Alfred's protected complaints, faculty scrutiny of Plaintiff intensified, culminating in his downgrade to provisional status and the termination of his assistantship.

**h. Defendants claim:**

> *"Plaintiff alleges defendants discriminated against him because of his race (Black) and national origin (Africa) in violation of the Equal Protection Clause. To state a claim of sex discrimination...that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent...Only when a complaint pleads and proves that each defendant individually engaged in actions that caused the unconstitutional harm...For instance, a general statement that other similarly situated individuals were treated differently without pointing to a specific person or providing specifics as to their violations, is not sufficient to state an equal protection claim...None of these statements, even if true, are evidence of discriminatory intent."*

31

**Plaintiff responds**

Defendants' argument both misstates the law and misrepresents the record. Plaintiff does not allege sex discrimination; his claim rests on race- and national-origin–based unequal treatment, supported by specific comparators, factual evidence, and documented statements demonstrating discriminatory and retaliatory motive. As detailed in *Exhibit O*, Plaintiff was the only student in the department assigned a forced co-mentorship—while every similarly situated peer retained a single mentor. Plaintiff and his twin brother were the only students subjected to disciplinary threats over a non-evaluative self-assessment form. These are not generalized allegations; they are specific, documented disparities grounded in institutional records. Claims alleging unequal treatment based on race and national origin trigger strict scrutiny, and Plaintiff's allegations comfortably meet the *Rule 12(b)(6)* plausibility threshold. The record—specific, individualized, and corroborated by contemporaneous evidence—supports far more than a speculative inference of discrimination; it establishes a prima facie case warranting discovery into Defendants' motives and decision-making processes, where the full scope of discriminatory intent can be examined under the constitutional lens it deserves.

### i. Defendants maintain:

> *"Moreover, only one of these statements, Dr. Yang's purported statement that Plaintiff and his brother dominate conversations was both about plaintiff and made by a defendant with supervisory authority within the department."*

**Plaintiff responds**

That contention misses the point. Discriminatory animus is not absolved by job title or confined to a single speaker. The fact that one remark was made by a supervisor does not render other racially charged comments by faculty members, including Plaintiff's assigned mentor, benign or

irrelevant. Nor does it erase the cumulative impact of those remarks within a close-knit academic department. Discrimination rarely manifests as a single statement; it emerges through patterns of tone, repetition, and coordinated behavior that reinforce bias and unequal treatment. Here, the comments attributed to multiple faculty members share the same racialized and retaliatory undertones, revealing a consistent pattern of differential treatment. The Equal Protection Clause guards against the collective operation of bias, not merely its most overt expression. To isolate one remark and disregard the rest is to ignore how discrimination functions in real institutional environments—through subtle reinforcement and cumulative harm.

### j. Defendants argue:

> "Plaintiff also alleges that upon information and belief, he was treated differently than similarly situated white or U.S. born student, but he points to no specific person and makes no factual allegation about their circumstances. He notably does not allege that any non-Black student who refused to complete an abilities transcript was treated differently than himself...Plaintiff has failed to state an equal protection claim."

### Plaintiff responds

Defendants' argument collapses under its own premise. Plaintiff did not "refuse" to complete the Abilities Transcript; he raised good-faith procedural and policy concerns—concerns expressly protected under both University policy and constitutional law. Even setting aside that mischaracterization, the issue extends far beyond the Transcript itself. Before any question of completion arose, Plaintiff was subjected to conditions no other student faced: the forced imposition of a co-mentor and the requirement of a closed-door, in-person meeting with two faculty members—actions taken in direct violation of his signed mentoring agreement and contrary to university practice. As documented in *Exhibit O*, no similarly situated student—white or U.S.-born—was subjected to such coercive measures or threatened with academic and employment

33

sanctions tied to a developmental, non-evaluative form. These disparities are not conjecture; they are substantiated by the department's own records.

**k. Defendants argue:**

> *"Plaintiff alleges defendants violated his procedural and substantive due process rights...Here, the individual defendants are entitled to qualified immunity because there is no clearly established law creating a property interest in good standing or non-provisional status...Plaintiff has not alleged he was removed – even temporarily – from his graduate program, and his status change was not disciplinary in nature. Nor does the mentor-mentee document create a cognizable property interest, as it does not limit the university's ability to change the mentorship program. Plaintiff does not, as he suggests, have a property interest in the renewal of his graduate assistantship because he has not alleged a legitimate claim of entitlement to it."*

**Plaintiff responds**

Defendants' argument fails both factually and legally. Repurposing a developmental mentoring document into a disciplinary weapon is not an *"academic act"*; it is administrative coercion disguised as scholarship. Likewise, downgrading a student's standing in direct violation of university policy is not academic judgment—it is procedural misconduct with constitutional consequences. Plaintiff maintained a 4.0 GPA and a spotless record. To characterize his downgrade as *"non-disciplinary"* strains credulity.

Clearly established law requires universities to adhere to their own procedural safeguards and to afford students fair process before depriving them of any recognized interest. ***Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961).*** The signed Mentor–Mentee Agreement created a legitimate expectation of stability within the mentoring relationship—an expectation Defendants could not unilaterally discard without justification. Altering that agreement in violation of governing policies constituted a deprivation of a protected interest without due process. Plaintiff also held a protected property interest in his Graduate Research Assistantship, renewed for two

34

consecutive years and serving as his sole source of income. Defendants were fully aware that this assistantship was integral to his continued enrollment, housing, and F-1 visa compliance. Its sudden termination—without cause, notice, or hearing—just days into a new semester was not merely arbitrary; it was conscience-shocking. Defendants' assertion that Plaintiff *"was not removed"* from the program is misleading. The combined impact of the unlawful downgrade and immediate termination of financial support amounted to a constructive expulsion, executed with deliberate indifference to its predictable harm. Plaintiff and his twin brother have established a verified GoFundMe campaign to obtain minimal support for food, rent, and other basic living expenses during this period of this deprivation (available at *https://shorturl.at/Qzkr0*).

1. **Defendants contend:**

> *"A public university is not required to afford significant process before dismissing a student on academic grounds…Plaintiff cannot state a procedural due process claim. Nor could plaintiff state a substantive due process claim if he had alleged the existence of a property interest. Public officials violate substantive due process rights if they act arbitrarily or capriciously…Plaintiff must show that the challenged decision so lacked a basis in fact that it could be said to have been made without professional judgement…Defendants conduct cannot be said to have been arbitrary and capricious and plaintiff cannot state a substantive due process claim."*

**Plaintiff responds**

Defendants' argument collapses under its own weight. The sanctions imposed were not academic in nature—they were administrative reprisals masquerading as academic judgment. Repurposing a developmental self-assessment form into a disciplinary weapon, fabricating deficiencies in an exemplary record, ratifying a status downgrade in direct violation of university policy, and terminating employment within hours of that downgrade are not exercises of professional judgment. They are acts of arbitrariness and retaliation, plain and simple.

The Constitution does not shield misconduct merely because it occurs in an academic setting. Plaintiff's record, 4.0 GPA, timely progress, and full compliance with all programmatic requirements, contradicts any suggestion of academic deficiency. ***Bd. of Curators v. Horowitz, 435 U.S. 78 (1978)***, and ***Regents of the Univ. of Michigan v. Ewing, 474 U.S. 214 (1985)***, protect genuine academic decisions—not bad-faith administrative coercion disguised as pedagogy. Furthermore, ***Dixon v. Alabama State Bd. of Educ., 294 F.2d 150 (5th Cir. 1961)***, clearly established more than sixty years ago that public universities must follow their own policies and afford due process before imposing adverse actions. Here, Defendants disregarded their established procedure and policy in executing a downgrade and termination that effectively expelled Plaintiff from the program. Such omissions are not discretionary; they are constitutional violations and meets every standard of arbitrary and capricious behavior under the Due Process Clause.

## I. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Honorable Court:

a. Deny Defendants' Motion to Dismiss in its entirety;

b. Permit this action to proceed to discovery; and

c. Grant such further equitable relief as justice requires, including declaratory and injunctive relief restoring Plaintiff's Graduate Research Assistantship, academic standing, and full constitutional protections.

Respectfully submitted this 9th day of October, 2025.

Ehiremen Bennard Eriakha, Plaintiff, Pro Se

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2025, I delivered the foregoing to the Clerk of Court for filing and served a true and correct copy by email upon:

**Paul B. Watkins, Esq.**

Mayo Mallette PLLC

Email: pwatkins@mayomallette.com

(cc: Brooke Jackson, bjackson@mayomallette.com)

Executed this 9th day of October, 2025, in Oxford, Mississippi.

Ehiremen Bennard Eriakha

Plaintiff, pro se

1802 Jackson Ave. W., Apt. 83

Oxford, MS 38655

Tel: (662) 281-4676

Email: eriakhabernard@gmail.com